## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DONALD DWAYNE WHATLEY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CIV. ACT. NO. 1:19-cv-938-TFM-N** |
| **JEFFERSON D. DUNN,** | ) | |
| **Commissioner, Alabama Department** | ) | |
| **of Corrections** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioner, Donald Whatley, a state prisoner currently in the custody of the Alabama Department of Corrections, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Whatley challenges the validity of his 2008 conviction for capital murder in the Circuit Court of Mobile County, Alabama. This matter is now before the Court on Whatley's petition (Doc. 9), Respondent's Answer (Doc. 17), and the briefs, responses, and exhibits filed by the parties, including the 35-volume record of state-court proceedings. (*See* Docs. 2, 20). Following a thorough review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[1] For the reasons set forth below, the Court finds that Petitioner Whatley's petition for writ of habeas corpus is **DENIED** in its entirety.

---

[1] Because Whatley filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1337 (11th Cir. 2004). Whatley has failed to establish that an evidentiary hearing is warranted in this case. *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc) ("The burden is on the petitioner . . . to establish the need for an evidentiary hearing.").

I.   FACTUAL AND PROCEDURAL BACKGROUND

In September 2006, Petitioner Whatley was indicted by the Mobile County, Alabama Grand Jury of capital murder in violation of ALA. CODE § 31A-5-40(a)(2) ("Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant."). (Doc. 2-25). After entering a plea of not guilty to the charges, a jury trial was held in the Circuit Court of Mobile County, Alabama in November 2008, where Whatley was represented by court appointed attorneys Gregory Hughes and Lee Hale, Jr. (Doc. 2-1 at 2, 15-16). The facts of this case are summarized as follows:[2]

> On the morning of December 29, 2003, Kenneth McCall, an employee of Austal Crosby Joint Venture, went to his work site under a bridge in Mobile and discovered the victim's body lying on the ground near the entrance gate to the work site. He telephoned emergency 911. The state medical examiner, Dr. Kathleen Enstice, testified that Patel died of "multiple traumatic injuries" that included numerous injuries to his head, neck, sternum, and shoulder. Dr. Enstice testified that the injuries to his face were consistent with a beating, that the injury to his neck was consistent with strangulation, and that the injuries to his upper body were consistent with having been run over by a vehicle. Patel's pants, Dr. Enstice said, were around his neck. Cigarette butts were found near the victim's body. DNA testing on one of the cigarettes matched Whatley's DNA.
>
> Testimony also established that Patel had been at Gabriel's, a bar in downtown Mobile, on the evening of December 28, 2003, with another male. Joseph Jones testified that he saw Patel drive up to Gabriel's and approach Whatley, who had been standing outside the bar. The two then went inside the bar together. On January 4, 2004, Patel's vehicle was discovered partially submerged in a large mud hole off Theodore Dawes Road. The vehicle had been set on fire. Sam Stevens of the Mobile Fire Department testified that he found an ignitable liquid behind the

---

[2]    The summarization of facts is quoted from the Alabama Court of Criminal Appeals' opinion. *See Whatley v. State*, 146 So. 3d 437, 449–51 (Ala. Crim. App. 2010). AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." *Bui v. Haley*, 321 F. 3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." *Id*. (citing *Sumner v. Mata*, 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)). These facts are recited in the memorandum opinion of the Alabama Court of Criminal Appeals on Whatley's direct appeal of his trial and conviction. *See Whatley v. State*, CR-08-0696, 146 So. 3d 437, 449-51 (Ala. Crim. App. 2010).

driver's seat in the vehicle. Sharee Wells of the Alabama Department of Forensic Sciences testified that the substance on the floor of the vehicle was gasoline.

Officer Steve Thrower, an investigator with the district attorney's office in Beaumont, Texas, testified that on August 4, 2006, Whatley was at the police station in Texas when Whatley told him that he had committed a murder in Mobile, Alabama, and wanted to confess. Officer Thrower read the following statement Whatley made to him:

"I know I don't have to talk to anyone about this and no one from the police department or from the [district attorney's] office is making me do this. I fully understand that Alabama can seek the death penalty against me but the Lord had put it on my heart to tell what I did so I'm going to tell it.

Back in 2003 around December 29th I killed a man by the name of Pete Patel. I'm not sure what the proper spelling of his name is and I think Pete was just a nickname. But he was a man of Indian descent that owned a small motel by the name of the Budget Inn in Mobile, Alabama. On the night the murder happened, I had gone to a local gay bar there in Mobile by the name of Gabriel's to look for someone to rob. It was there that I first met Pete. We made small talk and he hit on me for sex. I agreed to go with him and we left the bar in his car. I don't remember what time it was but it was pretty late. To the best of my knowledge I think his car was a light green Honda. Pete was driving when we left the bar and we went to the Africatown Cochran Bridge. When we got there we got out of the car and sat on the hood. I smoked a cigarette. We were talking and he put his hand on my leg. That just freaked me out so I hit him with my fist. It knocked him down so I got up on top of him and hit him a couple of more times and then I started choking him. I thought at that point he was dead. So I took his pants off of him but he started moaning. When he did that I jumped in his car and ran over his head a couple of times. The driver's side front tire was the tire that ran over him. I then took off in his car. I stopped about a quarter to three-eighths of a mile down the road and went through his pants. I got a couple of hundred dollars out of his wallet and threw his pants out. I took off again but just a short distance down the road I threw his wallet out. I went and bought some crack with the money I got. I then drove his car to Theodore Alabama and burned it. I started the fire with some gas I bought at a convenience store. The police never talked to me about the crime until 2005 when my DNA connected me to the crime scene. I don't think they had enough to charge me because I was never charged and I never admitted anything to them. I would have never, if I had not been all messed up on alcohol. I'm very sorry for what I did to this man. I hope that by my confessing to what I have done will ease the pain of some of his family."

The jury convicted Whatley of murdering Patel during the course of a robbery. A separate penalty phase hearing was held. At the sentencing hearing, Whatley asserted that he should be sentenced to life imprisonment without the possibility of parole for the following reasons: since he murdered Patel he had turned his life over to Christ; he grew up in a dysfunctional family marked by violence and abuse; he

had a history of poly-substance abuse; he was depressed; and his substance abuse had affected his actions on the night of the murder. The jury, by a vote of 10 to 2, recommended that Whatley be sentenced to death. After the jury returned its verdict, Whatley made the following statement:

> "Ladies and gentlemen of the jury, I see that few of y'all are upset. Please don't let it weigh so much on y'all. I done a very terrible thing. Just, if you believe in God, pray. Don't let it weigh on y'all so much because I'm the one that's messed up. I'm the one that done wrong. I'm man enough to admit it. And the only way that I can get through something like this is by the Lord's strength."

The circuit court then held a sentencing hearing and found the existence of three aggravating circumstances: (1) that Whatley had previously been convicted of a crime of violence or threat of violence, § 13A–5–49(2), Ala. Code 1975; (2) that the murder was committed while Whatley was engaged in the commission of a robbery, § 13A–5–49(4), Ala. Code 1975; and (3) that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, § 13A–5–49(8), Ala. Code 1975. The court then followed the jury's recommendation and sentenced Whatley to death.

*Whatley v. State*, 146 So. 3d 437, 449–51 (Ala. Crim. App. 2010) (internal record citations omitted);

*see also* Vol. 8-12, Tab-16-26, R. 898-1401; Tab-39, R. 1737.  Through representation of appellate

counsel, Whatley timely appealed his conviction and sentence and exhausted his state court post-

conviction remedies.[3]

---

[3]     On October 1, 2010, the Alabama Court of Criminal Appeals remanded to the trial court with instructions to conduct a *Batson* hearing and to make findings of fact concerning the State's use of its peremptory strikes to remove black venire members. *Whatley*, 146 So.3d at 446-49. The trial court held a *Batson* hearing on November 17 and December 13, 2010 (Doc. 2-34; Vol. 22, Tabs 51-52), finding that the State's preemptory strikes were for race neutral reasons. (Doc. 2-35; Vol. 22, R. 78). On return from remand, after supplemental briefing by the parties, the Court of Criminal Appeals upheld Whatley's conviction and death sentence. *Whatley v. State*, 146 So.3d 437, 449-500 (Ala. Crim. App. 2010), *rehearing denied* Apr. 20, 2012. (Doc. 2-44; Vol. 27, Tab-62). Whatley was denied certiorari review by the Alabama Supreme Court on January 17, 2014, and by the United States Supreme Court on October 6, 2014. (Vol. 28, Tab-64; Vol. 29, Tab-67); *see also, Whatley v. Alabama*, 574 U.S. 840 (2014).

On January 9, 2015, Whatley executed a post-conviction Rule 32 petition alleging ineffective assistance of counsel at either the guilt or penalty phases of his capital trial. (Vol. 30, Tab-69, R. 51-85). On January 27 and May 19, 2015, the post-conviction court found Whatley indigent and appointed Glenn Davidson and Deborah McGowin to represent him in his Rule 32

On November 7, 2019, Whatley timely filed the instant petition for federal habeas relief, challenging his 2008 conviction for capital murder.[4]  (Docs. 1, 9).

## II.    GROUNDS FOR RELIEF

In his petition for habeas relief, Whatley raises the following grounds for relief:[5]

1. The prosecution used peremptory strikes in a race conscious manner in violation of *Batson v. Kentucky* and its progeny and clearly established United States Supreme Court Precedent.

2. Trial Counsel provided Ineffective Assistance:

    a.  During the Guilt Phase.

    b.  During Penalty Phase:

        i.   Trial counsel failed to investigate and present critical mitigating evidence.

        ii.  Trial counsel inadequately presented the mitigating evidence that they did uncover.

        iii. The Court of Criminal Appeals' finding that counsel's performance cannot be deficient if they presented any mitigating evidence is contrary to and an unreasonable application of United States Supreme Court precedent.

---

proceedings.  (Vol. 30, R. 17, 18).  The State answered the petition on May 4, 2015, and filed Motion to Dismiss, along with a proposed order denying Whatley's Rule 32 petition. (Vol. 30, Tab-70, R. 96-170).  On May 16, 2016, post-conviction counsel filed a reply to the State's motion to dismiss, requesting permission to file an amended complaint.  (Vol. 30, Tab-71, R. 172-89).  The post-conviction court gave counsel until December 30, 3016 to file an amended petition (Vol. 30, R. 22); no amended petition was filed. (Vol. 31, R. 219).  On February 2, 2018, the post-conviction court adopted the State's proposed order summarily dismissing Whatley's Rule 32 petition.  (Doc. 55; Vol. 30, Tab-68, R. 28-50)

Whatley timely appealed the dismissal of his post-conviction petition.  On October 5, 2018, the Alabama Court of Criminal Appeals affirmed the dismissal by memorandum opinion. *Whatley v. State*, No. CR-17-0485 (Ala. Crim. App. Oct. 5, 2018) (mem op.), *rehearing denied* Nov. 2, 2018.  On February 22, 2019, the Alabama Supreme Court denied Whatley's petition for writ of certiorari. *Ex parte Whatley*, No. 1180116 (Ala. Feb. 22, 2019); (Doc. 2-61; Doc. 2-62).

[4]     The parties do not dispute the timeliness of Whatley's federal habeas petition.

[5]     For clarity, the Court has renumbered Whatley's claims of ineffective assistance of counsel.

    iv.  The Court of Criminal Appeals' finding that counsel had no independent duty to identify mitigation witnesses is contrary to and an unreasonable application of United States Supreme Court precedent.

    v.  The Court of Criminal Appeals' finding that counsel's penalty phase performance was the result of reasonable strategic decisions is contrary to and an unreasonable application of United States Supreme Court precedent.

3. The trial court's failure to find and consider mitigating circumstances violated clearly established United States Supreme Court precedent.

4. The trial court's reliance on future dangerousness as a non-statutory aggravating circumstance in sentencing Whatley to death violated clearly established United States Supreme Court precedent.

5. The prosecution's improper assertion that the victim's family wanted Whatley to be sentenced to death violated clearly established United States Supreme Court precedent.

6. Informing jurors that others would review the case impermissibly lessened their sense of responsibility and violated clearly established United States Supreme Court precedent.

7. Whatley was prevented from adequately presenting the mitigating effect of addiction in violation of clearly established United States Supreme Court precedent.

8. The refusal to give appropriate lesser included offense instructions violated clearly established United States Supreme Court precedent.

9. Whatley's death sentence is in conflict with *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

10. The failure to instruct the jury that it must unanimously find each aggravating circumstance violated clearly established United states Supreme Court precedent.

11. The trial court erroneously instructed the jury on flight without sufficient evidence and used flight as a sentencing factor in violation of clearly established United States Supreme Court precedent.

12. The trial court's instructions on intent and intoxication lessened the state's burden of proving intent to kill beyond a reasonable doubt, in violation of clearly established United States Supreme Court precedent.

13. The trial court improperly became an advocate by questioning witnesses and commenting on evidence in violation of clearly established United States Supreme Court precedent.

14. The introduction of testimony that Whatley's DNA was in a database containing convicted offenders and suspects violated clearly established United States Supreme Court precedent.

(Doc. 9). The habeas petition has been fully briefed and is ripe for consideration. The Court will consider each of Whatley's claims in turn.

### III.   STANDARD OF REVIEW

This Court's review of Whatley's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under AEDPA, "the role of the federal court . . . is strictly limited." *Jones v. Walker*, 496 F.3d 1216, 1226 (11th Cir. 2007). Specifically, § 2254(d) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d).

According to subsection (1), "[a] federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). "A state court's decision is not 'contrary to . . . clearly established Federal

law' simply because the court did not cite our opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003). Indeed, "a state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (internal quotes omitted).

The "clearly established Federal law" contemplated by subsection (1) "refers to the holdings, as opposed to the dicta, of [U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (internal quotes omitted); *accord Greene v. Fisher*, 565 U.S. 34, 37-38, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011). Moreover, review under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011); *see also Shinn v. Ramirez*, --- U.S. ---, 142 S. Ct. 1718, 1732 (May 23, 2022) ("the federal court may review the claim based solely on the state-court record").

Importantly, "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (internal quotes omitted, emphasis in original). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (internal quotes omitted). That is, "an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (internal quotes omitted); *Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that the application must also be *unreasonable*.").  "To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (internal quotes omitted).  The petitioner bears the burden of showing that the state court's ruling was contrary to, or involved an unreasonable application of, controlling Supreme Court precedent. *Harrington*, 562 U.S. at 98, 131 S. Ct. at 784; *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).

Likewise, with respect to §2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Burt v. Titlow*, 571 U.S. 12, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013) (internal quotes omitted).  In other words, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. . .[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011); *see also Greene v. Fisher*, 565 U.S. 34, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011) (AEDPA standard is purposely onerous because "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction") (citations and internal quotation marks omitted); *Cullen*, 563 U.S. at 181, 131 S. Ct. at 1398 (AEDPA standard "is a difficult to meet . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citations and internal quotation marks omitted).

Accordingly, in evaluating Whatley's § 2254 petition, the Court takes great care to abide

by the stricture that "[a] federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own." *Hill v. Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) ("This inquiry is different from determining whether we would decide *de novo* that the petitioner's claim had merit.").  "If this standard is difficult to meet, that is because it was meant to be." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (citation omitted).  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03, 131 S. Ct. at 786 (citation and internal quotation marks omitted).

Additionally, when a state court refuses to decide a federal claim on state procedural grounds, the federal habeas court is generally precluded from reviewing the claim at all.  *See, e.g., Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) ("[I]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.") (citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment").  If, however, the state court's procedural ruling is not adequate to bar federal review, then the federal habeas court must review the claim *de novo* and is not confined to the state-court record.  *See Williams*, 791 F.3d at 1273.

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state law courts to any federal claims to allow the state

courts an opportunity to review and correct the claimed violations of his federal rights." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 936 (11th Cir. 2009).  "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Sec'y, Dep't of Corrs.*, 682 F.3d 1342, 1352 (11th Cir. 2012); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (exhaustion requirement not satisfied unless "petitioner presented his claims to the state court such that a reasonable reader would understand each claim's . . . specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004).  Nor is it sufficient for a petitioner to present federal claims to the state trial court; rather, "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted); *see also Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) ("Exhaustion requires that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") (citations and internal quotation marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344.

Having established the proper standard of review, the Court turns to the claims asserted in Whatley's petition.

## IV.   DISCUSSION AND ANALYSIS

## 1.   Whether the prosecution used peremptory strikes in a race conscious manner in violation of *Batson v. Kentucky*

Petitioner Whatley asserts that the prosecution in this case violated *Batson v. Kentucky*,

476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)[6] by striking African American prospective jurors in a racially discriminatory manner and advanced pretextual reasons which were not supported by the record.  (Doc. 9 at 7-53).  He further asserts that, contrary to Supreme Court precedent, the Alabama Court of Criminal Appeals failed to consider all relevant circumstances in addressing his *Batson* claim, in part, by its consideration of a single asserted justification for each of the strikes of African American jurors.

## Summary of State Court Decisions on Direct Appeal

Whatley did not raise a *Batson* objection at trial. Rather, he first raised the claim on direct appeal (through appellate counsel) arguing "that the prosecution exercised a large number of challenges to remove black venire members, engaged in little or no *voir dire* examination of the black venire members it struck, engaged in disparate treatment of similarly situated black and white venire members, and struck venire members who had nothing in common other than race. Whatley also allege[d] that the Mobile County District Attorney's Office has a history of discrimination." *Whatley*, 146 So. 3d at 447.  In reviewing the claim for plain error, the Alabama Court of Criminal Appeals remanded the case for a *Batson* hearing, noting:

> Because Whatley did not raise a *Batson* objection at trial, the State did not have an opportunity to respond to his allegations and, if required by the trial court, to state its reasons for its exercise of its peremptory challenges. Also, the trial court, which is in a better position to evaluate such arguments because it was present during the jury-selection proceedings, did not have an opportunity to hear and rule on the allegations. Finally, based on the limited record before us, we cannot properly review Whatley's allegations.

*Id.* at 448.

On November 18, 2010, the trial court conducted a *Batson* hearing, where the State provided its reasons for each and every peremptory strike that it exercised during jury selection.

---

[6]     The Supreme Court held that it is unconstitutional, under the Equal Protection Clause, for the prosecution to challenge potential jurors based solely upon their race or on the assumption that because of their race, they should be unable to consider the case impartially.  *Id.* at 89, 106 S. Ct. at 1719.  Therefore, a defendant may raise the necessary inference of "purposeful discrimination in selection of the petit jury" based "solely on evidence concerning the prosecutor's exercise of peremptory challenges" during the trial.  *Id.* at 96, 106 S. Ct. at 1723.

(Doc. 2-34 at 1-43; Vol. 22, Tab 51, BH 1-43). The State advised the trial court that the reasons being offered for each strike were from notes made contemporaneous to the *voir dire* in November 2008, as well as the 10-page juror questionnaire, and each trial counsel's own memory. (Doc. 2-34 at 11-12; Vol. 22 at 80). At the conclusion of the hearing, the court heard limited argument from the State and the Whatley as to the jury strikes and recessed until December 13, 2010,[7] to allow Whatley's counsel to review the reasons offered by the State and file arguments to the peremptory strikes which they contend were not race neutral or otherwise in violation of *Batson*. Whatley filed a "Response to the District Attorney's Attempt to Rebut the Prima Facie Case of Discrimination" (Doc. 2-31; Vol. 23 at 30-61), to which the State responded (Doc. 2-32; Vol. 22 at 34-77) and Whatley replied in response (Doc. 2-33). Upon reconvening the hearing, the court ordered Whatley's trial counsel, Gregory Hughes, Esq., to testify as to his thoughts, opinions, and observations during *voir dire* and the striking process. (Doc. 2-34 at 64-71; Vol. 22, Tab 52 at 21-28). The trial court then provided written findings of fact to the Alabama Court of Criminal Appeals, finding the State's proffered explanations of its peremptory strikes to be race neutral. Specifically, the trial court stated in its opinion to the Court of Criminal Appeals:

> The Court has carefully reviewed the reasons offered by the State for its peremptory strikes. Additionally[,] the Court has carefully reviewed defense counsel's "Response To The District Attorney's Attempt to Rebut The *Prima Facie* Case of Discrimination." Had a <u>Batson</u> challenge been raised and considered at trial, the Court would never have had as much information, law, and arguments to consider. In the last 14 years this Court has never spent over 2 hours dealing with a <u>Batson</u> motion. The instant matter has occupied at least 20 hours of the Court's time. This, it has been so carefully reviewed and scrutinized that no <u>Batson</u> motion raised at trial would ever get such scrutiny or attention from all counsel involved.
>
> In spite of the masterful job that defense counsel has done, two years after the *voir dire*, in piecing together portions of juror's backgrounds and comparing those to

---

[7] It was originally recessed until December 9, 2010, but the hearing was reset to December 13, 2010. (Vol. 22, R. 81).

others, the fact remains that of all of the persons forward of the bar for the present hearing, the only ones who were not present during the actual *voir dire* and striking process are the able attorneys for the Defendant, Mr. Susskind and Ms. D'Addario. The Court, Ms. Rich, Ms. Wright, Mr. Hughes, Mr. Hale, and Mr. Whatley all spent the better part of one week selecting a jury.  It was done in a slow and methodical pace, with a large number of jurors interviewed one on one.

The reasons provided to the Court for the State's strikes, as contained in "STATE v. DONALD WATLEY STATE'S STRIKES" State's Exhibit 1 to the November 18 hearing, and in a pleading filed by the State "STATE'S RESPONSE TO DEFENDANT'S MOTION REGARDING PRIMA FACIE OF DISCRIMINATION" are thorough and convincing.  Additionally, whether relevant or not, the testimony of Defendant's trial counsel, Greg Hughes, was obvious.  This Court regards Mr. Hughes as one of the finest criminal defense attorneys in the 13th Judicial Circuit.  Mr. Hughes did not think that the State was using its strikes impermissibly.

In order to believe the Defendant, the court would have to believe that the State, thought[sic] the District Attorney for the 13th Judicial Circuit, not only used its strikes in a racially impermissible manner, but that it engaged in a conspiracy to cover this up by manufacturing "STATE v. DONALD WATLEY STATE'S STRIKES" State's Exhibit 1 to the November 18th hearing in order to conceal their actions and did this so well that the Defendant's own trial counsel was left clueless as to what had happened.

The Court is completely unimpressed with the argument made by the Defense that the office of the District Attorney for the 13th Judicial Circuit has a history of discrimination.  This Court has never observed such a practice and the cases cited by the Defendant, which were reversed by appellate courts, are largely outdated, and have little relation to the District Attorney's Officer for the 13th Judicial Circuit that exists today or has existed for the past 14 years.  Finally, the cases cited by the Defense were not ones that were tried by trial counsel in the Whatley case.

After a painstaking and thorough review of all of the records available, the reasons stated by the State, the arguments made by the Defendant, a review of Defense counsel's "Response To The District Attorney's Attempt To Rebut The *Prima Facie* Case Of Discrimination," as well as another review of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and its progeny, it is the opinion of this Court that the State of Alabama did not exercise any of its peremptory strikes in an impermissible manner as defined by Batson and that all of the State's strikes were for race neutral reasons.

(Vol. 22 at 81-84).

On return from remand, the Alabama Court of Criminal Appeals determined:

In Whatley's case, 105 prospective jurors composed the venire. After jurors were removed for cause, both the prosecutor and defense counsel were left with 30 peremptory strikes each. The State used 17 of its strikes to remove black prospective jurors and 13 of its strikes to remove white prospective jurors. The State used its 2d, 3d, 4th, and 5th strikes to remove white jurors and then rotated between striking a black juror and striking a white juror. Defense counsel used 26 of its strikes to remove white prospective jurors, 3 strikes to remove black prospective jurors, and 1 strike to remove a juror whose race was indicated as "other." Whatley's jury consisted of 10 whites and 2 blacks.

The prosecutor gave the following reasons for removing the black prospective jurors. We have listed the jurors in the order in which they were struck by the State:

Juror P.C. (No. 93)—Worked with mentally challenged individuals, has a brother who was charged with a stabbing and was acquitted, and does not believe in the death penalty because it goes against her faith to impose a death sentence.

Juror G.W. (No. 76)—Expressed reservations about the death penalty, had heard and read about the case, and had rheumatoid arthritis.

Juror L.W. (No. 85)—Knew one of the defense attorneys because he had represented her ex-boyfriend and had a family member who had alcohol and drug problems.

Juror C.C. (No. 87)—Was working on a degree in rehabilitation and counseling with an emphasis on substance abuse and mental health and dealing with criminals and putting them back into society and has a stepbrother in prison for armed robbery.

Juror C.A. (No. 1)—Worked for a local attorney and her cousin and husband had prior criminal histories.

Juror A.P. (No. 27)—Knew the defense attorney because he had previously represented the father of her child in a robbery case.

Juror J.W. (No. 16)—Indicated that she was scared and that it would be very tough for her to vote for the death penalty.

Juror M.M. (No. 26)—On her questionnaire she answered that she did not believe in the death penalty, was hesitant in individual questioning about the death penalty, indicated that she would hold the State to a higher burden of proof, believes that there are innocent people on death row, and was hesitant to impose a death sentence.

Juror B.D. (No. 34)—Husband had been at a mental hospital, nephew worked at Searcy mental-health facility, stepson has a drug and alcohol problem, and grandson was currently incarcerated for a probation violation.

Juror K.J. (No. 50)—Her father and uncle were currently incarcerated for murder and attempted murder, respectively; she did not want to be put in a position of having to vote for the death penalty; and she had stayed at the Budget Inn motel, which had been owned by the victim.

Juror C.O. (No. 40)—Had hearing problems, suffered from post-traumatic stress disorder, and expressed reservations about the death penalty, suffered from a manic depression, and had a son who had been convicted of murder, and had a drug and alcohol problem.

Juror B.T. (No. 104)—Uncle was currently in prison for murder and juror had reservations about the death penalty.

Juror K.S. (No. 75)—In individual voir dire indicated that she did not believe in the death penalty and could not vote for death.

Juror S.W. (No. 66)—Had problems with his vision and other health problems and had a nephew in jail at the time of Whatley's trial.

Juror C.H. (No. 61)—Had family members who worked in mental-health field, had two relatives who were in prison at the time of voir dire, specifically a niece had a drug problem and was in the city jail and a relative by marriage was serving time for murder.

Juror O.J. (No. 24)—Brother-in-law had drug problem, two friends had been charged with robbery, and he was hesitant in answering questions on the death penalty.

Juror T.P. (No. 74)—Grandfather is an alcoholic, and she was struck based on her responses to voir dire questions concerning drug use.

*Whatley*, 146 So. 3d at 453–54. Relying on *Hernandez v. New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991) and emphasizing its obligation to give due deference to the trial court's findings, the Court of Criminal Appeals concluded that the State provided race-neutral reasons for its peremptory strikes and further concluded black and white prospective jurors were struck for the same reasons, demonstrating no disparate treatment and no *Batson* violation. *Whatley*, 146 So. 3d at 455. In upholding the trial court's decision, the Court of Criminal Appeals reasoned that "[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made."

*Id.* at 454 (quoting *Martin v. State*, 62 So. 3d 1050, 1059-60 (Ala. Crim. App. 2010), *cert. denied*, *Martin v. Alabama*, 565 U.S. 830, 132 S. Ct. 126, 181 L. Ed. 2d 48 (2011) (internal quotation marks and citation omitted)).  Stated another way, "[w]here a prosecutor gives a reason which may be a pretext, . . . but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike."  *Id*. at 456 (quoting *Martin*, 62 So. 3d at 1060 (internal quotation marks and citation omitted)).  Without discussing every strike reason proffered by the State for its strikes, the Court of Criminal Appeals categorized the peremptory strikes into the following race-neutral groupings:

> "The State struck eight black prospective jurors—jurors P.C., J.W., M.M., K.J., G.W., B.T., K.S., and O.J.—based on their views or reservation toward capital punishment" and "nine white prospective jurors—jurors J.C., M.G., C.L., C.Sh., D.H., B.F., P.G., C.Sm., and D.E.—based on their views toward capital punishment."  *Id*. at 455.

> "The State struck seven black prospective jurors—jurors C.C. B.D., B.T., S.W., C.H., C.O., and K.J.—who had relatives incarcerated at the time of Whatley's trial; it struck two white prospective jurors—jurors L.B. and S.C.—for this same reason."  *Id*. at 456.

> "One black prospective juror, M.M., and one white prospective juror, D.B., were struck because they indicated that they would hold the State to a higher burden of proof."  *Id*.

> "Jurors L.W. and A.P. were struck because they knew defense counsel."  *Id*.

> "The State used its last strike to remove juror T.P. based on her responses during voir dire concerning drug use. . . . The State [believed, based on T.P.'s demeanor and responses to questions,] T.P. would hold accountable only those individuals who are continual abusers or who sell drugs to small children."  *Id*.

The Court of Criminal Appeals also noted in its opinion that Whatley's trial attorney testified at the evidentiary hearing that "he did not see that there was a basis for a *Batson* challenge or he would have done it", *id*. at 454 (brackets omitted) and that the trial judge specifically stated, "the current Mobile County District Attorney's Office did not have a history of violating *Batson* and

that the cases cited by the defense for this proposition were cases tried under a former administration."  *Id*. at 457.  Giving due deference to the trial court's findings, the court held that "based on the totality of the relevant factors" the trial court's findings were not clearly erroneous and found no *Batson* violation.  *Id*.

### Federal Review of the State Court Decision[8]

In determining whether a *Batson* violation has occurred, courts are to apply a three-step approach:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S. Ct. 1712 (citing *Washington v. Davis,* 426 U.S. 229, 239-242, 96 S. Ct. 2040, 48 L.Ed.2d 597 (1976)). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S. Ct. 1712; *see also Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S. Ct. 1221, 31 L.Ed.2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem,* 514 U.S. 765, 767, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995) *(per curiam)*.

*Johnson v. California*, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416, 162 L. Ed. 2d 129 (2005).  Here, Whatley's challenge centers on the third step,[9] the determination "if the defendant has established

---

[8]     In review of this claim, the Court of Criminal Appeals must be afforded AEDPA deference. *See Lee v. Comm., Ala. Dep't of Corrs*., 726 F.3d 1172, 1207-10 (11th Cir. 2013) ("[W]e hold that when a state appellate court applies plain-error review and in the course of doing so, reaches the merits of a federal claim and concludes there is no plain error, that decision is an adjudication 'on the merits' for purposes of § 2254(d) and thus AEDPA deference applies to it.").

[9]     The parties do not dispute that steps one and two have been established.  First, the remand for a *Batson* hearing necessarily evidences that Whatley has established a *prima facie* case. Second, at the *Batson* hearing, the State proffered nondiscriminatory reasons for striking the 17 minority jurors. *See Hernandez v. New York,* 500 U.S. 352, 363, 111 S. Ct. 1859, 114 L.Ed.2d 395 (1991) ("At this [second] step of the inquiry, the issue is the *facial validity* of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.") (emphasis added).  Whatley, however, challenges that the State's explanations were pretextual, thus centering on the third prong of *Batson*.

purposeful discrimination." *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724. "The credibility of the prosecution's explanation is to be evaluated considering the 'totality of the relevant facts,' including whether members of a race were disproportionately excluded." *Hernandez,* 500 U.S. at 363, 111 S. Ct. at 1870. "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721 (internal quotation marks omitted). "Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned." *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (internal citations omitted). "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez,* 500 U.S. at 365, 111 S. Ct. at 1869. "The evaluation of a prosecutor's race-neutral explanations under *Batson* is a 'pure issue of fact . . . peculiarly within a trial judge's province.'" *McGahee v. Ala. Dep't of Corr.,* 560 F.3d 1252, 1255 (11th Cir. 2009) (quoting *McNair v. Campbell,* 416 F.3d 1291, 1310 (11th Cir. 2005)).

> Ultimately, the burden of persuasion to show purposeful discrimination "rests with, and never shifts from, the opponent of the strike." *Purkett,* 514 U.S. at 768, 115 S. Ct. at 1771. "[A] defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination" in the third step. *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005). As to "side-by-side comparisons," the Supreme Court has said that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* at 241, 125 S. Ct. at 2325.

> Importantly too, "under *Batson,* the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." *United States v. David*, 803 F.2d 1567, 1571 (11th Cir.1986); *see also Snyder,* 552 U.S. at 478, 128 S. Ct. at 1208 ("Because we find that the trial court committed clear error in overruling petitioner's *Batson* objection with respect to [one venire member], we have no need to consider petitioner's claim regarding [a second venire member].").

*Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1200 (11th Cir. 2013).

To the extent Whatley argues that the state court failed to follow the *Batson* three step analysis, his claim is reviewed under AEDPA § 2254(d)(1), "which requires the federal court find that the state court rendered a decision that was 'contrary to, or involved an unreasonable application of, clearly established Federal law.' AEDPA, 28 U.S.C. § 2254(d)(1)." *McGahee*, 560 F.3d at 1256; *see also Adkins v. Warden*, 710 F.3d 1241, 1251 (11th Cir. 2013) ("[A] state court's failure to consider 'all relevant circumstances' at *Batson's* third step is an unreasonable application of *Batson* under § 2254(d)(1).") (internal citation omitted).

> "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000) (O'Connor, J., writing for the majority). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S. Ct. at 1522.

*McGahee*, 560 F.3d at 1256.  To the extent Whatley challenges the evaluation of the prosecutor's asserted race-neutral explanations, his claim is analyzed under AEDPA § 2254(d)(2) and is only granted "if it was unreasonable to credit the prosecutor's race-neutral explanations." *Id*. at 1255 (quoting *Rice v. Collins,* 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)).

### Analysis under § 2254(d)(1)

In his petition, Whatley points to the Alabama Court of Criminal Appeals' "single asserted justification for each of the strikes of African American jurors" and argues that the state court

unreasonably applied *Batson* by not considering all relevant circumstances in rejection of his claim. (Doc. 9 at 9). He specifically asserts that the single asserted justifications evidence the court's "fail[ure] to address the other reasons given for these strikes, and it ignored the fact that many of these reasons were contradicted by the record or were disparately applied to white and black prospective jurors."[10] *Id*. He further claims "[t]he court also did not consider the history of discrimination by the Mobile County District Attorney's Office both in the past and more recently." *Id*.

The Eleventh Circuit has clarified that, under *Batson*, the requirement of a state court to

---

[10]     Whatley further challenges the Alabama Court of Criminal Appeals' reasoning that "[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made." (Doc. 9 at 8; *Whatley*, 146 So. 3d at 454). Pointing to *Synder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008), Whatley asserts that a "peremptory strike shown to have been motivated in substantial part by discriminatory intent' because one of the multiple proffered justifications has been shown to be pretextual, can *only* be upheld, if at all, where prosecution affirmatively demonstrates pretextual factor 'was not determinative.'" (Doc. 20 at 3) (quoting *Snyder*, 552 U.S. at 485). The Court, however, disagrees with Whatley's interpretation of the cited dicta as it appears to be a misstatement of *Snyder*.

The *Snyder* Court, while noting that a pretextual explanation naturally gives rise to an inference of discriminatory intent, reiterated in its opinion that the 'decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.' 552 U.S. at 485, 128 S. Ct. at 1212 (quoting *Hernandez*, 500 U.S. at 365). If it is shown that a discriminatory intent was a substantial or motivating factor, *Snyder* pointed out that "[i]n other circumstances . . . the burden shifts to the party defending the action to show that this factor was not determinative." *Id*. (internal citation omitted). The *Snyder* Court then specifically stated, "[w]e have not previously applied this rule in a *Batson* case, and we need not decide here whether that standard governs in this context." *Id*. Instead, the Court determined that there was no evidence in the record showing that pretextual explanations were credited or that the prosecutor would have preemptively challenged any juror on the alleged pretextual reasons alone.

Here, the record reflects that the prosecution provided multiple reasons for its strikes and, thereafter, the state court's determination that a single race-neutral reason was proffered to support each strike demonstrates that any alleged pretextual factor was not determinative. *See also, infra*, at n.13 (discussing the Eleventh Circuit's adoption of a mixed motive analysis).

evaluate the totality of the evidence and consider "all relevant circumstances . . . is a far cry from a federal court requiring that a state court prove to a federal court that it did so by setting out every relevant fact or argument in its written opinion." *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1212 (11th Cir. 2013).   The Eleventh Circuit explained:

> Under Supreme Court and our Circuit precedent, a state court's written opinion is not required to mention every relevant fact or argument in order for AEDPA deference to apply. . . . And we do not determine whether a state court "considered" evidence by looking to see whether the state court opinion "mentions" or "never mentioned" that evidence.  The statements in *Adkins* about "never mentioned" or "did not mention" or about the lack of content in the state court opinion do not, and cannot, establish a new rule for state court opinion-writing in our Circuit because they are contrary to Supreme Court and our Circuit precedent . . .

*Id.* at 1223.[11]  Indeed, "[t]he test in § 2254(d)(1) is whether the state court unreasonably applied *Batson* and its progeny to the facts of [a] case.  The test is not about how long the state court opinion is or whether it explicates every relevant fact and argument." *Id.*

---

[11]     The Eleventh Circuit has further specified AEDPA deference is to be afforded to state court decisions "accompanied by opinions that do not discuss all the evidence, circumstances, or arguments," citing the following cases:

> *Greene v. Upton,* 644 F.3d 1145, 1155–56 (11th Cir. 2011) (emphasizing in a § 2254 capital case that "*Batson* does not require elaborate factual findings" and applying AEDPA deference to a state court's *Batson* ruling even though it did not address every argument or make an explicit fact finding on *Batson*'s third step); *Blankenship v. Hall,* 542 F.3d 1253, 1271–72 (11th Cir. 2008) (stating in a § 2254 capital case that "implicit findings" may be inferred from a state court opinion and record and "these implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact"); *Hightower v. Terry,* 459 F.3d 1067, 1072 n. 9 (11th Cir.2006) (deferring to a state court judgment on a *Batson* claim in a § 2254 capital case and noting a state court's "dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling" (citing *United States v. $242,484.00,* 389 F.3d 1149, 1154 (11th Cir.2004) (en banc) ("[W]e and other federal appellate courts have 'inferred from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated.' "))); *Atwater v. Crosby,* 451 F.3d 799, 807 (11th Cir.2006) (applying AEDPA deference in a § 2254 capital case, where the state appellate court's opinion "improperly condensed the second and third steps of *Batson* " but the opinion contained "some evaluation of the prosecutor's reasons for the strike").

Here, unlike *McGahee* and *Adkins*,[12] which Whatley cites to as support, Whatley has not shown that the state court failed to consider an explicitly racial reason for juror strikes, in violation of *Batson*.  Indeed, all the reasons proffered by the state for its strikes are facially race-neutral, including: (1) having friends or family members with drug and alcohol problems; (2) having friends or family members previously charged with crimes; (3) views on or hesitation to the death penalty; (4) experiences with mental illness and mental health treatment; (5) health problems; (6) connection to locations associated with the crime; (7) experience in the legal field; (8) knowledge or connection to the defense attorney(s); and (9) the current incarceration of a family member.  *See Whatley*, 146 So. 3d at 453-54.  Furthermore, Whatley has failed to show that the Court of Criminal Appeals did not "consider any of the facts indicating that [the State's proffered] justifications were pretextual" (Doc. 20 at 3) – other than the fact that the state court did not mention or explicitly discuss these circumstances in its opinion – which "is insufficient to show an unreasonable application of *Batson's* third step."  *King v. Warden, Georgia Diagnostic Prison*, Civ. Act. No. 2:12-cv-119, 2020 WL 423344, at *25, 2020 U.S. Dist. LEXIS 12317, at *88 (S.D. Ga. Jan. 24,

---

*Lee*, 726 F.3d at 1213.

[12]      In both *Adkins*, 710 F.3d 1241 and *McGahee*, 560 F.3d 1252, the Eleventh Circuit determined the state court failed to consider all relevant circumstances in evaluating *Batson* claims, when there was "no indication from [the court's] opinion that the Alabama Court of Criminal Appeals considered any of the relevant circumstances bearing on the ultimate issue of discriminatory purpose beyond the fact that the prosecutor had proffered race-neutral reasons for its strikes" and because it "did not even mention all the relevant circumstances brought to its attention." *Adkins*, 710 F.3d at 1252.  The Eleventh Circuit has clarified, however, "[w]hat drove the unreasonable application result in [*Adkins* and *McGahee*] was the abundant racial discrimination evidence that demonstrated that the state court's *Batson* decision was an unreasonable application of clearly established federal law" which included "explicit racial statements and strong evidence of discriminatory purpose in each case." *Lee,* 726 F.3d at 1213-14.  The Eleventh Circuit unambiguously declared that while "[t]here is some loose language to be sure" in *McGahee* and *Adkins*, neither hold "that a state court *Batson* opinion must discuss every fact or argument to be a reasonable application of *Batson* under §2254(d)." *Id*. at 1214.

2020).  "King, however, has pointed to no evidence that the Georgia Supreme Court failed to consider the circumstances listed [] — other than the fact that the Georgia Supreme Court did not mention these circumstances: such evidence is insufficient to show an unreasonable application of *Batson's* third step." *Id*. (citing *Greene v. Upton*, 644 F.3d 1145, 1155 (11th Cir. 2011)).

Contrary to Whatley's argument that the state court considered only a single asserted justification for each of the challenged peremptory strikes, failing to consider all relevant circumstances, the Alabama Court of Criminal Appeals clearly states in its opinion that its decision was "based on the totality of the relevant factors".  *Whatley*, 146 So.3d at 457.  In addition, the Court of Criminal Appeals maintains that it relied heavily on the trial court's ruling, crediting the trial court's fact-findings and determination, which explicitly confirmed:

- The trial court "carefully reviewed defense counsel's 'Response To The District Attorney's Attempt to Rebut The *Prima Facie* Case of Discrimination.'"  (Doc. 22 at 81-82).

- The trial court had never "so carefully reviewed and scrutinized" nor allotted so much time to determining a *Batson* challenge as Whatley's.  (*Id*. at 82).

- The trial court took "a painstaking and thorough review of all of the records available, [including] the reasons stated by the State, the arguments made by the Defendant, a review of Defense counsel's "Response To The District Attorney's Attempt To Rebut The *Prima Facie* Case Of Discrimination," [(a brief which consisted of 30 pages of rebuttal argument for why the State's asserted reasons were pretextual and provided the relevant circumstances, evidence, and reasoning for each of the 17 struck black venire members) (*See* Vol. 23 at 30-60)], as well as another review of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and its progeny. . ." in determining that the State of Alabama did not exercise any of its peremptory strikes in an impermissible manner as defined by Batson and that all of the State's strikes were for race neutral reasons."  (*Id*. at 83-84).

In its opinion, the Court of Criminal Appeals identified the strike pattern of the venire, including that the State used 17 of its 30 peremptory strikes to remove potential black jurors, comprising of petit jury of 10 whites and 2 blacks, 146 So.3d at 453, by which it can be inferred that the court

implicitly considered the high level of exclusion of African Americans from the jury.  The court articulated every reason given by the State for each peremptory strike against a potential black juror, *id*. at 453-54, by which it can be inferred that the court was aware of the multiple proffered reasons of the prosecutor's strikes and implicitly considered Whatley's arguments of pretext, disparate treatment of black venire members, and record contradictions before determining that black prospective jurors P.C., J.W., M.M., K.J., G.W., B.T., K.S., and O.J. were struck based on their views or reservation toward capital punishment (as were white prospective jurors, J.C., M.G., C.L., C.Sh., D.H., B.F., P.G., C.Sm., and D.E.).  *Id*. at 455.  Black prospective jurors C.C. B.D., B.T., S.W., C.H., C.O., and K.J. were struck for having relatives incarcerated at the time of Whatley's trial (as were white prospective jurors L.B. and S.C.).  *Id*. at 456.  Black prospective juror, M.M. and white prospective juror, D.B., were struck because they indicated that they would hold the State to a higher burden of proof; jurors L.W. and A.P. were struck because they knew defense counsel; and juror T.P was struck based on her responses during *voir dire* concerning drug use.  *Id*.

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike."  *Miller-El v. Cockrell*, 537 U.S. 322, 338–39, 123 S. Ct. 1029, 1040, 154 L. Ed. 2d 931 (2003).  The Court interprets the state court's opinion as crediting the prosecutor's justifications and reasoning that any insufficient, pretextual explanation proffered was overcome due to the strength and persuasiveness of the identified strike categories – which applied equally to all struck jurors – black and white.  Such reasoning has repeatedly been upheld and cannot be viewed as an

unreasonable application of *Batson*.[13]   *See Davis v. Ayala*, 576 U.S. 257, 275, 135 S. Ct. 2187, 192 L.Ed.2d 323 (2015) (finding it unnecessary to consider the prosecutor's supplementary reason for a strike after interpreting that the juror's "views on the death penalty were alone sufficient to convince him to exercise a strike"); *Martin v. State*, 62 So. 3d 1050, 1058-60 (Ala. Crim. App. 2010) ("Where a prosecutor gives a reason which may be a pretext, . . . but also gives valid

---

[13]     Notably, the Eleventh Circuit applies a dual motive or mixed motive analysis when a peremptory strike is challenged with a race neutral reason, coupled with a racial reason. *Wallace v. Morrison*, 87 F.3d 1271, 1274-75 (11th Cir. 1996) (finding a "*Batson* error arises only if the legitimate reasons were not in themselves sufficient reason for striking the juror."); *King v. Moore*, 196 F.3d 1327, 1335 (11th Cir. 1999) (citing *Wallace*, 87 F.3d at 1274); *see also Lee v. Thomas*, Civ. Act. No. 10-0587-WS-M, 2012 WL 1965608, at *10, 2012 U.S. Dist. LEXIS 75470 at *41 (S.D. Ala. May 30, 2012), *aff'd sub nom. Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172 (11th Cir. 2013) (finding no factual basis to attribute pretext to a justification for exercise of a peremptory strike where another stated "reason was in itself sufficient to justify striking [the juror]"). Under the dual motive analysis, once a credible race neutral and discriminatory reason for a strike has been given, the burden shifts to the party defending the peremptory challenge to show that discrimination was not the "but for" cause of the strike – that is that the strike would have been made despite the racially motivated reason(s). *Howard v. Senkowski*, 986 F.2d 24 (2d Cir. 1993). The Second, Third, Fourth, Sixth, Eighth, and Eleventh Circuits have permitted a mixed motives approach. (Other circuits have adopted the "tainted" approach, which Justice Marshall defended in his dissent in *Wilkerson v. Texas*, reasoning that "a 'neutral' explanation for challenging an Afro-American juror means just what it says—that the explanation must not be tainted by *any* impermissible factors. Requiring anything less undermines an already underprotective means of safeguarding the integrity of the criminal jury selection process." 493 U.S. 924, 928, 110 S. Ct. 292, 107 L. Ed. 2d 272 (1989) (Marshall, J., dissenting from the denial of certiorari)).

        To date, the mixed motive analysis adopted by this Circuit has been upheld by the Supreme Court and allows the attorney exercising a peremptory challenge to have a "mixed motive" so long as the neutral reason(s) for striking the juror show that the same outcome would have occurred even without the discriminatory reason. *Gattis v. Snyder*, 278 F.3d 222, 235 (3d Cir. 2002), *cert. denied*, 537 U.S. 1049, 123 S. Ct. 660, 154 L. Ed. 2d 524 (2002) (State court did not unreasonably interpret the Supreme Court's precedent in *Batson* by adopting the mixed motive analysis.); *U.S. v. Darden*, 70 F.3d 1507, 1531 (8th Cir. 1995), *cert. denied*, 517 U.S. 1149, 116 S. Ct. 1449, 134 L. Ed. 2d 569 (1996) (Trial court did not commit plain error in finding no *Batson* violation after the prosecutor stated several race-and gender-neutral reasons for exercising peremptory strike before adding a reason that was discriminatory regarding an African–American juror where the court determined that the other reasons formed the basis for the strike and the prosecutor struck two other white jurors for the same neutral reasons.).

additional grounds for the strike, the race-neutral reasons will support the strike." (quoting *Battle v. State,* 574 So. 2d 943, 949 (Ala. Crim. App. 1990)), *cert. denied*, 565 U.S. 830 (2011); *King v. Moore,* 196 F.3d 1327, 1335 (11th Cir.1999) ("[W]hen the motives for striking a prospective juror are both racial and legitimate, *Batson* error arises only if the legitimate reasons were not in themselves sufficient reason for striking the juror.").  Accordingly, the Court of Criminal Appeals' articulation of race-neutral strike categories and finding no *Batson* violation indicates that the state court implicitly found that the State's strikes were not purposefully discriminatory.  *See U.S. v. Ongaga*, 820 F.3d 152, 167 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 211 (2016) ("By finding that the challenged strike was not suspect, the district court necessarily found the government's explanation credible: It could not have made that statement if it disbelieved the government's race-neutral explanation. The record reflects that the district court performed the third step of the *Batson* analysis adequately and implicitly found that the government's strike was not purposefully discriminatory.").

The record further supports that the Court of Criminal Appeals considered the history of the district and prosecutor in concluding the jury strikes were not discriminatory.  The state court's opinion states that the trial court "specifically noted that the current Mobile County District Attorney's Office did not have a history of violating *Batson* and that the cases cited by the defense for this proposition were cases tried under a former administration." *Whatley*, 146 So.3d at 457. From this statement, it can reasonably be inferred that the court implicitly considered the history of the district and prosecutor in concluding Whatley failed to establish his burden of showing the State's strikes were purposefully discriminatory.

Accordingly, Whatley has failed to show that the Court of Criminal Appeals unreasonably applied clearly established law finding no *Batson* violation under § 2254(d)(1).

**Analysis under § 2254(d)(2)**

Pursuant to § 2254(d)(2), Whatley must establish that the state court's determination of his *Batson* claim was based on an unreasonable determination of the facts presented in the state court proceeding in order to obtain habeas relief.

> The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was "too powerful to conclude anything but [the petitioner's factual claim]," *Miller–El v. Dretke* (*Miller–El II* ), 545 U.S. 231, 265, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), and when a state court's finding was "clearly erroneous," *Wiggins v. Smith,* 539 U.S. 510, 528–29, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

*Landers v. Warden, Attorney. Gen. of Ala.,* 776 F.3d 1288, 1294 (11th Cir. 2015).   Thus, a state court's "determination of facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination. . . ." *Holsey,* 694 F.3d at 1257.   "[I]t is not sufficient that the federal habeas court would have reached a different conclusion in the first instance." *Landers*, 776 F.3d at 1294 (internal quotation marks and citation omitted).   The Court turns now to the factual findings surrounding the prosecution's striking of Whatley's jury.

**A.  Striking Pattern**

The record reflects that 105 prospective jurors composed Whatley's venire (31 of which were removed for cause or excused by the trial court).[14]  Both the prosecutor and defense counsel were allotted 30 peremptory strikes.[15]  The State used 17 of its peremptory strikes to remove black prospective jurors and 13 of its peremptory strikes to remove white jurors.  The record evidences the following strike order by the State:

---

[14]    African American venire members 19, 33, 44, 57, 58, 59, 63, 86, and 99 were removed for cause or excused by the trial court.  (Vol. 8 at 846; Vol. 14 at 36).

[15]    After the parties struck 30 prospective jurors each, the clerk discovered that there only 11 jurors remaining.  All parties agreed to put the numbers of the last two strikes for both the State and the defense in a hat and Mr. Whatley drew out the name of a juror who would sit on the jury. *Whatley*, 146 So. 3d at 453 n.3.

| Juror No. | Initials | Race |
|-----------|----------|------|
| 1.  Juror 93 | P. C., | Black |
| 2.  Juror 76 | G. W., | Black |
| 3.  Juror 3 | E. C., | White |
| 4.  Juror 2 | L. B., | White |
| 5.  Juror 85 | L. W., | Black |
| 6.  Juror 4 | S. C., | White |
| 7.  Juror 87 | C. C., | Black |
| 8.  Juror 1 | C. A., | Black |
| 9.  Juror 7 | M. G., | White |
| 10. Juror 27 | A. P., | Black |
| 11. Juror 16 | J. W., | Black |
| 12. Juror 26 | M. M., | Black |
| 13. Juror 103 | C. S., | White |
| 14. Juror 34 | B. D., | Black |
| 15. Juror 35 | D. F., | White |
| 16. Juror 50 | K. J., | Black |
| 17. Juror 79 | D. E., | White |
| 18. Juror 40 | C. O., | Black |
| 19. Juror 104 | B. T., | Black |
| 20. Juror 75 | K. S., | Black |
| 21. Juror 66 | S. W., | Black |
| 22. Juror 61 | C. H., | Black |
| 23. Juror 24 | O. J., | Black |
| 24. Juror 60 | P.G., | White |
| 25. Juror 74 | T. P., | Black |
| 26. Juror 48 | B.F., | White |
| 27. Juror 25 | C. L., | White |
| 28. Juror 45 | D. B., | White |
| 29. Juror 28 | C. S., | White |
| 30. Juror 89 | A. S., | White |

(Doc. 2-2 at 678-86; Vol. 8 at 837-45). Thus, the prosecution used 61% of their strikes against African Americans, who made up 31% of the venire. (Doc. 9 at 7). Whatley's jury consisted of 10 white jurors and 2 black jurors.

While this striking pattern is troubling, it is not, alone, dispositive of *Batson's* third step. *See Presley v. Allen,* 2008 WL 1776570, at *4 (11th Cir. Apr. 21, 2008) ("Although the statistics presented are suggestive of discrimination, in that the state struck all but one of the black members of the venire and used 78% of its strikes against females, the Alabama Supreme Court's

determination that the statistics were not enough given the facts of this case was not objectively unreasonable."). "[T]he number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (11th Cir. 2005) (citation omitted).

**B.  Alleged Racial Discrimination History**

In reviewing *Batson* challenges, "history of the State's peremptory strikes in past cases" is relevant and is a factor in determining whether racial discrimination has occurred, *Flowers v. Mississippi*, __ U.S. __, 139 S. Ct. 2228, 2243, 204 L. Ed. 2d 638 (2019), and Whatley argued to the state court, that the Mobile County District Attorney's Office has a history of discrimination, citing to eight cases from 1987 to 1999.  (*See* Vol. 24, Tab 53 at 45, n.15).  In reviewing the claim, the Alabama Court of Criminal Appeals stated:

> The [circuit] court also specifically noted that the current Mobile County District Attorney's Office did not have a history of violating *Batson* and that the cases cited by the defense for this proposition were cases tried under a former administration. Giving due deference to the circuit court's findings, which we must, we hold that based on the totality of the relevant factors, the circuit court's findings are not "clearly erroneous."

*Whatley*, 146 So. 3d at 457.

In his habeas petition, Whatley alleges the Mobile County District Attorney has a pattern of jury discrimination, and specifically that the prosecutor of Whatley's case, Ashley Rich, has personally struck between 70 and 80 percent of the African Americans qualified for jury service in all five of the death penalty cases that she tried around the time of Whatley's trial - pointing to *Lane v. State*, 80 So. 3d 280 (Ala. Crim. App. 2010) (80% eligible black venire members struck), *Dotch v. State*, 67 So. 3d 936, 982 (Ala. Crim. App 2010) (71% eligible black venire members struck), *Penn v. State*, 189 So. 3d 107 (Ala. Crim. App. 2014) (75% eligible black venire members

struck), *Shaw v. State*, 207 So. 3d 79 (Ala. Crim. App. 2014) (78% eligible black venire members struck), and *Woolf v. State*, 220 So.3d 338 (Ala. Crim. App. 2014) (65% eligible black venire members struck).  (*See* Doc. 9 at 11-12).  Whatley alleges in a county that is 35.6 percent African American, this historical strike pattern evidences a pattern of racial discrimination.  (*Id*. at 12).

The cases cited by Whatley in the state court were all tried prior to the prosecutor, Ashley Rich, assuming office in 2011, a fact no one disputes.  As to the cases Whatley now cites that were tried after Rich assumed office, review reveals that none have been found to evidence a *Batson* violation – the jury strikes have been held racially neutral or the *Batson* issue was not even addressed.  Thus, Whatley's argument does not support a prima facie case of racial discrimination in the State's use of its peremptory strikes.

## C.  <u>Strike Explanations</u>

Whatley claims that the prosecutor's peremptory strikes violated *Batson* for multiple reasons, namely that the explanations were pretextual, reflected disparate treatment of African American and white prospective jurors, and mischaracterized the testimony of black jurors; also, Whatley claims that the prosecution abandoned its initially asserted justifications and failed to question jurors about alleged areas of concern – evidencing a violation of *Batson*.  (Doc. 9 at 13-53).  Again, "the critical question in determining whether [Whatley] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for [her] peremptory strike."  *Miller-El*, 537 U.S. at 339.

> The prosecutor's failure to strike similarly situated jurors is not pretextual "where there are relevant differences between the struck jurors and the comparator jurors." *United States v. Novaton,* 271 F.3d 968, 1004 (11th Cir.2001). The prosecutor's explanation "does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins,* 546 U.S. 333, 338 (2006). "Neither a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question provides 'clear and convincing' evidence of pretext." *McNair[ v. Campbell[,* 416 F.3d 1291, 1311–1312 (11th Cir.2005)].

*Parker*, 565 F.3d at 1271. All relevant circumstances must be considered when determining whether purposeful discrimination has been shown. *Snyder*, 552 U.S. at 478. Here, based on the state court's application of the law, the trial court's acceptance of the prosecutor's strike explanations, and comparisons of the stricken and seated jurors, it cannot be said that the state court unreasonably applied the facts in determining that Whatley failed to prove purposeful discrimination under *Batson*.

### Juror 1, C.A.

According to the State, C.A. was struck because "she had worked for a local law firm and had two close family members with criminal history." (Doc. 2-32 at 2, Doc. 2-30 at 1; Vol. 22 at 35). At the *Batson* hearing, the State explained, "we struck all of those for either black, white, that worked for attorneys in town and had anyone with a close relative with a prior criminal history." (Doc. 2-34 at 12-13; Vol. 22, Tab 51, Batson Hearing ("BH"), p. 12-13). However, Whatley claims that white Juror L.B. was not struck, even though he himself had been charged with domestic violence, nor did the prosecution strike white jurors C.P. or T.M., who had personally been charged with DUI. (Doc. 9 at 15). Whatley further contends that the prosecution failed to question C.A. about her former employment with a local law firm (Vol. 5 at 349); thus, it is unknown how this previous job experience might have influenced her as a juror. (Doc. 9 at 35-36).

The record shows that C.A. admitted in her juror questionnaire that within the last 10 years, she had worked for a local law firm, Stokes & Clinton, PC. (Doc. 9 at 112). The record confirms that the State struck every juror with any experience in the legal field, whether criminal or not (compare C.P., #25, struck for working with banking attorney (Doc. 2-34 at 16-17; Doc. 2-30 at 3; Vol. 6 at 427) and B.F., #48, struck for her paralegal experience and knowledge of criminal law (Doc. 2-34 at 22-23; Doc. 2-30 at 6; Vol. 6 at 508)); thus, it was unnecessary for the prosecution

to question C.A. about her previous legal experience, because potential jurors with any legal experience (past or present) were struck by the State.

The record further confirms that C.A. had a cousin convicted of writing a bad check (and sentenced to one and half years in jail), and her husband had a domestic charge that was dismissed in 2002. (Doc. 2-29 at 77; Vol. 5 at 265). Disparate treatment cannot be found here when comparing jurors L.B., C.P., and T.M to juror C.A.

> "[D]isparate treatment" cannot automatically be imputed in every situation where one of the State's bases for striking a venireperson would technically apply to another venireperson whom the State found acceptable. *Cantu v. State,* 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). The State's use of its peremptory challenges is not subject to rigid quantification. *Id.* Potential jurors may possess the same objectionable characteristics, yet in varying degrees. *Id.* The fact that jurors remaining on the panel possess one of more of the same characteristics as a juror that was stricken, does not establish disparate treatment."

*Wiggins v. State*, 193 So. 3d 765, 790 (Ala. Crim. App. 2014) (internal citation omitted). The charges of seated jurors L.B., C.P., and T.M. were dismissed or found not guilty,[16] unlike C.A.'s cousin's conviction. Moreover, none of the seated jurors had any experience or background working in any law office or in the legal field. Accordingly, there are significant differences between the characteristics of these veniremembers that justify the prosecutor treating C.A. differently than seated jurors L.B., C.P., and T.M. As such, it cannot be said that the state court unreasonably applied the facts in determining that Whatley failed to prove purposeful discrimination under *Batson*.

---

[16]   Juror L.B. was charged with a misdemeanor, third-degree domestic violence, in 2004, for which he was never convicted, and the charge was dismissed. (Doc. 2-29 at 680; Vol. 18 at 715).
Juror C.P. had a DUI dismissed in 1998 and was never convicted. (Doc. 2-29 at 814; Vol. 5 at 298; Vol. 19 at 850)
Juror T.M. was charged with a DUI, but "had not been drinking,", and was found not guilty. (Doc. 2-29 at 168; Vol. 16 at 203).

**Juror 16, J.W.**

The State struck Juror J.W. because of her hesitation and personal beliefs on death penalty. (Doc. 2-32 at 3; Vol. 22 at 36).  Whereas, Whatley argues the record reflects Juror J.W. in fact supported the death penalty based on her juror questionnaire response, "It depends on the case, If you did the crime than you have to do the time," and that Juror J.W. did not respond during *voir dire* that she opposed the death penalty.  (Doc. 2-29 at 215; Doc. 2-2 at 78-81; Vol. 16, Tab 45 at 237-40, 250; *see also* Doc. 9 at 19).  While Whatley admits Juror J.W. was hesitant during her individual questioning regarding the death penalty, J.W. ultimately answered, when asked if she could consider the death penalty, "Yes, I could. Yes." (Doc. 2-2 at 235; Vol. 6 at 394).  Whatley further contends that Juror J.W. expressed less doubt than seated juror S.G. regarding imposing the death penalty.  (Doc. 9 at 18-120).

The record reflects the following exchange during Juror J.W.'s individual questioning:

[State]:Ms. [J.W.] you stated on your questionnaire that in the answer to the death penalty question if it fits - - it depends on the case.  If you did the crime then you have to do the time.

My question to you is this.  Coming in here today do you have a certain set of beliefs that if it's this kind of crime I can't impose the death penalty; but if it's this kind of crime I can?  Do [you] have those fixed beliefs?

[J.W].: I don't know.

Court:  A little louder.

[J.W].: I don't know.  I don't know.  I'm kind of like stunned right now.  Really like how y'all were saying it earlier with the evidence and stuff it just - - I guess like I would have to go by that and see what was what.

. . .

[State]:. . . could you impose the death penalty if the aggravating circumstances outweigh the mitigating?

[J.W].: I guess

[State]:Well, you're hesitant.  Why are you hesitant, ma'am?

[J.W.]: I'm just scared.

Court:  You're just being here or are you scared of not knowing what the evidence is?

[J.W.]: I don't know, kind of being here.

State:   My question would be, are you scared to have to make a decision regarding the death penalty?

[J.W].: Yes.

State:   And based on that being afraid of making a decision on the death penalty, would that emotion influence you so much that when you got to the second part of the case you said, well, I'm not going to vote to impose the death penalty because it's too much of a big decision for me to make.  Do you feel that way?

[J.W.]: Yeah, you could say this.

[State]:So that's what we're asking you these questions for because basically I think that what you're saying is you can't do that weighing of the aggravating and mitigating circumstances because you're too - - it would be too much of an emotional burden on you to impose the death penalty; right?

[J.W.]: Yeah. Yes, ma'am.

[State]:Okay. So you couldn't impose the death penalty because of your personal beliefs and your feelings about it; right?

[J.W.]: Yeah, you could say.

[State]:Okay.

[Defense]:      Ma'am, I understand you being kind of nervous.  This isn't what you're used to doing.  It's kind of a strange environment you're in here and I understand that.  We've talked about nobody wants to be here.  It's not a pleasant thing.  Somebody has to make these decisions.

. . .

[Defense]:      And then if the case went to the second level, the second stage is the sentencing phase, would you still be able to listen to the evidence?

[J.W].: It would just be tough for me.

[Defense]:      I understand.  It's tough on everybody.  It really is.  Like I said, this is how it works if citizens participate.  Would you be able to listen to that evidence and consider it?

[J.W.]: Yeah I could.

. . .

[Defense]:    . . . assuming it wound up that the evidence showed that death might be the appropriate penalty, would you at least be able to consider that as a possibility? I'm not trying to get you to commit to do it.  I'm just saying could you consider that possibility?

[J.W.]: I guess I could.  But like I said earlier, it would be just hard for me.

[Defense]:    I understand.  It is a hard thing.  But would you be able to consider it and with the law that the Judge gives you and the evidence showed that's what ought to be, would you be able to consider that as a possible punishment?

[J.W.]: Yes, I could. Yes.

(Doc. 2-2 at 229-235; Vol. 6, Tab. 45 at 388-394).  Based on the responses of Juror J.W. during her individual questioning, the record supports the prosecutor's explanation that Juror J.W. was hesitant to impose the death penalty.[17]  *Brown v. North Carolina*, 479 U.S. 940, 107 S. Ct. 423, (Mem)–424, 93 L. Ed. 2d 373 (1986) (J. O'Conner, concurrence) ("Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon[ v. Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)].").

When Juror J.W. is compared to seated Juror S.G, there is a notable difference – Juror S.G.'s hesitation surrounding the death penalty relates to the proof necessary to impose a death sentence, not in her ability to vote a death sentence.  The record reflects that Juror S.G. responded in her questionnaire, "I believe if a person commits a crime he should pay for it."  (Doc. 2-29 at

---

[17]    The record further reveals that the State struck all jurors (white or black) who were hesitant or had reservations regarding voting for the death penalty, including Juror J.C. (white), Juror M.G. (white), juror C.L. (white) Juror M.M. (black), Juror C.S. (white), Juror D.H. (white), Juror C.O. (black), Juror B.F. (white) Juror K.J. (black), Juror P.G. (white), Juror K.S. (black), Juror D.E. (white), Juror  P.C. (black), Juror C.S. (white), and Juror B.T (black). (Doc. 2-34 at 13-20, 22, 23-24, 26, 27, 28-29).

269; Vol. 16 at 304).  However, after Juror S.G. stood during voir dire, indicating that she would

not be able to impose the death penalty, the State questioned her regarding her seeming

inconsistency.  The relevant portion of this exchange is as follows:

> [State]: . . . And you had made a statement that you believe a person commits a crime he
> should pay for it.  And then when we were asking the questions I think you stood up and
> said you would not be able to impose the death penalty.
>
> [S.G.]: Well, like I say, I have a question on it.  On capital punishment like that, if
> they had witnesses to this crime and know for sure, you know, I could handle that.
> . . .
>
> Court:  [What if there were a] video tape, a confession, fourteen eyewitnesses - -
>
> [S.G.]: Oh, yeah, I could.
>
> Court:  Could you impose the death penalty?
>
> [S.G.]: If you knew beyond a shadow of a doubt that this guy - - that he actually
> did it, I can handle it.
>
> [State]: And when you say handle it, you could vote - -
>
> [S.G]:  I could.
>  . . .
>
> [S.G.]: . . . Like I say, if you had the witnesses to it I wouldn't have a problem with
> it. . . .
>
> . . .
>
> [Defense]:      And it's just your question in your mind would be the level of proof
> that the State can produce.
>
> [S.G].: Yes.

(Doc. 2-2 at 255-260; Vol. 6 at 414-19).  The record, thus, confirms that juror S.G. supported

imposition of the death penalty and had no hesitation voting for the sentence of death, if adequate

evidence was offered to prove guilt.  (*See id*.).

Accordingly, the decision that Whatley did not prove purposeful discrimination by the state cannot be viewed as an unreasonable determination of the facts.

**Juror 24, O.J.**

The State explains it struck Juror O.J. because he had a brother-in-law with a drug problem "and he was very hesitant regarding the death penalty" during the individual interview.  (Doc. 2-34 at 34; Doc. 2-30 at 3).  Whatley challenges the prosecution's strike of Juror O.J., arguing that white venire members C.P., L.F., and D.S., had friends or family members who had been convicted crimes and white venire members D.S., S.G., and K.F., had friends or family members with drug or alcohol addictions, yet these venire members were seated on the jury.

The record reflects that Juror O.J. responded in his juror questionnaire, in regard to his beliefs about the death penalty, "if guilty you should pay for the crime."  (Doc. 2-29 at 287; Vol. 16 at 322).  When individually questioned during voir dire, the following exchange occurred:

> [State]: Mr. Joiner, in your questionnaire regarding the death penalty you put, if you are guilty you should pay for the crime.  What exactly does that mean?  Are you for the death penalty or are you against the death penalty?
>
> [O.J.]:  Well, my take on that is if a person is found guilty of a crime according to law the[y] should pay for it.
>
> [State]: Okay.  And if a person is found guilty of capital murder and we move to that sentencing phase where your job as a juror would be to weigh the aggravating and mitigating circumstances, and if the aggravating circumstances outweigh the mitigating circumstance, could you vote to impose the death penalty?
>
> [O.J.]:  Yes.
>
> [State]: You hesitated.  Is there any reason why you hesitated?
>
> [O.J.]:  None in particular.

(Doc. 2-2 at 264-65; Vol. 6 at 423-24).  Accordingly, the record clearly supports that during voir dire, the State viewed Juror O.J. as hesitant in his view of imposing the death penalty.  Noticeably,

neither defense counsel nor the court challenged the State's characterization of Juror O.J.'s response at the time of questioning, supporting that Juror O.J. was tentative in answering if he could vote to impose the death penalty.   As such, it is not unreasonable that the state court credited the prosecutor's strike explanation.

To the extent that Whatley compares Juror O.J. to Jurors C.P., L.F., D.S., S.G., and K.F, these jurors are not so similarly situated as to establish disparate treatment on the part of the State. *DeBlase v. State of Alabama*, 294 So. 3d 154, 203(Ala. Crim. App. 2018).

> "Where multiple reasons lead to a peremptory strike, the fact that other jurors may have some of the individual characteristics of the challenged juror does not demonstrate that the reasons assigned are pretextual." *Luong v. State,* 199 So.3d 173, 191 (Ala. Crim. App. 2015) (internal quotation marks and citations omitted). We must look "to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the venire members that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury." *Wiggins v. State*, 193 So.3d 765, 790 (Ala. Crim. App. 2014) (quoting *Leadon v. State*, 332 S.W.3d 600, 612 (Tex. App. 2010)).

*Id*. Juror O.J. affirmed that he had two friends who were convicted of and served time for robbery (Doc. 2-29 at 284; Vol. 16 at 319) and that he had an ex-brother-in-law who died from drug usage, his father died of alcoholism, and  he had a nephew on probation related to drug possession.  (Doc. 2-2 at 94, 111; Vol. 5 at 253, 270).  Whatley compares Juror O.J. to Juror D.S. (who had a sister with an alcohol problem and was under house arrest for a criminal charge), to Juror S.G. (who had a son addicted to pain pills following an operation), to Juror C.P. (who had a dismissed DUI charge and knew someone convicted of murder), to Juror K.F. (who had an aunt with a drug and alcohol problem), and to Juror L.F. (who had a friend with a theft charge).  The record confirms that Jurors D.S., S.G., K.F. and C.P. never wavered in their ability to impose the death penalty as did Juror O.J.,[18] and Juror L.F.'s friend's theft conviction is not so similar to Juror O.J.'s friends' robbery

---

[18]    Juror D.S. stated, "death penalty is acceptable" (Doc. 2-29 at 827; Vol. 19 at 862) and

convictions as to deem them similarly situated.  Whatley also contends the Juror O.J. was a more favorable juror than jurors C.P., L.B., and T.M., who had themselves been charged with crimes. (Doc. 9 at 16-5-16).  As discussed previously (*see* n.18), the charges against jurors C.P., L.B., and T.M. were dismissed or found not guilty.  Thus, the record confirms relevant differences between the struck Juror O.J. and the compared jurors, so that the state court's determination of no purposeful discrimination cannot be viewed as unreasonable in light of the facts.

### Juror 26, M.M.

The State struck Juror M.M. for her hesitation on the issue of the death penalty, believed juror would require a higher burden of proof, and believed innocent people had been sentenced to death. (Doc. 2-34 at 35; Vol. 22 at 42, 87).  Whatley challenges this explanation, arguing that Juror M.M. in fact supported the death penalty (despite her faith's opposition to it), similar to Juror K.F., who was seated on the jury.  (Doc. 9 at 20-21).  Whatley further compares struck Juror M.M. to seated Juror S.G. in regard to her concern for adequate proof before imposing the death penalty. (Doc. 9 at 20-21).

Review of the record reflects that Juror M.M. initially opposed the death penalty. When asked in the juror questionnaire, "What is your faith's position of the death penalty?"; Juror M.M. responded, "I do not believe in the death penalty."  (Doc. 2-29 at 305; Vol. 16 at 340).  Contrarily,

---

answered with a resounding "No" when asked if she would have a problem imposing the death penalty. (Doc. 2-2 at 557; Vol. 7 at 716).

Juror S.G., as previously discussed, had no hesitation voting for the sentence of death, if adequate evidence was offered to prove guilt.  (*See* Doc. 2-2 at 255-261; Vol. 6 at 414-420).

Juror K.F. affirmed, "I don't have a problem with [the death penalty]" and that she had no "blanket opposition to it."  (Doc. 2-2 at 261; Vol. 6 at 420).

Juror C.P.'s responses in his questionnaire and during individual questioning clearly support the death penalty and his ability to impose the sentence.  (*See* Doc. 2-29 at 817; Vol. 19 at 853; Doc. 2-2 at 553-54; Vol. 7 at 712-13).

during voir dire, the venire was asked, "In your questionnaire there was a question, what is your

faith's position on the death penalty and that was a bit confusing it appeared from the responses in

the questionnaire.  I'm going to ask you now, is there any one who because of their own personal

beliefs is opposed to the death penalty for any reason? Please stand up.  What this means is your

feelings are so strong against the death penalty that you would not be able to listen to the law as

the judge instructs you do exactly what I have explained to you." (Vol. 5 at 237-38; Doc. 2-2 at

78).  Juror M.M. stood in opposition to the death penalty (Doc. 2-2 at 81), but then the following

exchange occurred between the prosecutor and Juror M.M.:

> [State]:        Ms. [M.M.]
>
> [M.M.]:              Yes.
>
> [State]:        Ms. [M.M.] in your questionnaire you stated your views.  Have
> those changed?
>
> [M.M.]:        I changed my mind.
>
> [State]:        You changed your mind?
>
> [M.M.]:        Yes.
>
> . . .
>
> [State]:        Thank you.  I'm going to ask that same question of Ms. [M.M.].
> [That was asked to Mr. Y. previously.]  Ms. [M.M.] you said you changed your
> opinion.
>
> [M.M.]:        Yes, because - -
>
> [State]:        Stand up for us Ms. [M.M.]
>
> [M.M.]:        Faith based and it wasn't.
>
> [State]:        Tell us why you changed your opinion.
>
> [M.M.]:        Well, because I thought it was concerning my church and it wasn't.
> That's why I said that.

> [State]:        And so if you were called on as a jury member in this particular case and the jury voted and determined that the Defendant was guilty of capital murder and we went into a second phase of the trial, the penalty phase of the trial, could you listen to the evidence, the aggravating circumstances and the mitigating circumstances and weigh those circumstances and determine which one outweighs the other?  Could you do that?
>
> [M.M.]:        Yes, I definitely could.
>
> [State]:        And if you found that the aggravating circumstance outweighed the mitigating circumstances, could you return a verdict of death?
>
> [M.M.]:        Yes, I could because based on the evidence.

(Doc. 2-2 at 81, 83-84; Vol. 5 at 240, 242-43).  Thereafter, M.M. was interviewed individually and

asked to clarify her position on the death penalty:

> State:  We just called you in to ask you on the issue of the death penalty in your questionnaire you had stated that you do not believe in the death penalty. And then I believe yesterday you had stated that you could possibly return a verdict for the death penalty based on some evidence.  So it's kind of unclear on your position on that.
>
> M.M.:  Right.  Now the reason I said that is because I have in previous years found that a lot of people that have received the death penalty were innocent.  As that's what made me think that.  But I re-thought about what you had said and it occurred to me that if enough evidence was based on the person's guilt then I certainly could go along with the panel.
>
> . . .
>
> State:  And if the evidence was sufficient in the guilt phase to find the Defendant guilty and then we move to the penalty phase, would you be able to weigh the aggravating and the mitigating factors and reach a verdict of death?
>
> M.M.  Yes, I could.

(Doc. 2-2 at 270-271; Vol. 6 at 429-430).  Juror M.M. was then questioned extensively by the State

and the trial court as to the burden of proof she would require, being that she believed innocent

people were on death row.  Juror M.M. responded that she could follow the legal standard and

when asked if she could decide a case where no DNA evidence was produced, she stated, "Yes,

possibly I could" and reiterated that she would not require DNA evidence to be produced in every case.  (Doc. 2-2 at 271; Vol. 6 at 432).

Notably, Juror M.M. was questioned three times regarding her beliefs on the death penalty, and three times, she gave differing explanations and responses.  First, Juror M.M. provided the categorical statement, "I do not believe in the death penalty."  Second, she indicated it was the position of her faith to oppose the death penalty, not her personal opinion.  Third, she stated that because a lot of innocent people had received a death sentence, she originally opposed the death penalty; however, she "re-thought about" the issue and decided, if enough evidence was presented then she could vote to impose death.  (Doc. 2-2 at 271; Vol. 6 at 430).  "[C]learly established federal law, as determined by holdings in Supreme Court decisions, does not prohibit prosecutors from using their peremptory strikes to remove venire members who are not ardent supporters of the death penalty...." *Walls v. Buss,* 658 F.3d 1274, 1282 (11th Cir. 2011) (citing *Bowles v. Sec'y for Dept. of Corr.*, 608 F.3d 1313, 1317 (11th Cir. 2010)).  While Whatley contends Juror M.M. was rehabilitated based on these final statements (that she could weigh the evidence and impose the death penalty), there is nothing inherently discriminatory about a prosecutor focusing more on the anti-death component of the juror's answers, if the prosecutor does so consistently across the panel, as done here, and next discussed.

Unlike Juror M.M., seated Juror K.F. clearly indicated in her juror questionnaire, "I assume it [(my faith)] is in opposition [to the death penalty]."  (Doc. 2-29 at 260; Vol. 16 at 295).  When questioned about the death penalty during individual voir dire, Juror K.F. unequivocally responded, "I don't have a problem with it" and, thereafter, never wavered.  (Doc. 2-2 at 261; Vol. 6 at 420).  This is starkly different than Juror M.M.

Next, Juror S.G. stated in her juror questionnaire, "I believe if a person commits a crime

[he] should pay for it." (Doc. 2-29 at 269; Vol. 16 at 304).    However, Juror S.G. did stand in opposition to the death penalty during voir dire (doc. 2-2 at 79; vol. 6 at 238) but clarified her belief in the death penalty when questioned individually:

> [State]: You're all right, Ms. [S.G]. I promise you.
>
> We just called you in, Ms. [S.G.], because I that the question was kind of confusing on the questionnaire regarding the death penalty and your faith's view. And you had made a statement that you believe a person commits a crime he should pay for it. And then when we were asking the questions, I think you stood up and said you would not be able to impose the death penalty.
>
> [S.G.]: Well, like I say, I have a question on it. On capital punishment like that, if they had witnesses to this crime and know for sure, you know, I could handle that.

(Doc. 2-2 at 255; Vol. 6 at 414). After further questioning by the prosecutor, judge, and defense, the record confirms (repeatedly) that Juror S.G. had "no problem", no hesitation voting for the sentence of death as long as the State "produced a proper level of proof" of guilt. (*See* Doc. 2-2 at 255-60; Vol. 6 at 414-419). Notably, Juror S.G. never articulated that she was against the death penalty, as did Juror M.M. Instead, the record expounds that her oppositional standing during voir dire concerned the burden of proof necessary for the imposition of a death sentence, not her belief in the death penalty. Nor did Jurors K.F. or S.G. ever reference a belief that innocent people were on death row. It, thus, cannot be said that Juror M.M. is similarly situated to Jurors K.F. and S.G. as to evidence disparate treatment.

Accordingly, it was not an unreasonable application of the facts for the state court to determine that the State's peremptory strike of Juror M.M. was not racially motivated.

### Juror 27, A.P.

The State proffered at the *Batson* hearing that it struck Juror A.P. because she knew defense attorney Gregory Hughes and because the father of Juror A.P.'s child (Christopher Fralin) had been convicted of capital murder and was on death row. (Doc. 2-34 at 18; Doc. 2-30 at 4; Vol. 22

at 88).   The record reveals that after Whatley's counsel pointed out that Mr. Fralin had not been

convicted of murder and was not on death row, the prosecution asserted:

> Christopher Fralin is currently incarcerated and being held due to a Robbery 1st
> conviction.  He had also been tried and acquitted on capital murder for the killing
> of two people.  The charge for which he was incarcerated was a Robbery with a
> gun.  The same defense counsel as in the present case State v. Whatley, Greg
> Hughes, also represented the father of Ms. [A.P.]'s child in his Robbery case.

(Doc. 2-32 at 11-12; Vol. 22 at 44-45).   Whatley argues that the prosecution's abandonment of its

initial justification is proof that the original explanation was pretextual and evidence of

discrimination.   (Doc. 9 at 32).

"Neither a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question

provides 'clear and convincing' evidence of pretext." *Parker v. Allen*, 565 F.3d 1258, 1271 (11th

Cir. 2009) (quoting *McNair v. Campbell,* 416 F.3d 1291, 1311 (11th Cir.2005), *cert. denied sub*

*nom.*, *McNair v. Allen,* 547 U.S. 1073, 126 S. Ct. 1828, 164 L. Ed. 2d 522 (2006) ("Although the

prosecutor's reason for striking McAllister was based on a belief that ultimately proved incorrect,

this does not establish by clear and convincing evidence that the state court's finding of fact was

erroneous.").   In such situations, trial judges are "in the best position to evaluate an attorney's

candor and ferret out purposeful discrimination" and "appellate court[s] will defer to trial court's

findings on genuineness of reasons even when 'troubled by the weakness of record evidence."

*United States v. Walker*, 490 F.3d 1282, 1294 (11th Cir. 2007) (internal citation omitted).   Given

that Juror A.P. indicated on her juror questionnaire that Christopher Fralin was the father of her

child, was represented by Gregory Hughes in a murder trial, and was currently incarcerated for

Robbery 3rd (Doc. 2-29 at 311-12; Vol. 16 at 346-47), that Juror A.P. was questioned regarding

her relationship to Christopher Fralin, and that all jurors were struck who knew someone currently

incarcerated or who knew defense counsel, it cannot be said that the state court's decision was

based on an unreasonable application of the facts in light of the record evidence.

**Juror 34, B.D.**

The State struck Juror B.D. because she had a husband committed to a mental facility, her nephew worked at a state mental facility, her stepson and grandson had drug and alcohol issues, and her grandson was currently serving time.  (Doc. 2-34 at 18-19; Doc. 2-30 at 4; Doc. 2-32 at 13; Vol. 22 at 46, 88).

The record reflects that Juror B.D. responded on her juror questionnaire that she had her husband committed to psychiatric facility for evaluation.  (Doc. 2-29 at 375; Vol. 17 at 410).  She stated her nephew was a policeman at Searcy Hospital.  (*Id*.).  And, she stated that she had a close relative, Phillip York, who "served time" for a criminal charge.  (Doc. 2-29 at 374; Vol. 17 at 409).  Juror B.D. confirmed in individual voir dire that Phillip York was her grandson and he was "serving time" for a probation violation.  (Doc. 2-2 at 116-117).  The record reflects that the State struck all jurors who had a friend or family member currently incarcerated.

To the extent Whatley compares Juror B.D. to seated Jurors D.S., S.G., and K.F. (who had relatives with mental illness and/or drug and alcohol problems), he has failed to show disparate treatment.  Juror D.S. had a sister who suffered with drug and alcohol issues but did not have a friend or family member currently incarcerated.  Juror S.G. had a son who had received addiction treatment for pain pills following a surgery, but she did not have a friend or family member currently incarcerated.  Juror K.F. had an aunt, who she was not close to, who had drug and alcohol problems before being diagnosed with bipolar disorder, but she did not have a friend or family member currently incarcerated.  Furthermore, none of these seated jurors testified at a court hearing to have their family member committed.

Thus, based on the record facts, the state court's decision that the strike against Juror B.D.

was race neutral cannot be viewed as unreasonable.

**Juror 40, C.O.**

The State struck Juror C.O. because he told the Court he had hearing difficulties and hearing problems during the voir dire, his son had been convicted of murder, his son had a drug and alcohol problem, and Juror C.O. was not sure of his feelings on the death penalty, and he was currently under psychiatric care for manic depressive disorder and PTSD.  (Doc. 2-34 at 20-21; Vol. 22, Tab 51, BH at 20; Doc. 2-29 at 431; Doc. 2-30 at 5; Vol. 22 at 89).  Whatley contends these reasons were pretext, as Juror C.O. confirmed his hearing would not be a problem during the trial (as he had no difficulty hearing during voir dire), he did not believe his son was wrongly convicted, and he was never questioned about the death penalty (and his juror questionnaire states, "Baptist").  (Doc. 2-2 at 314-316; Doc. 2-29 at 431).  Whatley further argues that Juror C.O. is comparable to seated Jurors S.G. and B.D. (who both have medical conditions) and Jurors D.S. and C.P. (who had family members or friends convicted of attempted murder and murder, respectively).

The record confirms that Juror C.O.'s son was currently incarcerated for murder (Doc. 2-29 at 428; Vol. 5 at 281; Vol. 6 at 474).  The record further confirms that all potential jurors, white or black, who knew someone currently incarcerated were struck.  *Cf., Thomas v. State*, 611 So. 2d 416 (Ala. Crim. App. 2009) ("previous criminal charges, prosecutions, or convictions of potential jurors or their relatives are a race-neutral reason for striking them").  Review of the record also confirms that Juror C.O. was currently under psychiatric care for PTSD and manic-depressive disorder (Doc. 2-29 at 431; Doc. 2-2 at 316; Vol. 6 at 475), and no other juror shared this characteristic.  Accordingly, it cannot be said that Juror C.O. was similarly situated to any seated juror.

Thus, it is not an unreasonable determination of the record facts to conclude that Juror C.O. was struck for race neutral reasons.

**Juror 50, K.J.**

The State struck Juror K.J. because she had family members incarcerated at the time of Whatley's trial, because she had stayed at the victim's hotel for Mardi Gras four years in a row, and due to her hesitation to impose the death penalty. (Vol. 22 at 90). Whatley argues, however, that the State did not strike all jurors who knew people convicted of murder or attempted murder and that staying at the victim's hotel would tend to make her sympathetic to the prosecution. These challenges are insufficient to evidence a discriminatory strike. Instead, the State's strike explanations are race-neutral and are borne out by the record.

Juror K.J. indicated in her juror questionnaire that her father and uncle were currently incarcerated for attempted murder and murder, respectively. (Vol. 17 at 553). Juror K.J. also expressed hesitancy regarding the death penalty. First, she did not answer the question regarding the death penalty on the juror questionnaire, leaving it blank. (Vol. 17 at 556). Second, when questioned on the issue of the death penalty in *voir dire* her response was as follows:

> [State]: And knowing that this is a capital murder case and if chosen as a jury member you would be asked to determine the guilt or innocence of someone charged with capital murder. With those experiences that you have, do you think you would still be able to do that or would these past experiences prevent you from doing that?
>
> [K.J.]: I don't feel like they would prevent me from doing that. I just don't feel like I would want to be in a predicament where I have to do that.
>
> [State]: Okay. And it would make you feel uncomfortable, wouldn't it?
>
> [K.J.]: Yes, ma'am.
>
> [State]: And the level of uncomfortableness that you would feel, wouldn't that level of uncomfortableness affect your decision making ability?

[K.J.]:  Yes, ma'am.

(Doc. 2-2 at 156-57; Vol. 5 at 315-316).  Juror K.J. then stood during voir dire, acknowledging

that the thought of being a juror on a capital case was "so offensive or overwhelming" that she did

not believe she could sit and hear the testimony and make a fair decision based on the evidence.

(Vol. 5 at 323-24).  The State then moved to strike Juror K.J. for cause, stating that Juror K.J.

testified that her decision as a juror would be influenced because her father and uncle's convictions;

thus, Juror K.J. would not base the verdict on the evidence and law (Doc. 2-2 at 182; Vol. 6 at

341), but the defense asked to question her further.  (Doc. 2-2 at 184; Vol. 6 at 343).

During individual *voir dire*, Juror K.J. confirmed that the murder trials and convictions in

her family would affect her decision making as a juror, as would murders that have occurred in

her family.  (Doc. 2-2 at 357-58).  She clarified that while she would know the difference between

guilty and not guilty, "she just wouldn't even want to have any dealings with the case, just period

point blank" – that it would make her very uncomfortable.  (Doc. 2-2 at 358-59; Vol. R. 517-18).

The prosecutor pursued questioning to determine if, despite being uncomfortable, Juror K.J. could

put her feelings aside and follow the law and instructions of the judge.  Juror K.J. affirmed she

could.  However, she continued to insist that she did not want to be involved in the case.  Review

of her testimony reveals that each time she was questioned by the prosecution, she maintained that

she "would not be able to reach a fair verdict in this case" or impose the death penalty; then when

questioned by the defense, she would affirm her ability to consider the choices of life imprisonment

and death and vote based on the evidence and the law.  (Doc. 2-2 at 360-63; R. 519-522).  Such

testimony evidences her hesitation and/or reservations in regard to the death penalty.   As

previously discussed, the State struck all jurors who expressed issues and hesitation to imposition

of the death penalty, as well as all potential jurors who knew someone currently incarcerated.[19]

Thus, it cannot be said that the state court's determination was based on an unreasonable application of the facts nor has Whatley shown disparate treatment.

### Juror 61, C.H.

The State struck Juror C.H. because her son was a mental health worker, her niece was currently incarcerated, and she was related to Andrew Husband by marriage, who had been prosecuted in 2005 by the Mobile District Attorney's Office.  (Doc. 2-2 at 96, 425, 428; Doc. 2-30 at 7; Vol. 22 at 91).  Juror C.H. also had a cruise scheduled during the potential dates of the trial.  Whatley argues these reasons are pretext, asserting that the prosecutor failed to question Juror C.H. regarding her son's job to see how it would affect her as a juror, that Juror C.H. affirmed that she was not close to Andrew Husband, and argues that the record fails to support that Juror C.H. had a relative in prison.

Juror C.H. was questioned during voir dire about the charges and convictions of her niece and nephew that she listed on her juror questionnaire (Doc. 2-29 at 617; Vol. 18 at 652):

> [State]: - - you answered some questions regarding priors.  Do you know what they were charged with?
>
> [C.H].: I think one of the charges on my niece was probably a theft and I don't know what else.  I think she's currently still in Metro.

(Doc. 2-2 at 126; Vol. 5 at 285).

Given that the record supports all jurors with a family member in jail or prison were struck (see n.19), no disparate treatment is evidenced, and the state court's decision cannot be viewed as an unreasonable determination based on the facts.

---

[19]    The following jurors were struck for having a friend of family member currently incarcerated, Jurors C.C. (black), L.B (white), A.P. (black), B.D. (black), C.O. (black), K.J. (black), C.H. (black), S.W. (black), and B.T. (black).  (See Doc. 2-34 at 12, 18, 20, 23, 24, 25, 29).

**Juror 66, S.W.**

The State struck Juror S.W. because he had blurry eyesight and informed the court he had problems seeing, he has a nephew with a burglary charge, and has health problems including blood pressure issues. (Doc. 2-30 at 8; Vol. 22 at 92).

The record reflects that in his juror questionnaire, Juror. S.W. checked "yes" to the question asking, "Do you have any personal or health problems (hearing, sight, medications, etc.) that would prevent you from giving you full attention to the testimony during the trial?", and indicated he had blurry vision. (Doc. 2-29 at 667; Vol. 18 at 702). Juror S.W. also stated in his juror questionnaire, that his nephew was currently in jail and/or prison. (Doc. 2-29 at 662; Vol. 18 at 697). Juror S.W. was further questioned during *voir dire* about his nephew's charges, where he confirmed he was close to his nephew, who was currently in jail for theft charges in Mobile County. (Doc. 2-2 at 130-32). During individual *voir dire*, Juror S.W. affirmed that he suffered from blood pressure and cholesterol problems that were not under control at that time. (Doc. 2-2 at 460; R. 619). However, he did not think that they would affect his ability to be a juror. (*Id*.).

Based on the facts of record, it was not unreasonable that the state court found no discrimination as to the strike of Juror S.W., where the record confirms that all jurors who had relatives in jail or prison were struck from the jury. (*See* n.19).

**Juror 74, T.P.**

The State explained at the *Batson* hearing that it struck Juror T.P. because her grandfather was an alcoholic and based upon her statements regarding punishing those who are continual users and those who sell to children. (Doc. 2-34 at 26; Vol. 22, BH at 26). Whatley argues the strike of Juror T.P. exhibits disparate treatment and further argues that the state court failed to reasonably consider Juror T.P.'s actual testimony in determining that there was no discrimination. (Doc. 9 at

38-38).

Review of the Alabama Court of Criminal Appeals' opinion reflects that the court questioned the prosecution's reason for striking Juror T.P. due to her grandfather's alcoholism,[20] but deferred to the trial court's credibility determination that there was no discriminatory purpose to the strike of Juror T.P.  The Court of Criminal Appeals stated:

> The State used its last strike to remove juror T.P. based on her responses during voir dire concerning drug use. T.P. indicated that she was not offended by drug use. When questioned further she said that she "believed that those who are continual users and abusers or sell to children are the only ones that should really be punished to the full extent of the law." The prosecutor stated:
>
>> Based on this line of questioning and her demeanor throughout this questioning, the State believed as though she would need the Defendant to be a continual or habitual offender in order to vote for death or in her words 'to be punished to the full extent of the law.' In this case, the State would not be presenting evidence during the trial phase of [Whatley] being a continual user or selling any type of drugs to children. Based on the fact that these two specific examples were given by [T.P.] as reasons to punish someone to the full extent and would not be evidence in this case, the State struck this juror.
>
> (Remand R. 55).  The State questioned whether T.P. would hold accountable only those individuals who are continual abusers or who sell drugs to small children. This reason was race neutral.
>
>> Within the context of *Batson*, a "race-neutral" explanation "means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

---

[20]     The Court of Criminal Appeals stated:

Although the State also said that this juror was struck because her grandfather was an alcoholic, this reason is questionable, given that the State did not use this reason to strike white jurors who indicated that they had a relative with a drinking problem.

*Whatley v. State*, 146 So. 3d 437, 456 n.7 (Ala. Crim. App. 2010).

*Allen v. State*, 659 So. 2d 135, 147 (Ala. Crim. App. 1994) (quoting *Hernandez v. New York,* 500 U.S. at 360).

> "When reviewing a trial court's ruling on a *Batson* motion, this court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous." *Yancey v. State,* 813 So. 2d 1, 3 (Ala. Crim. App. 2001). "A trial court is in a far better position than a reviewing court to rule on issues of credibility." *Woods v. State,* 789 So. 2d 896, 915 (Ala. Crim. App. 1999). "Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries." *Parker v. State,* 571 So.2d 381, 384 (Ala.Crim.App.1990).

> *Doster v. State,* 72 So.3d 50, 73-74 (Ala. Crim. App.2010).

*Whatley*, 146 So. 3d at 456-57.

Juror T.P.'s juror questionnaire reflects that she "believe[s] in the death penalty." (Doc. 2-29 at 737; Vol. 18 at 772). When questioned individually, the following exchange occurred:

[Defense]:   In your - - Two questions I have from your questionnaire. One that says drug abusers should be punished to the full extent - -full content of the law.

[T.P.]:   Uh-huh.

[Defense]:   Does that mean you have some particular strong opinion about drugs in general?

[T.P.]:   No, like continual user, like continual abuser, you know, several offender where they go to trial or be arrested one time and get off and go back. Young children - - old people selling to young children, something like that, especially to children, I think should be.

[Defense]:   You said abuser. What about people that use drugs? Would that offend you?

[T.P.]:   No, it doesn't offend me. It doesn't offend me that they use drugs. Everybody has their own preference. Just when they abuse it - - it's an endangerment to others.

[Defense]:   you also - - In there it says you believe in the death penalty. Can you tell me just a little bit about how you feel about that?

[T.P].:          It depends on the circumstances at hand.

[Defense]:     You're not saying you're opposed to it?

[T.P.]:          No, I don't oppose it.

[Defense]:     Do you have any feelings about maybe it's not used enough on people or –

[T.P.]:          No.

[Defense]:     It's just something that's out there?

[T.P.]:          Yes.

[Defense]:     Do you understand that if we got to that point where you make a decision about the death penalty or not, there's only two choices.  One is death and the other is life without parole.  What it says is what it means.  Do you understand that?

[T.P.]:          Yes, sir.

[Defense]:     Would you have any problem voting in favor of life without parole if those are the two choices?

[T.P].:          No, I would not have a problem with it.

[Defense]:     And assuming that - - and this is a murder case, capital murder case but it's still a murder case, and assuming after the first stage that the Defendant was found guilty, would you at that point believe that the death penalty ought to be imposed or would you be able to hear the evidence relating to aggravating factors and mitigating factors and weigh the two?

[T.P.]:          I would need to hear the evidence in fullness in order for me to make a good and right decision.

[Defense]:     Appreciate it.  Thank you.

. . .

[State]:        Ms. [T.P.], you are saying that after you heard all the evidence and you weighed those factors, would you be able to reach a decision of death if that were appropriate?

[T.P.]:          Yes, if that was appropriate.

(Doc. 2-2 at 501-03; Vol. 7 at 660-62).

The record supports Whatley's assertion that Juror T.P. did not indicate that "only" continual drug users and abusers or those who sell to children should be punished to the full extent of the law.  However, the record does imply that Juror T.P. held such defendants to be some of the most offensive.  The line of questioning cited above reflects an attempt to obtain an understanding of Juror T.P.'s opinion on the death penalty and when/if it should be imposed.   Juror T.P.'s responses to the death penalty questions, however, are notably vague.  While Juror T.P. expounded on her views regarding drug use (including the types of offenders and under which circumstances these offenders should receive harsh penalties), she failed to give any explanation or hint as to when the death penalty should be imposed – using phrases like, "it depends on the circumstances" and "when appropriate."  Thus, it cannot be viewed as unreasonable that the prosecution opined that Juror T.P. would require specific circumstances and facts to be evidenced before punishing someone to the full extent of the law.

> [W]e have noted that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous. *[Hernandez*, 500 U.S.] at 364, 111 S. Ct. 1859. A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); *see also Williams,* 529 U.S., at 399, 120 S. Ct. 1495 (opinion of O'CONNOR, J.).

*Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003).  Here, Whatley has not demonstrated that the state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence or that the determination was "objectively unreasonable" in light of the record before the court.

**Juror 75, K.S.**

The State struck Juror K.S. because the stated "that she does not believe in the death penalty in individual interview."  (Doc. 2-34 at 26; Vol. 22 BH 26).

The record reflects that Juror K.S. left the question regarding the death penalty blank on her juror questionnaire (Doc. 2-29 at 746; Vol. 18 at 781) and affirmed she opposed the death penalty during voir dire:

> [State]: In response to my question you said you have a view on the death penalty that would cause you to vote for or against it?
>
> [K.S].: Against Yeah.
>
> [State]: You would vote against it?
>
> [K.S.]: Nods

(Doc. 2-2 at 158-59; Vol. 5 at 317-318).  Juror K.S. was again questioned regarding her opinion and belief about the death penalty, with the following exchange occurring:

> [State]: What is your position on the death penalty?
>
> [K.S.]: Well, I just - - I don't like the death penalty.  It just - - I just don't like it.
>
> [State]: And many people are very uncomfortable when you even say the words death penalty.
>
> [K.S.]: Uh-huh.
>
> [State]: The issue in this case is if you were on to sit as a jury member in this particular case and the jury determines that the Defendant was guilty of capital murder and we moved on to the penalty phase, the Judge will instruct you by law, as a jury member, you are to weigh the aggravating and mitigating circumstances presented in that portion of the trial. And if the aggravating circumstances outweigh the mitigating circumstances, it is your duty as a juror to impose the death penalty.  Could you do that?
>
> [K.S.]: I don't know - - I don't want to make that decision, no.  I don't want to make the decision.  I don't.

[State]: So you're saying no and you're saying you don't want to does that mean you cannot?

[K.S.]: No, I can't.

(Doc. 2-2 at 504-05; Vol. 7 at 663-64). Juror K.S. was then questioned by defense counsel in attempt to rehabilitate her., where Juror K.S. affirmed, "yes," [(she could vote in favor of the death penalty if that's what the evidence required along with the Judge's instructions),] "but it would be hard." (Doc. 2-2 at 506-08; Vol. 7 at 664-67).

Based on the testimony of Juror K.S., it is not unreasonable that the state court credited the prosecution's strike as race neutral and determined no *Batson* error.[21] As previously discussed, "clearly established federal law, as determined by holdings in Supreme Court decisions, does not prohibit prosecutors from using their peremptory strikes to remove venire members who are not ardent supporters of the death penalty...." *Walls,* 658 F.3d at 1282 (internal citation omitted). Here, the prosecution struck all jurors who exhibited hesitation regarding the death penalty.[22]

### Juror 76, G.W.

The State struck Juror G.W. because she had a nephew that suffered with mental health issues most of his life, three uncles with alcohol and drug problems, because she heard about the case on the news, she suffered with rheumatoid arthritis ("and said that may affect her in being able to sit as a juror"), and she expressed reservations about the death penalty. (Vol. 22 at 58 and BH 26-27). The State maintained, "the combination of the[se] together, are the reason for her

---

[21] Although Whatley attempts to compare the strike of Juror K.S. to seated Juror S.G., such argument fails. Juror K.S. expressed complete opposition to the death penalty, whereas Juror S.G., as previously discussed, never wavered in her belief of the death penalty, only in reiterating that to impose it she would need to know for sure that the defendant was guilty, based on eyewitness testimony, video tape evidence, a confession, etc. (*See* Doc. 2-2 at 255-57; Vol. 6 at 414-416). Thus, these two jurors are not similarly situated as to evidence disparate treatment.

[22] *See supra* n.17.

being struck by the State."  (Vol. 22 at 58).

The record confirms that Juror G.W. had heard about the case "on the news and in the paper" and was aware that it involved a robbery and that the victim owed a local hotel (Doc. 2-2 at 512-13; Vol. 7 at 671-72).  The record further confirms that Juror G.W. responded "N/A" to her faith's position on the death penalty in her juror questionnaire (Doc. 2-29 at 755) and when questioned about her ability to impose a death sentence, Juror G.W. responded, "I guess after I heard everything."  (Doc. 2-2 at 514; Vol. 7 at 673).  The prosecution stated, "Okay. You had some - - You're expressing reservations about that.  Is that correct?"  (*Id*.).  To which Juror G.W. answered, "Well, yes."  (*Id*.).    Thereafter, Juror G.W. confirmed, "Yes", she could weigh the aggravating and mitigating circumstances and vote for death as instructed by the court.  (*Id*.).

While Whatley seeks to compare the strike of Juror G.W. to seated jurors D.S., S.G., and K.F. (who had family members with drug or alcohol addictions), C.P., L.B., and T.M. (who personally were charged with crimes), D.S., A.H., and K.F. (who had family members with mental health issues), and S.G. (who had back problems), none of these jurors also expressed reservations to the death penalty nor had they previously heard about the case.  As previously noted, the prosecution struck every potential juror, both black and white, hesitant regarding voting a death sentence. [23]  Thus, it cannot be said that these seated jurors were so similarly situated to Juror G.W. as to evidence disparate treatment.  Relying on the trial court's crediting of the prosecutor's explanations to support the strike of Juror G.W., and the record confirmation of facts supporting the proffered explanations, the Court of Criminal Appeals' decision cannot be viewed as an unreasonable determination based on the facts.

---

[23]     *See, supra*, n.17.

**Juror 85, L.W.**

The State struck Juror L.W. because she knew Whatley's defense attorney Lee Hale, Jr., who previously represented her ex-boyfriend, and she believed the sentence he received was too much. (Doc. 2-34 at 27-28; Vol. 22, Tab. 51, BH at 27-28). The record confirms this explanation (Doc. 2-2 at 564-68) and reflects that the only other juror with knowledge of the defense attorney(s) was also struck.[24]  It is thus not unreasonable in light of the facts that the state court determined no racial discrimination in the striking of Juror L.W.

**Juror 87, C.C.**

The State proffered at the *Batson* hearing that it struck Juror C.C. for the following reasons:

> [Juror C.C. was] working on degree in rehab and counseling.  Brother convicted of armed robbery.  Her area of degree and study was substance abuse, mental health and dealing with criminals and putting them back into society.  She was working on a degree in, more specifically, rehabilitation counseling working with substance abuse facility with clients who have mental issues incorporating them back into the community.  She said she dealt with a lot of people who have been convicted of crimes and that those that have substance abuse, alcohol abuse issues or illness, they're given - - we work with those giving them an opportunity who want to help them self be rehabilitated and put them back into society.

(Doc. 2-34 at 28; Vol. 22, Tab. 51, BH at 28).

The record confirms that Juror C.C.'s step-brother had been convicted of armed robbery and sentenced to 8 years (Doc. 2-29 at 851) and that the prosecution struck all jurors who had friends or family currently incarcerated.[25]  However, it is unclear from the record whether or not Juror C.C.'s relative was incarcerated at the time of Whatley's trial, as Juror C.C. was never questioned about the conviction nor did Juror C.C respond during voir dire to the prosecutor's

---

[24]   See discussion of Juror C.H, *supra*.

[25]   *See supra* n.19.

request to stand if a juror had a family member or close personal friend who had been arrested or convicted of a crime.  (*See* Doc. 2-2 at 105-140).

The State did, however, question Juror C.C. at length regarding her degree and line of work:

[State]:      Ms. C[.C].   I noted that you have a degree in rehabilitation counseling.

[C.C.]:       I'm working on one now.

[State]:      What exactly is that, ma'am?

[C.C[:        That - - it's in the counseling field where - - right now I'm doing my internship at a substance abuse facility and that's where we work with clients mentally and try to incorporate them back into the community.

[State]:      And that's your chosen profession; right?

[C.C]:        That's what I'm going into, yes.  Well, rehab counseling is actually different aspects.  That's one small aspect of it.

[State]:      But you specifically put on your questionnaire that you were specializing in rehabilitative counseling; right?

[C.C]:        Correct.  Which could involve counseling for other forms of helping them incorporated themselves back into the community, daily living facilities and so forth.

[State]:      As such do you deal with a lot of people who have been convicted of a crime?

[C.C.]:       Some, somewhat, yes.

(Doc. 2-2 at 140-41).  Juror C.C. was subsequently asked to clarify her previous answers:

[State]:      I think one of your answers was that you believed that in your profession it would be – you believed – Excuse me.  You believed that putting criminals back into society and rehabilitating them; is that correct?

[C.C]:        No, that's not what I said.

[State]:      Okay.  I don't want to put words in your mouth.  That's why I'm asking you to clarify it.  Tell me what you meant by that.

> [C.C.]:        I said those who have substance and alcohol abuse issues or illness, they're given – we work with those to five them the opportunity who want to help them self be rehabilitated back into society.
>
> [State]:       Okay.
>
> [C.C.]:        You asked me did I work with some lady or criminals or had been criminals.
>
> [State]:       Yes, ma'am.  You were getting you degree in rehabilitative-
>
> [C.C.]:        My masters in rehabilitative counseling.

(Doc. 2-2 at 574-75).  In explaining the strike to the trial court, the State noted that "the capital case of Donald Whatley involved testimony and evidence of not only mental issues but alcohol and drug abuse." (Doc. 2-32 at 28).  Likewise, the record supports that Juror B.D. and Juror C.H. were struck because they had family members who worked at mental health hospitals or facilities. (Doc. 2-34 at 18-19, 24-25).

In light of the record evidence, it cannot be said that the strike of Juror C.C. was discriminatory.

### Juror 93, P.M.

The State struck Juror P.M. because she worked with mentally challenged individuals, her brother was charged with a stabbing and acquitted, and because she had strong feelings against the death penalty.  (Doc. 2-34 at 28-29).

When questioned during individual voir dire, Juror P.M. affirmed that her husband was a pastor and that in regard to the death penalty, "thou shalt not kill." (Vol. 8 at 747; Doc. 2-2 at 588). Juror P.M. further confirmed that her faith prevented her from imposing the death penalty and that if instructed to do so, she "couldn't do it." (Vol. 8 at 748-49; Doc. 2-2 at 589-90).  After attempts to rehabilitate Juror P.M., she stated, "Yeah" that she could consider and follow the Judge's instructions and consider the options of life imprisonment and the death penalty.  (Vol. 8 at 749-

756; Doc. 2-2 at 590-96). Juror P.M. was testified that her brother was acquitted of a stabbing in Mobile County in the 1990s, and she affirmed that his case would not influence her decision-making process if she was called to serve as a juror. (Doc. 2-2 at 597; Vol. 8 at 756).

With nearly 10 pages of individual voir dire questioning, the record supports the prosecution's explanation that Juror P.M. expressed hesitation regarding the death penalty. Contrary to Whatley's argument, the record confirms, as previously discussed, that the prosecution unequivocally struck all potential jurors who had reservations and hesitations about imposing the death penalty.[26] Thus, the state court's determination was reasonable in light of the facts of record.

**Juror 104, B.T.**

The State struck Juror B.T. because he had an uncle currently incarcerated and was hesitant on death penalty issue. (Doc. 2-34 at 29-30; Vol. 22, Tab. 51, BH at 29-30; Doc. 2-30 at 11).

The record reveals that the follow exchange occurred during individual *voir dire* of Juror B.T.:

> [Stat]e:      Just wanted to ask a few questions to make sure we were clear. Whenever we asked on the questionnaire and then we asked you in voir dire yesterday, and it seems much longer than that, but we asked you about the death penalty. And you stated that you were opposed to the death penalty; is that correct?
>
> [B.T.]:      That's right.
>
> [State]:      So does that mean that you would be unable to impose the death penalty in any circumstances?
>
> [B.T].:      Yeah, but if I have to I would.
>
> [State]:      What do you mean if you have to you would?

---

[26]      Whatley attempts to compare Juror P.M. to seated Juror S.G. Juror P.M. expressed multiple times that her faith and personal beliefs prevented her from imposing the death penalty., whereas Juror S.G. had no such reservations. Instead, Juror S.G. affirmed multiple times that if sufficient evidence of guilt was shown, she had no problem or hesitation in voting for death.

[B.T.]:         I mean, I don't believe in the death penalty but if I was chosen to sit on it, be a juror, I would.

[State]:         Now, based on the fact that you do not believe in the death penalty, would that belief that you have affect you if you were to sit on this jury and you were to go into the penalty phase of the jury and you were to be deciding, after the Judge instructs you in the law, . . .

[B.T.]:         No, it wouldn't.

[State]:         So you could set aside what you personally believe?

[B.T.]:         Yeah, I could.

. . .

[State]:         I noticed and I know that we asked you some yesterday about this, that you have had an uncle that has been in - - serving time; is that correct?

[B.T].:         That's right.

[State]:         And that was on a murder charge.  And I know that obviously that was - - Were you close to that uncle?

[B.T].:         Yes, I am.

[State]:         And is he still serving time.

[B.T.]:         Yes.

(Vol 8 at 820-22; Doc. 2-2 at 661-63).  As previously discussed, the prosecution struck all potential jurors who expressed reservations about the death penalty, as well as those who had family members currently incarcerated.[27]  The record evidence supports both here.  Accordingly, the state court's determination that there was no purposeful discrimination in the striking of Juror B.T. cannot be viewed as unreasonable in light of the record evidence.

For the reasons discussed herein, Petitioner Whatley has failed to carry his burden of showing that the prosecution used peremptory strikes in a race conscious manner in violation of

---

[27]     *See supra* notes17 and 19.

*Batson v. Kentucky* and its progeny, or clearly established United States Supreme Court precedent, nor has he shown that the state court decision was an unreasonable determination based on the facts.  Accordingly, habeas relief is due to be denied on this claim.

## 2.  Whether Whatley Received Ineffective Assistance of Counsel

The Sixth Amendment of the Constitution guarantees every accused "the right . . . to have Assistance of counsel for his defense."  U.S. CONST. amend. VI.  To establish an ineffective assistance claim under the Sixth Amendment, a petitioner must make both showings of the two-prong standard, discussed in *Strickland v. Washington*, that has been adopted by the Supreme Court for evaluating claims of ineffective assistance of counsel.  *Strickland*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  That is, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citing *Strickland*, 466 U.S. at 687).  Because the failure to demonstrate either deficient performance or prejudice is dispositive of the claim, courts applying the *Strickland* test "are free to dispose of ineffectiveness claims on either of [*Strickland's*] two grounds."  *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998).

In order to satisfy the "performance" prong of the *Strickland* test, a petitioner is required to show that his attorney's representation "fell below an objective standard of reasonableness," which is measured by "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  That is, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  In considering such a claim, the court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F. 3d 1051, 1053 (11th Cir. 1999) (citations omitted).  Thus, the petitioner has a difficult burden as to be

considered unreasonable, "the performance must be such that 'no competent counsel would have taken the action that [the petitioner's] counsel did take.'" *Ball v. United States*, 271 F. App'x 880 (11th Cir. 2008) (citations omitted).

The petitioner must also satisfy the "prejudice" prong of the *Strickland* test.  To that end, the petitioner must show that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The petitioner "must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'" *Butcher v. United States*, 368 F.3d 1290, 1293, 95 F. App'x 1290 (11th Cir. 2004) (citations omitted).  Further, it is not enough to satisfy the prejudice prong to merely show that the alleged errors affected the case in some imaginable way. *See id*. at 1293-94. ("[T]hat the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice") (quoting *Strickland*, 466 U.S. at 693) (internal quotation marks omitted).  Thus, "under the exacting rules and presumptions set forth in *Strickland*, 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (citations omitted).

Given that the state courts have adjudicated Whatley's claim on the merits in post-conviction proceedings, the question now is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (emphasis added).  Put another way, Whatley must not only satisfy the two *Strickland* prongs, but he must also "show that the State court applied *Strickland* to the facts of his case in an objectively

unreasonable manner." *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (citations and internal quotation marks omitted).  "Although courts may not indulge '*post hoc* rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions, *Wiggins*[, 539 U.S. at 526-27], neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 562 U.S. at 109, 131 S. Ct. at 790.  The Eleventh Circuit has further elaborated on this difficult, but not insurmountable, burden stating that,

> When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." [*Harrington*, 562 U.S. at 102], 131 S. Ct. at 786. So long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. Id., 131 S. Ct. at 786. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. *Id.*, 131 S. Ct. at 786.

*Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).  As a result of this difficult burden, "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Id*.

Having set forth the appropriate standard for determining an ineffective counsel claim, the Court turns to Petitioner Whatley's asserted challenges.

### a.  Claims Arising During Guilt Phase of Trial.

Whatley claims that trial counsel provided ineffective assistance during the guilt phase of his capital trial by failing to conduct a minimal investigation of the State's case, thus preventing him from being able to show that he lacked specific intent to kill at the time of Mr. Patel's death. Specifically, Whatley alleged in his post-conviction petition:

On the night of the offense, Mr. Whatley was suffering withdrawal symptoms from

crack cocaine and was under the influence of other controlled substances. However, trial counsel failed to investigate and verify the amount of drugs and alcohol Mr. Whatley consumed the night of the crime. Additionally, trial counsel failed to investigate what effects such a quantity of drugs would have on the user. Without a reasonable investigation into these facts and the State's case against Mr. Whatley, trial counsel was unable to effectively cross-examine the State's witnesses or formulate an effective and coherent theory of defense.

. . .

Mr. Whatley was a deeply troubled man who was under the influence of drugs and alcohol, and battling severe mental health issues, at the time of the offense. He was also suffering withdrawal symptoms from crack cocaine. If the jury had been presented with evidence of the substances and amounts he used on the night of the offense, expert testimony on the effect that these controlled substances and withdrawal symptoms can have on an individual's cognitive processes, and other evidence and testimony about how mental illness could interfere with one's ability to form the requisite specific intent for capital murder, there is a reasonable probability that the jury would have found Mr. Whatley not guilty of capital murder and guilty of a lesser-included offense, such as manslaughter.

(Doc. 2-49 at 7-9; Vol. 30, Tab 69, at 57-59 (paragraph numbering omitted)). The trial court

rejected Whatley's claim as being deficiently pleaded pursuant to Ala. R. Crim. P. 32.6(b).[28] (*See*

Doc. 2-55 at 3-4). The Alabama Court of Criminal Appeals affirmed the trial court's summary

dismissal, concluding:

In the present case, Whatley fails to allege what information or evidence would have been discovered had an additional investigation been done, or how any additional information or evidence would have supported a lesser charge. He also fails to name the State witnesses whom counsel should have interviewed in order to develop an effective cross-examination. Under these circumstances, Whatley has failed to satisfy his burden of pleading. Therefore, summary dismissal of this ineffective-assistance-of-counsel claim was proper.

---

[28]     In Alabama, a Rule 32 petitioner does not have the burden of proving his claims at the pleading stage. *Ford v. State,* 831 So. 2d 641, 644 (Ala. Crim. App. 2001). However, the petitioner does "have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Ala. R. Crim. P. 32.3. Under Alabama Rule of Criminal Procedure 32.6(b), "[t]he petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceeding." "In other words, it is not the pleading of a conclusion which, if true, entitles the petitioner to relief. It is the allegation of facts in pleading which, if true, entitle a petitioner to relief." *Boyd v. State*, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003) (quotation marks and citations omitted).

. . .

As noted by the circuit court, in his petition, Whatley fails to allege what types of drugs and alcohol his trial counsel could have learned that he consumed on the night of the murder had they conducted an investigation.

. . .

Here, although Whatley alleged that his counsel should have retained an expert, he failed to identify by name any expert who could have given such testimony. Thus, summary dismissal of this ineffective-assistance-of-counsel claim was proper.

(Doc. 2-59 at 12-14).

The Court of Criminal Appeals' dismissal of Whatley's claim pursuant to Ala. R. Crim. P. Rule 32.6(b) is considered an adjudication on the merits. *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011) (a ruling "under Rule 32.6(b) is ... a ruling on the merits"); *Daniel v. Comm'r Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016) (dismissal pursuant to 32.6(b) is evaluated under AEDPA's "contrary to, or involved an unreasonable application of clearly established Federal law' standard); *Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1208 (11th Cir. 2013) ("We have held repeatedly that a state court's rejection of a claim under the state's heightened-fact pleading rule in Alabama Rule of Criminal Procedure 32.6(b) is a ruling on the merits."); *Alvarez v. Stewart*, 2016 WL 4870525, *10, 2016 U.S. Dist. LEXIS 124074, *27 (Ala. N.D., Aug. 1, 2016) ("The Eleventh Circuit has concluded that state-court dismissals for failure to plead facts with specificity amounts to a merits determination, not a procedural default."). "Thus, AEDPA requires us to evaluate whether the Court of Criminal Appeals's determination that [Whatley's] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was contrary to, or involved an unreasonable application of Federal law, or whether it 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Daniel*, 822 F.3d at 1261 (internal quotations and citations omitted).

The proper measure of attorney performance under *Strickland* "remains simply

reasonableness under prevailing professional norms."   466 U.S. at 688.   "[Courts] are not interested in grading lawyers' performances; [courts] are interested in whether the adversarial process at trial, in fact, worked adequately."  *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992).  Indeed, "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another."  *Strickland*, 466 U.S. at 693.  Accordingly, when evaluating an attorney's decision not to pursue a defense or present evidence, the essential question is not whether counsel should have presented the evidence, but "whether the investigation supporting the decision not to introduce . . . evidence *was itself reasonable*."  *Wiggins*, 539 U.S. at 522-23 (citation omitted).   "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment."  *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (internal quotation and citation omitted).  This objective test "has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id*. at 1316 (quotation and citation omitted).  Counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have taken the action that his counsel did take."  *Id*. at 1315.

To render adequate performance under *Strickland's* first prong, "[c]ounsel has a constitutional, independent duty to investigate and prepare a defense strategy prior to trial." *Williams v. Allen*, 598 F.3d 778 (11th Cir. 2010); *Porter*, 558 U.S. at 38.  However, "no absolute duty exists to investigate particular facts or a certain line of defense. Under *Strickland*, counsel's conducting or not conducting an investigation need only be reasonable to fall within the wide range of competent assistance." *Chandler*, 218 F.3d at 1317.   Further, "counsel need not always

investigate before pursuing or not pursuing a line of defense." *Id*. at 1318. Rather, "[i]nherent in this duty to conduct a substantial investigation into any . . . plausible lines of defense is the notion that strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations of investigation." *Martinez v. Sec'y, Fla. Dep't of Corr*., 684 F. App'x 915, 923 (11th Cir. 2017) (citations and internal quotation marks omitted).  Accordingly, the burden was on Whatley to prove by a preponderance of the evidence that his counsel's challenged decisions were not the result of reasonable strategy. However, because Whatley failed to "point to *any* evidence about the effect of the . . . substances on his sanity or ability to form a specific intent," *Powell v. Allen*, 602 F.3d 1263, 1271 (11th Cir. 2010) (Petitioner claimed counsel was ineffective for failing to investigate and hire a pharmacologist to evaluate the substances Powell allegedly ingested.  However, no deficient performance was found where Powell failed to allege or show what the result of any such expert testimony would be.), Whatley's attorneys are afforded the strong presumption that their conduct falls within the wide range of reasonable professional assistance.  466 U.S. at 689.   Mere speculation or conclusory allegations, as those put forth by Whatley, cannot satisfy the burden of establishing ineffective assistance of counsel under *Strickland*.  *See Boyd v. Comm'r, Ala. Dep't of Corr.,* 697 F.3d 1320, 1333–34 (11th Cir. 2012) (bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test); *Hill v. Lockhart,* 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); *Tejada v. Dugger,* 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).  Because Whatley has not produced any evidence to rebut the presumption of competence, he has not shown that his counsel was ineffective, *see Strickland*, 466 U.S. at 689, and "fairminded jurists could [not] disagree on

the correctness of the state court's decision." *Harrington v. Richter,* 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed 2d 624 (2011). Thus, Whatley has failed to overcome the AEDPA burden of establishing that the state court decision was contrary to or based on an unreasonable application of *Strickland*. *See Cullen v. Pinholster*, 563 U.S. 170, 190, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 ("The Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did.'") (alteration in original) (internal citation omitted). Moreover, Whatley's claim is meritless.

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins,* 539 U.S. at 527. Thus, the focus is not on what trial counsel could have done, but what trial counsel did. *See Grayson v. Thompson*, 257 F.3d 1194, 1219 (11th Cir. 2001). Here, the foundation of the State's case was Whatley's confession. The facts are clear, until Whatley confessed to the 2003 murder in 2006, it was unsolved and there was no arrest warrant for Whatley. (Doc. 2-4 at 2; Doc. 2-5 at 331). Whatley's confession states:

Back in 2003 around December 29th, I killed a man by the name of Pete PATEL. . . .

On the night the murder happened, I had gone to a local gay bar there in Mobile by the name of Gabriel's, to look for someone to rob. It was there that I first met Pete. We made small talk and he hit on me for sex. I agreed to go with him and we left the bar in his car. I don't remember what time it was but it was pretty late. To the best of my knowledge, I think his car was a light green Honda.

Pete was driving when we left the bar, and we went to the "African Town Cochran Bridge", I smoked a cigarette. We were talking and he put his hand on my leg. That just freaked me out, so I hit him with my fist. It knocked him down so I got on top of him and hit him a couple of more times and then I started chocking him. I thought at that point he was dead so I took his pants off of him but he started

moaning.  When he did that, I jumped in his car and ran over his head a couple of times.  The drivers side front tire was the tire that ran over him.

I then took off in his car.  I stopped about a 1/4 to 3/8 of a mile down the road and went through his pants.  I got a couple of hundred dollars out of his wallet and threw his pants out.  I took off again but just a short distance down the road I threw his wallet out.

I went and bought some crack with the money I got.  I then drove his car to Theodore, Alabama and burned it.  I started the fire with some gas I bought at a convenience store. . . .

I would have never done either of these crimes if I had not been all messed up on alcohol.  I am very sorry for what I did to this man . . . .

(Doc. 2-7 at 115).  In preparation for trial, counsel obtained an evaluation of Whatley from Dr. Alexander Morton, a psychopharmacologist.  Dr. Morton's report provided details regarding Whatley's drug use on the day of the crime, stating:

> [Whatley] reports "Stated drinking upon awakening" . . . "wine."  Had three bottles of MD 20-20.  He felt "Depressed.  I wanted cocaine."  He had no money, but "had intense cravings and wanted crack."  He reports smoking a small piece of crack with another person before going to the bar.  He reports having one drink at the bar, (Tequila Sunrise).  Donald reports smoking a dime bag of marijuana (three joints) before going to the bar.  Decided to get crack.  Got approximately $400 from crime and 20 minutes after the crime he was using crack."  "Bought a $100 piece and smoke it while I was driving down the road."  Bought about ½ oz of crack for $375 and smoked it all by himself by the following night.  He reports experiencing paranoia.

(Id. at 330).[29]  Dr. Morton opined that Whatley's "substance use and intense craving for cocaine were major factors in his behavior and thinking on December 28, 2003."  (Id. at 334).  Despite Whatley's claim, these findings reveal that counsel was aware of the specifics of Whatley's

---

[29]     Dr. Morton also reported that during the months of October, November, and December 2003, Whatley was using cocaine and alcohol daily.  (Doc. 2-26 at 330).  Dr. Morton specified that in December 2003, leading up to the crime, Whatley reported daily crack cocaine use (with the exception of December 24th and 25th), drinking approximately a gallon of alcohol (wine, liquor, or beer) daily (which would produce "blackouts"), smoking one marijuana joint a day, using LSD once that month, and occasionally using Lortabs and Darvocet.  (Id.).

substance use on the day of the offense.  Thus, counsel's decision not to investigate further or divulge to the jury the specifics of Whatley's drug and alcohol consumption on December 28, 2003, amounts to trial strategy.

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Wiggins*, 539 U.S. at 521-22, 123 S. Ct. at 2535 (quoting *Strickland*, 466 U.S. at 690-91). Under the circumstances of this case, counsel's decision to not investigate further and/or present evidence regarding the specifics and effects of the substances taken by Whatley on December 28, 2003 cannot be viewed as unreasonable under *Strickland*.

In Alabama, "[v]oluntary drunkenness [by drugs or alcohol] neither excuses nor palliates crime," *Ray v. State*, 257 Ala. 418, 421, 59 So. 2d 582, 584 (1952); it may, however, negate the specific intent essential to a malicious killing and reduce it to manslaughter."  *McConnico v. State*, 551 So. 2d 424, 426 (Ala. Crim. App. 1988); *see also Shanklin v. State*, 187 So. 3d 734, 795-96 (Ala. Crim. App. 2014) (recognizing that capital murder requires a specific, particularized intent to kill).  To negate the specific intent required for conviction, the degree of the accused's intoxication must amount to statutory insanity. *Smith v. State,* 246 So. 3d 1086, 1099 (Ala. Crim. App. 2017) ("The level of intoxication needed to negate must rise to the level of statutory insanity.") (quotation and citation omitted); *see also Flowers v. State,* 922 So. 2d 938, 955 (Ala. Crim. App. 2005) ("The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree *so extreme* as to render it impossible for the defendant to form the intent to kill.") (emphasis added) (citation and quotation marks omitted).  This necessary level of

intoxication has not been found where a defendant can aptly recollect the events of the crime in detail, nor where the defendant acted to conceal or hide his involvement in the crime. *See Smith*, 246 So. 3d at 1099-1100 ("Smith's ability to recall in detail [the crime] . . . is wholly inconsistent with being intoxicated to the point of insanity," as well as "Smith's attempt to hide his involvement in the crime" by getting rid of the victim's vehicle and fleeing the state); *see also Ex parte McWhorter*, 781 So. 2d 330, 342 (Ala. 2000) ("The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene."); *Davis v. State*, 740 So. 2d 1115, 1121 (Ala. Crim. App. 1998) (recognizing that a defendant's attempt to hide his involvement in the crime is inconsistent with a level of intoxication sufficient to make the defendant unable to appreciate the criminality of his conduct).

The record contains ample evidence that Whatley's intoxication at the time of the capital offense did not rise to the level necessary to negate the ability to form specific intent to kill. First, Whatley fully recalled the details of the crime. This is evidenced by Whatley's confession (Doc. 2-7 at 15) and Whatley's recounting of the crime to his cellmate inmate Cook. (Doc. 2-15 at 67-76). Also, Dr. Van Rosen, a forensic psychologist, posited that Whatley "had a coherent account of his activities during the alleged crime" and was not out of touch the reality at the time of the crime.[30] (Doc. 2-15 at 86). Furthermore, the report of Dr. Doug McKeown, the court appointed forensic expert, specifically evaluated Whatley regarding his mental state at the time of the offense and determined there was no evidence that Whatley lacked to ability to form the required intent to commit murder, finding:

---

[30]   Notably, Dr. Van Rosen testified as a witness for the State in the penalty phase of the trial, not in the guilt phase. However, counsel would have been privy to Dr. Rosen's report and findings prior to the start of trial.

[Whatley] is able to disclose information identifying events, activities, actions, thoughts, and behavior in the time frame associate with the index crime. He reports that he had been drinking all day and had been very depressed and reported that he wanted to get enough money to be able to buy some drugs so he could use the drugs to overdose. He indicates that he had utilized some marijuana and crack cocaine during the day in question as well. Even though he was under the volitional influence of alcohol and drugs during the effective time frame associated with the index crime, **he demonstrates a fully reasonable memory for events and activities during that time. His volitional drug usage would not allow for a basis for a mental state defense. [Whatley] provides no information suggesting any aberrations of thought that would have impaired his ability for appropriate decision making and judgment at that time.**

[Whatley] volunteered during this discussion that all his difficulties throughout his life have been associated with and under the influence of drugs and alcohol.

This examiner is of the opinion that during the time frame associated with the index crime, the Defendant maintained the ability to appreciate the nature and quality of his actions and behavior.

(Doc. 2-16 at 336-42) (emphasis added). Second, testimony supported that Whatley was observed at Gabriel's on the night of the crime and did not appear intoxicated.[31] (*See* Doc. 2-5 at 18-19, 21-28). Third, the evidence supported that the actions taken by Whatley in relation to the crime were inconsistent with being intoxicated to the point of insanity, namely getting rid of evidence - leaving of the scene, throwing Mr. Patel's wallet out of the window, and destroying Mr. Patel's vehicle. Consequently, it is reasonable that counsel chose not to introduce evidence regarding the quantity of substances taken by Whatley on the night of the offense nor more strongly pursue an intoxication defense.[32] *See White v. Singletary*, 972 F.2d 1218, 1226 (11th Cir. 1992) (noting counsel's

---

[31]     State's witness Joseph Jones testified that when he met Whatley at Gabriel's bar on the night of the crime, Whatley did not seem intoxicated, he "seem[ed] to be a reasonable person about appearance actually." (Doc. 2-5 at 18-19).
        State's witness Will Fernandez, the bartender at Gabriel's on the night of the crime, testified that he served Whatley a beer and a single shot of Yeigermister. (Doc. 2-5 at 21-28).
[32]     Notably, based on the motions, cross-examinations, and opening and closing arguments made by counsel, the record indicates that counsel pursued a defense mirrored by Whatley's confession. Counsel never disputed that Mr. Patel died as a result of an unlawful killing. (Doc. 2-9 at 6-7). Counsel adequately emphasized throughout the trial that Whatley was intoxicated at

decision not to pursue an intoxication defense was reasonable given "the general disdain which jurors hold for drunkenness as an excuse for violent behavior"); *Grayson v. Thompson*, 257 F.3d 1194, 1222 (11th Cir. 2001) ("It is conceivable that undue emphasis on a defendant's intoxication—beyond communication of the fact of intoxication itself—could potentially alienate the jury as an attempt to excuse truly horrendous conduct"; thus, reasonably competent counsel could have made such a strategic decision to downplay the intoxication defense at trial.) (citing *United States v. Boyles,* 57 F.3d 535, 551–52 (7th Cir. 1995) (rejecting claim of ineffective assistance of counsel which was based, in part, on trial counsel's failure to present expert testimony regarding intoxication, and noting that jurors possess "common knowledge and experience in the everyday affairs of life" making them "more than capable of concluding that [the victim was capable of communicating her lack of consent to the defendant despite her intoxication]")).

> Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced. Nor do we need to decide whether the information that would have resulted from further investigation would have necessarily been used at trial by every reasonable lawyer who was armed with such information. If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question

---

the time of the offense and that he suffered from addictions to alcohol and drugs. (*See* Doc. 2-5 at 31-38, 332; Doc. 2-9). Counsel further argued that due to these addictions, Whatley acted with intent to rob on December 28, 2003, as laid out in Whatley's confession, not intent to kill, arguing that Whatley "would not have committed this offense had he not been under the influence of alcohol or drugs" and "out of control." (Doc. 2-9 at 4-5). Furthermore, counsel argued that the killing only occurred "[a]s a result of Mr. Patel's homosexual advance to Mr. Whatley", causing Whatley to "freak out" - thus supporting a finding for manslaughter. (*Id*. at 5-8). Counsel asked the jury to rely on Whatley's confession as the "most effectual and satisfying evidence and proof" because "Whatley had nothing in the world to gain by giving these statements and everything in the world to lose." (*Id*. at 9-10).

The record reveals that counsel introduced to the jury, during sentencing, the drugs and amounts taken on the morning of the offense, to evidence how Whatley's self-medication of his mental illness with drugs created intense withdrawal symptoms, causing him to commit robbery for money to purchase cocaine. (Doc. 2-16 at 59, 99 ("I think his drive to get more drug help me understand why he would - - he needs to have money to get cocaine and that's get money at whatever costs.")).

> about the reasonableness of having failed to present evidence of which the lawyer
> was unaware as a result of a reasonable decision to investigate no further.

*Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994).  Perhaps other lawyers would have chosen to investigate and introduce drug evidence or expert testimony as to the effects of drugs at the time, but counsel here was not constitutionally ineffective for making the professional judgment to not introduce detailed accounts of the drugs and alcohol Whatley used on the day of the offense. Because counsel's choice was "arguably dictated by a reasonable trial strategy," we defer to the lawyers' judgment. *Devier v. Zant,* 3 F.3d 1445, 1450 (11th Cir. 1993).

Even if counsel were deficient, Whatley is unable to satisfy the prejudice prong of *Strickland*.  Whatley has not established that, but for counsel's professional errors the outcome of the proceedings would have been different.  *See Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (The Court must examine the entirety of counsel's performance and the effect of such" in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different.").  The record contains witness testimony that call into question the degree of intoxication Whatley experienced.  Given these contradictory accounts regarding the degree of Whatley's intoxication, it is unlikely that these inconsistencies would have changed the outcome of the proceedings.

Whatley has failed to show that counsel's actions were not the result of reasonable strategy, and the Court of Criminal Appeals, concluded that counsel's actions "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; 104 S. Ct. at 2065; Doc. 2-59 at 10.  Thus, it cannot be said that the Alabama Court of Criminal Appeals unreasonably applied the *Strickland* standard to the facts of Whatley's ineffective assistance claims.  *See Wiggins*, 539 U.S. at 520-21, 123 S. Ct. at 2535 ("The state court's application [of Supreme Court precedent] must have been 'objectively unreasonable'" to obtain habeas relief on a claim that was previously decided on the

merits by the state courts.) (internal citation omitted).  Consequently, Whatley's claim for habeas relief on this basis is denied.

### b.  Claims Arising During Penalty Phase.

Whatley also argues trial counsel provided ineffective assistance during the penalty phase of his capital murder trial in violation of *Strickland*.  According to Whatley, had trial counsel properly investigated and presented evidence of traumatic childhood experiences and critical evidence regarding his history of mental illness, the jury would not have returned a verdict for death.  (Doc. 9 at 54).

In Alabama, upon conviction of a capital offense, a death sentence may not be imposed unless at least one "aggravating circumstance" exists; otherwise, the sentence imposed is life without the possibility of parole. ALA. CODE § 13A-5-45(f).  The State bears the burden of proof as to the existence of any aggravating circumstances, but "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."  ALA. CODE § 13A-5-45(e).  Here, the court instructed the jury that one aggravating circumstance had already been proven by the State beyond a reasonable doubt during the guilt phase, that is that Whatley intentionally caused the death of Pete Patel during or in the course of robbery in the first degree.  (Doc. 2-19 at 7-8).  The trial court then advised the jury of two other aggravating factors being put forth by the State for consideration, that Whatley had "[t]hree prior convictions for felonies involving the use or threat of use of violence and that this capital offense that Mr. Whatley is charged with or convicted of was especially heinous, atrocious or cruel."  (*Id*. at 8).  The trial court instructed the jury that they were to consider the aggravating circumstances presented by the State in the penalty phase, as well as the existence of any mitigating circumstances presented by

the defense and identified the types of mitigating circumstances it could consider, both statutory and non-statutory. *See* ALA. CODE § 13A-5-51 (listing mitigating circumstances); (Doc. 2-19 at 10-15).

During the penalty phase, trial counsel presented in its opening statement to the jury that Whatley had been "dealt a bad hand as a child and it did nothing but get worse." (Doc. 2-14 at 3). Counsel maintained that while Whatley's "dysfunctional family" and upbringing did not negate the committed crime, the evidence would shed light on how Whatley got to where he was, "sitting in front of a jury of twelve people who will decide whether he lives or dies." (*Id*. at 3-4). Trial counsel stated:

> The evidence is going to show that he grew up in dysfunctional alcoholic family. His father is alcoholic. His father's - - his – Mr. Whatley's stepmother was an alcoholic. His grandmother is alcoholic. His grandfather's a alcoholic. He's got - - or had two brothers. They were into alcohol and drugs. One dies of overdose; one killed himself. This all started back in the home when he was child. It was a violent abusive place. The father would give him alcohol to drink as a small child and thought it was funny. The father would not allow the mother to do anything to discipline or give him any direction or focus. He didn't have a chance from that aspect. They find out as time goes on the father's got a second family over here nobody knew about which caused upheaval as you might imagine. The father puts Donald Whatley in an apartment on his own when he's thirteen years old. He's in there smoking dope and drinking at age thirteenth. He had no guidance. He had no one to direct him, teach him right from wrong. He was at loose ends without any kind of rudder so that he could hopefully guide himself in some regular fashion as most of us have.
>
> Donald Whatley has got a long term history of alcohol and drug abuse. That's not something that we make up. It's something in the records. It's not disputed. He has got - - He has been treated for psychological problems over the years. He has a history of suicides. The drug and alcohol abuse has left its mark on his mental facilities. He is a very disturbed and damaged person. That doesn't make all this all right. But it's somebody that never had a chance just because of the way life dealt it to him and that's how he's wound up here.

(Doc. 2-14 at 4-5). Trial counsel then called Franklin Lambert, Deborah Fortner, and Dr. William Morton to present mitigation testimony.

Franklin Lambert, Whatley's uncle, testified as to Whatley's childhood.  (Doc. 2-16 at 1-10).  Mr. Lambert testified that Whatley's father was an alcoholic and physically abusive to Whatley's mother.  (*Id*. at 3-4, 6).  He further testified that Whatley was allowed to drink alcohol at a young age, like age "four, five, six, very - - so small. . . ."  (*Id*. at 5).

Deborah Fortner, Whatley's half-sister, testified as to the violence and trauma in Whatley's life.  (Doc. 2-16 at 11-29).  She explained that Whatley had two older brothers who would tease him and encourage him to "head butt" brick walls and a father who physically abused their mother and inflicted "mental abuse toward all of us to some degree."  (*Id*. at 12, 17-18).  Ms. Fortner testified that Whatley "had a good relationship" with his mother and that his father, Gene Whatley, was extremely permissive with Whatley and would not allow Whatley to be disciplined.  (*Id*. at 14).  She described the alcoholic family atmosphere (where Whatley was allowed to drink from his father's drink every time Gene Whatley drank alcohol) and that Whatley would sit and drink with his father "as a young teenager".  (*Id*. at 15-16).  Ms. Fortner affirmed that Whatley was diagnosed with attention deficit disorders in early grade school, but no counseling or intervention strategy was obtained.  (*Id*. at 18-19).  She provided that when Whatley was around first grade, the family learned that Whatley's father had started another family, while still married to Whatley's mother.  (*Id*. at 13-14, 19).  According to Ms. Fortner, when Whatley he was thirteen or fourteen years old, his father rented him an apartment, where Whatley lived alone and would drink and smoke marijuana.  (*Id*. at 19-20).  She also provided testimony of regarding the prevalence of alcoholism in the family, which included Whatley's mother, father, grandfather, and brothers, as well as testimony as to Whatley's chronic drug and alcohol problems, which led to his homelessness.  (*Id*. at 20-27).  Ms. Fortner further described the deaths of Whatley's family members – both brothers, mother, and father in 1993, 1995, 1997 and 1999, respectively.  (*Id*. at

28).

On cross examination, Ms. Fortner admitted that Whatley was never physically abused by his father, that his father provided for the family, and clarified that Whatley's "drinking of alcohol" at a young age was more "swallows and sips" than Whatley being allowed to "walk off with it". (*Id*. at 29-31).  Testimony on cross examination also revealed that despite violent games played as a child, Whatley has received two CT scans and one MRI as an adult which confirmed no brain damage or brain problems.  (*Id*. at 33).

Dr. William Morton, Jr. a board certified psychopharmacologist, then testified as to his review of medical records from medical centers where Whatley was hospitalized, evaluated, and treated,[33] as well as his personal evaluations of Whatley.  (Doc. 2-16 at 34-99).  The crux of Dr. Morton's testimony was the effects of drugs on the brain, specifically that Whatley's drug addiction (coupled with his mental health issues) was "a big complicating factor" in the murder of Mr. Patel – that is Whatley needed cocaine so badly that he would "get the money at whatever costs."  (*Id*. at 98-99).  To explain Whatley's addiction, Dr. Morton testified as to Whatley's early introduction to alcohol and drugs, as well as Whatley's childhood depression and multiple suicide attempts.  (*Id*. at 50-51, 61-62).  He also discussed Whatley's previous mental health treatment, including that Whatley sought mental health treatment for severe mood swings, delusions, hallucinations, and agitation - five days before the crime was committed.  (*Id*. at 56-60, 78, 83).  Dr. Morton opined that Whatley had a "switch" from self-medicating his mood disorder to addiction, where he lost the ability to control his use and explained the effects of withdrawal for

---

[33]     Medical records were obtained and reviewed from Mobile Mental Health, South Alabama Medical Center, Lafayette Medical Center, the correctional system, Mobile County Correctional System, and the Texas Correctional Facility.  (Doc. 2-16 at 45).  These records were also introduced into evidence.  (*Id*. at 45-46).

an addict. (*Id*. at 64-65, 78-80). Dr. Morton further testified that there was an environmental and a "big genetic component" to Whatley's addiction and discussed those components, namely Whatley's alcoholic father, mother, grandparents, and brothers, as well as mental illness and childhood experiences. (*Id*. at 66-69, 84).

During closing argument, the jury heard from defense counsel:

There's a few things that I want to talk to you with regard to [the medical records in evidence]. There's reference in there attempted suicide at twelve years old. Do you think that's a red flag about your life going down the drain? 5/2/2000 at Knollwood Hospital. He's found lying in a ditch from an overdose. 6/30/02 USA Medical Center. He's beating his head on the screen in the back of a police car to the point he has to have stitches. 3/8/03 USA Hospital, Knollwood. Admitted suicide attempt OD, overdose. 3/9/03 USA Knollwood. Still suicidal the note says. 3/17/03 Mobile Infirmary. Got psychological problems, suffering from auditory hallucinations. As we get closer to the offense. 11/19/03, found banging his head on a wall behind a convenient [sic] store. That's the one where he - - same time where he had been on a bridge going to jump off the bridge but didn't but they find him behind the convenient [sic] store hammering his head on a brick wall. Getting closer to the offense. 11/24/03 Mobile Infirmary. Note, if discharged will pose a risk to his own safety and others. That's what the medical people and the hospital said. That's about a few days over a month from this incident here. 11/25/03, we're getting closer to the incident. He's exceptionally depressed. 11/25/03 talk about referring him going to jump off the bridge. 12/9/03, we're getting closer to the incident. Major depressive disorder. This is Mobile Mental Health records. Major depressive disorder. Alcohol dependence and then it goes on about what all kind of problems he's got along that line. 12/10/03 Mobile Mental Health. Reports sexual abuse by family friend, this is as a child, physical abuse by his brother. 12/23/0[3], we're now days from this incident. He's still being treated by Mobile Mental Health. And they set out he's got severe mood problems. They're going to try Lithium. This is within days of this incident.

As I told you this man, he truly had no chance. And I'm not asking you to turn him loose to forget it. I'm just asking you not to kill him because he is not operating with the same kind of faculties that the rest of us do. . . .

(Doc. 2-18 at 9-10). The jury also heard the following closing argument from the State:

And the defense wants to make it out that he's some man who has mental issues, mental illness, mental disease and the have even said brain damage, organic brain damage. But I want to show you what's in the volumes of records, . . . this Defendant has had nine CT scans or CT scans of his brain over the last fifteen years

and every single one of them is in those volumes of records and every single one of them says that there's no brain damage.  There is nothing wrong with his brain. . . .

And they bring in religion and they bring in this religious conversion and that the only reason he confessed was because he had a religious conversion.  But I want you to look at the Defendant's conduct as evidenced in the records. . . after that religious conversion. . . he says he's angry with other inmates. . . gets cited for disciplinary problems for disobeying staff members.  He picks a fight with another inmate where he's picked up and slammed on his left shoulder on the concrete floor fighting with another inmate. . . . [H]e's disrespecting staff.  He told staff members that he would shove a razor up his behind. . . . [H]e's fight in the day room and he took Moon Pies from another inmate. . . he's irate and screaming at other inmates.  He threatened to harm other inmates and hitting heads on the bars. . . he refuses to take his medications again. . . he refuses to obey orders given by staff members. . . . He destroyed and altered and damaged jail property.  He refused to obey the orders of the staff at the jail. His conduct was disrupting and interfering with the security and orderly running of the jail. . . he assaulted a staff member.  He hit a corrections officer who directed him to go to his jail cell.   The corrections officer was transported to [the hospital] . . . . He was not fully clothed when he was out of his cell and he was using abusive or obscene language.

Patterns of aggressive behavior even after behind bars, even after no drugs and alcohol, even after medications.  That man right there, cannot be controlled.

The Defendant wants you and said to you don't kill this defective man because of the way he grew up in his life.  I submit to you, . . . [h]e's not mentally defective.  What he is and what his problem is, ladies and gentlemen of the jury, is that [he] doesn't care what he does to other individuals. . . . His problem is, I want what I want and I want it now and I'm not going to let anybody stand in my way of getting what I want.  He didn't let Sharon Overstreet get in his way.  He killed her.  He slit her throat and he took her money and he left.  And on that night December 28, 2003, we don't' really know why Pete Patel chose to go with that man under the bridge.  We may never really know why he chose to go with that man under the bridge.  But one thing is for sure as evidenced by all of the photographs that you have seen again today . . ., Pete Patel, this man right here, got in the Defendant's way and the Defendant, . . . took care of the victim all right.  He wanted his money.  He wanted his car.  He wanted those things and Pete Patel, the victim in this case, got in his way.  If someone stands in his way he will do whatever it takes to get that person out of his way even if it means killing someone.

(Doc. 2-17 at 27-34).  After being charged and instructed on the weighing of aggravating and mitigating factors, the jury deliberated and returned a verdict form recommending Whatley be punished by death, in which 10 jurors voted for "death" and two jurors voted for "life without

parole".  (Doc. 2-21).

Based on the totality of evidence presented, and for the reasons more specifically laid out below, Whatley has failed to establish that the state court's dismissal of his claim was contrary to or an unreasonable determination of the facts pursuant to *Strickland*.  Namely, the mitigation evidence Whatley argues should have been presented is cumulative to that which was presented to the jury, and Whatley has failed to establish that he was prejudiced by the failure of counsel to present such evidence.  *See Walker v. State*, 194 So. 3d 253, 288 (Ala. Crim. App. 2015) ("[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.") (internal quotation omitted); *but cf*., *Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015) ("[B]ecause the sentencing judge and jury never heard evidence that Mr. Williams was a victim of sexual abuse, such evidence is not 'cumulative'. . . [and] can be powerful mitigating evidence, and is precisely the type of evidence that is 'relevant to assessing a defendant's moral culpability.'") (internal citation omitted).

### i. Claim that Alabama Court of Criminal Appeals unreasonably concluded that trial counsel adequately investigated and presented critical mitigating evidence.

In his petition, Whatley contends that trial counsel provided ineffective assistance when they failed to conduct more than a minimal investigation into his background, failed to present significant available evidence of traumatic experiences in his childhood, and failed to present critical evidence regarding his history of mental illness in violation of *Strickland*.  (Doc. 9 at 54). Whatley argues that trial counsel conducted only a cursory investigation into his background and failed to hire a mitigation expert to assist with the investigation after requesting funds from the

court for such a mitigation expert.[34]  Whatley contends that had such evidence been uncovered and presented to the jury, "there is a reasonable probability that he would not have been sentenced to death."  (*Id*.).

The trial court denied Whatley's claim, concluding:

To support this claim Whatley relies on the American Bar Association (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. 2003). (Pet. 10)

Whatley's reliance on the ABA Guidelines to support his claim is misplaced for two independent reasons.  First, the recommendations stated in the ABA Guidelines are not mandatory requirements on defense attorneys that are appointed to represent capital defendants.  *See Bobby v. Hook*, 558 U.S. 4, 8 (2009) ("*Strickland* stressed . . . that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition.")  Second, the Alabama Court of Criminal Appeals has held that "'hiring a mitigation specialist in a capital case is not a requirement of effective assistance of counsel.'" *Daniel v. State*, 86 So. 3d 405, 437 (Ala. Crim. App. 2011) (citation omitted).

(Doc. 2-55 at 4-5).  In affirming the trial court's denial of relief, the Alabama Court of Criminal Appeals, in its memorandum opinion, also noted that "Whatley's trial counsel did in fact call one expert, Dr. William Morton, Jr., a psychopharmacologist, to testify about Whatley's history of mental illness and substance abuse. [] Thus, Whatley's claim is without merit and he is not entitled to relief on this claim."  (Doc. 2-59; Vol. 34, Tab 80 at 25).

"It is unquestioned that under the prevailing professional norms at the time of [Whatley's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"  *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).  Where

---

[34]     Whatley claims, "[a]s a result of [trial counsel's] failure to investigate, counsel failed to obtain or read relevant educational, medical and employment records; failed to investigate Mr. Whatley's history of sexual abuse; failed to uncover key facts regarding additional traumatic experiences in Mr. Whatley's background; and failed to present a wealth of additional mitigating evidence.  (Doc. 9 at 57).

counsel has reason to know of potential mitigating evidence they are required to investigate.  *See Wiggins*, 539 U.S. at 524-25, 123 S. Ct. at 2537 (held that counsel "fell short of . . . professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, given the facts discovered in the two documents); *Daniel*, 822 F.3d at 1268 (counsel's performance was deficient where mitigation investigation ended after "acquir[ing] only rudimentary knowledge of [petitioner's] history from a narrow set of sources"). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066.  At some point during trial preparation, counsel "will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" *Pinholster*, 563 U.S. at 195 (quoting *Strickland*, 466 U.S. at 691). The "strategic choices [of counsel] made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," while those "made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.   Where counsel ignores "red flags" "alerting them to the need for more investigation," counsel performs deficiently.  *Rompilla v. Beard*, 545 U.S. 374, 392, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); *see also Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) (counsel rendered ineffective assistance where he failed to put forth any mitigating evidence despite that an investigation would have uncovered an impoverished childhood, epileptic seizures, and organic brain damage); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) (counsel's failure to conduct a mitigation investigation beyond petitioner's character was ineffective where "obvious evidence of serious mental illness" was undiscovered).  Whatley's case, however, is distinguishable from such cases, as Whatley's

counsel obtained discovery of background information.  For instance, psychiatrist Dr. Van Rosen was hired to evaluate Whatley and "to provide assistance with regard to mental health issues to the defense counsel."  (Doc. 2-26 at 80, 132-34).  Trial counsel not only moved for and were granted funds for a mitigation specialist, but counsel also obtained approximately "a thousand pages of medical records" "numerous hospitals and facilities across the United States", to investigate whether Whatley had neurological issues that "may have some impact on the case, particularly . . . the sentencing phase."  (Doc. 2-6 at 14-17, 108-115, 308).  These records were reviewed by neurologist Dr. Paul A. Maerten and indicated the possibility of brain damage which may have led to defects in Whatley's emotional control.  (Doc. 2-26 at 154).  (Doc. 2-26 at 14-17, 108-115). When Dr. Maerten's report suggested Whatley potentially suffered from organic brain damage, trial counsel moved for and obtained funds to hire neuropsychologist Dr. John Goff to evaluate Whatley.  (Doc. 2-26 at 145-47, 152-162).  Dr. John Goff concluded that Whatley functioned within the average range of intelligence but found indications for "organic brain dysfunction" and diagnosed Whatley with "cognitive disorder," most likely associated with multiple head injuries. (Doc. 2-26 at 170).  After investigation into Whatley's medical history revealed "a long history of mental health treatment . . . use of psychotropic and neurological medications. . . and past drug usage," trial counsel further employed Dr. William Alexander Morton, Jr, a pharmacologist, to evaluate Whatley and provide testimony ("particularly should the case proceed to the sentencing phase") concerning brain damage caused by drug and chemical usage.  (Doc. 2-26 at 240-41, 272-307).

Furthermore, as previously discussed, trial counsel presented mitigating evidence during the penalty phase regarding Whatley's unstable, violent childhood from his sister and uncle, as well as evidence of his drug and substance abuse and mental illness from expert witness Dr.

Morton.  Trial counsel also elicited evidence of from three state witnesses, all of whom had previously evaluated Whatley - Dr. Charles Smith and Patrick Buttell provided testimony related to Whatley's struggles with mental illness and Dr. Van Rosen testified that Whatley suffered from "organic brain damage" and alcohol and drug abuse.  (*See* Doc. 2-15 at 24-25, 26, 29-38, 52-53, 59-61, 87-88, 90-91)

Given the amount of mitigation evidence investigated, uncovered, and presented, trial counsel's decision not to expand its investigation further into Whatley's background cannot be viewed as unreasonable, as the question is not "what the best lawyers" or "even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citation omitted).  Consequently, Whatley has failed to satisfy the deficient performance prong of establishing ineffective assistance of counsel, and the state court's decision was not contrary to, or involved an unreasonable application of, clearly established federal law, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented.

Additionally, Whatley has failed to show that he was prejudiced by the failure to hire a mitigation expert or to further investigate his background and present evidence, as argued, of: (1) abuse by his brothers and nephew, (2) abuse by peers, (3) abuse by stepfather, (4) sexual abuse and molestation, (5) mother's suicide attempt, (6) sister-in-law's death, (7) generational substance abuse and dependence, (8) generational domestic violence, (9) early introduction of drugs and alcohol, and (10) cocaine withdrawal at the time of the crime.  The Alabama Court of Criminal Appeals reviewed these claims and affirmed the trial court's summary dismissal of the claims,

concluding that they were insufficiently pleaded or meritless.[35]  (*See* Doc. 2-55).

While "the demonstrated availability of undiscovered mitigating evidence clearly me[ets] the prejudice requirement," *Armstrong v. Dugger*, 833 F.2d 1430, 1434 (11th Cir. 1987), the trial record evidences that the jury was informed of the mitigation evidence during the penalty phase, including through the testimony of state and defense witnesses and through defense counsel's opening and closing statements to the jury.  For the reasons discussed below, Whatley's claim for habeas relief on this basis is denied.

### 1. Abuse by brothers and nephew

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence that he was abused by his brothers and nephew.  Whatley claims that "violence and dangerous activities were the norm in his life" but that only one incident was raised at trial.  (Doc. 9 at 59).  Admittedly, Deborah Fortner, Whatley's sister, testified at trial that Whatley's brothers "would make him run headfirst into brick walls."  (*Id*. at 59-60).  However, Whatley argues that his brothers also forced him to play dangerous "games", including pushing him down the stairs and making him fall or blowing marijuana smoke into his face when he was approximately eight years old.  (*Id*. at 60).  Whatley further claims that when he was four years old, his five-year-old nephew hit him in the head with a hammer and knocked him unconscious.  (*Id*.). Whatley contends had this evidence been investigated and produced, the jury would have

---

[35]   "Summary dismissals under Rules 32.6(b) and 32.7(d) are adjudications on the merits and subject to AEDPA review." *Daniel*, 822 F.3d at 1260. Thus, AEDPA requires the Court evaluate whether the Court of Criminal Appeal's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1); *Borden*, 646 F.3d at 817-18, or if the Court of Criminal Appeal's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

seen that the violence and abuse of his childhood predisposed him to violence as an adult and would not have sentenced him to death.

The Court of Criminal Appeals, in its memorandum opinion affirming the trial court's denial of relief, stated:

> The circuit court dismissed this claim as without merit because trial counsel had been able to get the state's expert witness to admit on cross-examination that Whatley had suffered brain damage due to the physical abuse he had suffered during his childhood. The court also noted that Whatley's defense counsel had reminded jurors during the penalty phase of his capital-murder trial that Whatley had been physically abused by his brothers during his childhood.
>
> The transcript from the penalty phase of Whatley's capital-murder trial indicates that, in addition to the evidence noted by the court, Whatley's sister, Deborah Fortner, testified that Whatley's older brothers would "pick on him and all in the name . . . of making him a man, making him tough and all of that." According to Fortner,
>
>> "[w]hen Whatley was maybe about the first grade . . . he was just fixing to go play football and they was talking about how tough he was. They'd say, oh, look, and they'd tell other people, you know, he's tough. And he'll do anything you tell him to do. Let me show you how tough he is. Whatley, go over there and head butt that wall and it would be the brick wall of the house. And I have seen [Whatley] from, we'll say five or six steps back or whatever, just rate back and take off and hit that wall with his head."
>
> . . .
>
> The testimony described above indicates that any additional testimony or evidence would have been cumulative to that which was already presented by defense counsel. Moreover, this claim is not pleaded with sufficient specificity to satisfy the requirements of Rules 32.3 and 32.6(b), Ala. R. Crim. P. Whatley failed to identify witnesses who would have testified at trial about the physical abuse he suffered at the hands of his older brothers and nephew. He also failed to specify what information would have been obtained had his trial counsel investigated these matters further and whether, assuming the evidence was admissible, its admission would have produced a different result. Finally, he failed to allege any facts demonstrating how he was prejudiced by his counsels' failure to investigate this issue further and to present additional evidence on the matter. Thus, summary dismissal of this claim was proper.

(Doc. 2-59; Vol. 34, Tab 80 at 30-32) (internal trial record citations omitted) (alterations in original).

To succeed on this claim, Whatley must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. 687. "Because both parts of the test must be satisfied to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

The record reflects that the jury heard testimony from Deborah Fortner that she had seen Whatley's older brothers have him "head butt" a brick wall so hard that it "knock[ed] him backwards to where he seemed to be unconscious. . . ." (Doc. 2-16 at 18).  Dr. Van Rosen testified that Whatley "had a number of documented incidents where he's suffered some obvious brain injury.  [Whatley] was hit in the head with a hammer on two different occasions.  Other such incidents occurred." (Doc. 2-15 at 90).  Dr. Van Rosen went on to diagnose Whatley as suffering brain damage, positing that previous head injuries led to a "cognitive disorder" that would "affect the way [Whatley] process information and the way he acts." (Doc. 2-15 at 90-91).

Given this evidence, if counsel had provided further examples of physical abuse by his brothers and/or nephew, no reasonable probability arises that the results of the proceeding would have been different, especially considering that the jury heard testimony from the State that Whatley had two CT scans and one MRI as an adult that evidenced no brain damage, and Whatley's sister confirmed that she knew of no medical tests that showed brain damage or serious problems.  (Doc. 2-16 at 32-33).  Thus, the Alabama Court of Criminal Appeals' holding that Whatley failed to establish *Strickland* prejudice was not unreasonable.

2.  Abuse by peers

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence of Whatley's relationship with his peers growing up.  According to Whatley, his longtime friend, Amy Russell, would have testified that kids in the neighborhood would "beat Mr. Whatley up, strip him naked, and force him to run home without any clothes.  He was also relentlessly mocked throughout his childhood on account of his stutter." (Doc. 9 at 60) (internal quotation marks and alterations omitted).  Amy Russell would have further testified as to Whatley's "kindness".  (*Id.*)

The trial court dismissed Whatley's claim finding Whatley "failed to proffer in his petition why testimony that he was bullied as a child would have been considered mitigating to a brutal capital murder he committed when he was almost 32 years old."  (Doc. 2-55 at 16).  The Alabama Court of Criminal Appeals agreed with the circuit court and further maintained that Whatley failed to indicate that he informed defense counsel about Amy Russell and the information she could have provided.  (Doc. 2-59; Vol. 34, Tab 80 at 32-33).

It is not unreasonable for counsel to fail to investigate witnesses that the defendant did not tell him about.  *Cf., Collins v. Francis*, 728 F.2d 1322, 1349 (11th Cir. 1984) (Counsel was not put on notice of any problems and could not be faulted for not pursuing the matter.).  Furthermore, Whatley has failed to put forth any evidence showing "a reasonable probability that at least one juror would have struck a different balance" regarding Whatley's culpability and not voted for death. *Andrus v. Texas*, __ U.S. __, 140 S. Ct. 1875, 1886, 207 L. Ed. 2d 335 (2020) (citations omitted); *see also Tompkins v. Moore*, 193 F.3d 1327, 1337 (11th Cir. 1999) ("[W]here there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating

weight.") (internal quotations omitted).

Accordingly, the Alabama Court of Criminal Appeals' holding that Whatley failed to establish counsel was ineffective pursuant to *Strickland* was not unreasonable.

### 3.  Abuse by stepfather

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence of the physical abuse he suffered at the hands of his stepfather, Henry Adams. According to Whatley, when he was 12 years old, Mr. Adams punished him by trying to throw him over a fence.  Whatley got caught on top of the fence and started to bleed.  When his mother questioned Mr. Adams about his method of discipline, Mr. Adams began to strike Whatley's mother.  Whatley stopped Mr. Adams from beating his mother by threatening him with a loaded shotgun.  (Doc. 9 at 61).  Whatley claims, "[t]his incident and others [] would have been uncovered with adequate investigation [and] provide[d] critical insight into the vast array of violence and trauma that Mr. Whatley experienced during his formative years."  (Doc. 9 at 61).

The Alabama Court of Criminal Appeals concluded that this claim was insufficiently pleaded because:

> Whatley failed to identify witnesses whose testimony could have been presented at trial regarding this specific abuse his stepfather inflicted upon him.  He also failed to allege any facts to indicate that he was prejudiced by his counsels' failure to investigate this issue further and to present additional witness testimony on the matter.  Therefore, summary dismissal of this claim was proper.

(Doc. 2-59; Vol. 34, Tab 80 at 33).

"Evidence of physical abuse while a youth is admissible at sentencing" but, as previously mentioned, carries little mitigating weight the further apart in time the committed crime is from the abuse.  *See Mills v. Singletary,* 63 F.3d 999, 1025 (11th Cir. 1995) ("We note that evidence of Mills' childhood environment likely would have carried little weight in light of the fact that Mills

was twenty-six when he committed the crime."); *Bolender v. Singletary,* 16 F.3d 1547, 1561 (11th Cir. 1994) (same holding where petitioner was twenty-seven years old at the time of the capital offense). Here, Whatley has failed to show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S. Ct. at 2068-69. That is, that if the additional mitigating circumstance evidence in question had been presented, "there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different." *Horsley v. Alabama,* 45 F.3d 1486, 1493 (11th Cir.1995). When weighing the mitigating circumstance evidence that was not presented, along with that which was, and considering the totality of it against the aggravating circumstances that were found, Whatley has failed to carry his burden of showing prejudice pursuant to *Strickland*.

Accordingly, the Alabama Court of Criminal Appeals' denial of Whatley's claim was not an unreasonable application of *Strickland*.

### 4. Sexual abuse and molestation

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence showing he was sexually abused by his 14-year old babysitter when he was six years old. (Doc. 9 at 61). Whatley submits that although counsel referenced this incident in closing arguments, counsel failed to investigate and present evidence of the effect this trauma had on Whatley, including "deep-seeded anger." (*Id.*).

The trial court dismissed Whatley's claim, concluding:

> Dr. Morton testified that Whatley allegedly being sexually abused was a factor that put him on track to abusing drugs. Whatley failed to proffer in his petition any expert that would have testified him being sexually abused when he was six years old contributed to him murdering the victim 25 years later.

(Doc. 2-55 at 17).

The Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of the claim finding it was insufficiently pleaded, stating:

> The circuit court dismissed this claim on the basis that it was insufficiently pleaded. We agree. In his petition, Whatley fails to explain how further investigation of that incident would have changed the result of his trial. He also fails to identify any witnesses who could have provided information about the sexual abuse he suffered as a child. Because his claim fails to satisfy the requirements in Rules 32.3 and 32.6(b), Ala. R. Crim. P., the circuit court's summary dismissal of this claim was proper.

(Doc. 2-59, Vol. 34, Tab 80 at 34).

Counsel's duty to conduct a reasonable investigation of the defendant's background "does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen,* 542 F.3d 1326, 1337 (11th Cir. 2008), *cert. denied,* 556 U.S. 1253, 129 S. Ct. 2383, 173 L. Ed. 2d 1325 (2009). Here, the record supports that trial counsel utilized the testimony of Dr. Morton to evidence that Whatley used drugs to self-medicate his mental illness, which led to drug addiction. In so doing, Dr. Morton discussed the disease of addiction, symptoms of withdrawal, and the negative and detrimental effect drugs have on the brain. Dr. Morton further testified that Whatley was particularly susceptible to addiction due to "his history," including past sexual abuse, stating:

> This just helped me understand Donald [Whatley], how he got on that track. He's got a history of addiction as well as well as mental illness. Developmentally I think environment and divorce was a problem. Early exposure, eight years old is pretty early to be exposed to a substance and these are some of the things graphically that I saw with Donald is that genetically he's loaded, he used early, he has documented physical and *sexual abuse*, divorce is a issue, he's lost just about everyone in his family. Environmentally he's homeless, jobless, he's got Hepatitis C along with the liver getting where it's not working very well. He's got untreated mood symptoms. And he runs across these drugs that work within seconds.

(*Id*. at 68-69) (emphasis added). Given that the jury heard testimony and argument involving a broad spectrum of circumstances and previous trauma experienced by Whatley, it is highly unlikely that a reasonable juror would have decided against death based on specific details of the

sexual abuse being provided or testimony of the effects of sexual abuse.[36]   Thus, Whatley has

failed to carry his burden of showing prejudice pursuant to *Strickland*.

Accordingly, the Alabama Court of Criminal Appeals' denial of Whatley's claim was not

an unreasonable application of *Strickland*.

### 5.  Mother's suicide attempt

Whatley claims in his petition that trial counsel was ineffective for failing to investigate

and present evidence showing his mother's suicide attempt.   Whatley contends that he and his

mother shared a close relationship but that it changed when he was 10-years old, when the family

learned that his father, Gene Whatley, had a second family, and his mother attempted suicide.

Whatley claims:

> [He] was devasted, but it felt like he could no longer confide in his already
> overburdened and fragile mother.   He felt so miserable during this period that he
> would walk into the woods and bang his head repeatedly against trees until the loss
> of consciousness alleviated the emotional distress.   With no parent to turn to for
> help, Mr. Whatley turned to his older siblings and peer support.   They offered him
> drugs, and, not knowing how else to cope, Mr. Whatley began his lifelong habit of
> self-medication.

(Doc. 9 at 63).   Whatley claims trial counsel's failure to investigate and present evidence of his

---

[36]     The record supports that the failure to not introduce evidence regarding the sexual abuse
suffered by Whatley was strategic.   While Whatley argues counsel should have presented evidence
that the sexual abuse caused "deep-seeded anger", the trial record clearly represents that counsel
presented a mitigation defense showing that Whatley was an addict with comorbid mental illness
(which included the environment in which he was raised).   This defense, as pleaded by trial counsel
in opening and closing argument, presented Whatley as someone with "a mental defect", less
culpable for his conduct, as counsel argued, "[y]ou don't kill people for being sick and being in a
situation they can't help." (Doc. 2-18 at 7).   *Strickland* requires that a court reviewing an attorney's
performance "indulge a strong presumption that counsel's conduct falls within the wide range of
reasonable professional assistance; that is, the defendant must overcome the presumption that,
under the circumstances, the challenged action might be considered sound trial strategy."  466 U.S.
at 689 (internal quotation omitted).   Here, counsel's mitigation strategy is opposed to someone
with "deep seeded anger" issues.   Therefore, it is reasonable that counsel did not introduce and
pursue mitigation evidence which would promote that Whatley had "deep seeded anger" issues,
and Whatley has failed to show otherwise.

mother's suicide attempt (or what led to Whatley's suicide attempt), omitting a critical piece of the Whatley family history and failing to "present[] a comprehensive picture of his upbringing and genetic predispositions to the jury."  (Doc. 9 at 63).

The Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of the claim finding it was meritless, stating:

> The record on direct appeal indicates that during the penalty phase of Whatley's capital-murder trial, Whatley's sister, Deborah Fortner, testified that Whatley had a close relationship with his mother.  In addition to that testimony, Dr. Morton testified that after reviewing Whatley's medical records, he learned that Whatley was depressed as a child and had a suicide attempt at the age of twelve.  He further stated that Whatley's suicidal thoughts increased shortly after his mother's death in 1997 and that he had at least four documented suicide attempts in 2000, 2003, 2005, and 2006.
>
> As previously mentioned, counsel is "not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy" because "counsel must be permitted to weed out some arguments to stress others and advocate effectively." *McWhorter*, 142 So. 3d at 1264.  Moreover, Whatley failed to identify witnesses who would have testified at trial about the connection between his mother's suicide attempt and his own suicide attempts.  Whatley also failed to allege facts demonstrating whether, assuming the evidence was admissible, its admission would have produced a different result. *See Van Pelt*, 202 So. 3d at 730.  Finally, he failed to allege how he was prejudiced by his counsels' failure to investigate this issue further and to present additional testimony on the matter.  Thus, summary dismissal of this claim was proper.

(Doc. 2-59, Vol. 34, Tab 80 at 37-38) (internal record citations omitted).

The record reveals that trial counsel was made aware of Whatley's family's psychiatric history, as Dr. Morton's evaluation and report indicated that Whatley's older brothers died from a drug overdose and suicide from a self-inflicted gunshot wound, respectively, his stepbrother died of an accidental drug overdose, and his mother had a suicide attempt with pills and was a heavy drinker (dying of cancer in 1997), and his paternal grandparents were described as alcoholics. (Doc. 2-26 at 326-334).  Dr. Morton also reported record findings supporting treatment for psychiatric disorders and medical problems of major depressive disorder, drug and alcohol dependence, severe

mood swings, borderline personality disorder, psychosis, schizophrenia, and bipolar disorder.  (*Id*. at 331).  Accordingly, it appears that counsel decided to center its mitigation strategy on Whatley's "substance use and intense craving for cocaine [being] major factors in his behavior and thinking on December 28, 2003," as opined by Dr. Morton in his preliminary report and later mitigation testimony.  (*Id*. at 334).

After reviewing the omitted mitigation evidence and that which was presented, it cannot be said that counsel was unreasonable in their decision not to further investigate Whatley's mother's suicide attempt or to present additional evidence of such nor was Whatley prejudiced by the decision.  Therefore, the state court's decision was not contrary to or an unreasonable application of federal law.  Consequently, the claim for habeas relief on this basis is denied.

### 6.   Sister-in-law's death

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence that Whatley witnessed the death of his pregnant sister-in-law when he was 15 years old.  (Doc. 9 at 63).  According to Whatley, "[t]his incident provides further insight into the trauma Mr. Whatley experienced at an early age, without the guidance and coping skills needed to properly process such events."  (*Id*. at 64).

The trial court dismissed Whatley's claim as deficiently pleaded because "Whatley failed to proffer in his petition why testimony that he witnessed his sister-in-law's death when he was a teenage[r] would have been mitigating given the fact that he was 31 years, ten months old when he murdered the victim." (Doc. 2-55 at 17).  The Alabama Court of Appeals affirmed the decision, finding that Whatley also "failed to identify witnesses who would have testified about this event. He also failed to explain how further investigation into this matter would have changed the result of his trial."  (Doc. 2-59; Vol. 34, Tab 80 at 38).

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.  Here, Whatley has failed to indicate that he ever provided information to counsel which would have indicated that witnessing the death of his sister-in-law was a life event to be further investigated.  Furthermore, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  *Id*.  Review of the record indicates that the jury heard testimony during the penalty phase regarding Whatley's experiences involving the deaths of immediate family members, including that one brother died when Whatley was 21 years old, another brother died when Whatley was 23 years old, his mother died when he was 25 years old, and his father died when Whatley was 27.  (Doc. 2-16 at 28).  The jury also heard how emotional and impactful the death of Whatley's father was on him, after an outburst by Whatley during the State's closing argument:

> [Prosecutor]:          . . . What did Deborah Fortner say?  His dad was very important to him in his life.  And when his dad was in the hospital for seven - -
>
> [Mr. Whatley]:          You ain't never seen your damn daddy die, have you?  You ain't never had to be there and to watch him die.
>
> Officer:          Donald, be quiet.  Be quiet.  That's it.
>
> [Prosecutor]:          When his father was in the hospital dying, there is no doubt it was very traumatic on him and Ms. Fortner said it was very traumatic and had a traumatic effect on him. . . .

(Doc. 2-17 at 18).

"The prejudice inquiry necessarily requires a court to speculate as to the effect of the new evidence on the trial evidence," and Whatley has failed to show or even allege how evidence that he witnessed the death of his sister-in-law would have "influenced the jury's appraisal of [Whatley's] moral culpability" as to establish *Strickland* prejudice.  *Andrus*, __ U.S. at ___, 140

S. Ct. at 1887 (internal quotation marks and citations omitted).   Instead, the record confirms evidence was presented regarding trauma caused by the deaths of his immediate family members, namely his father.   Whatley has failed to show, and the undersigned cannot find, that there is a reasonable probability that introduction of this additional evidence would have caused at least one juror to have returned a different sentencing verdict when it is held against the cumulative evidence and aggravating factors presented during the penalty phase.   *Wiggins*, 539 U.S. at 537, 123 S. Ct. at 2543 (That is, at the very least, whether "there is a reasonable probability that at least one juror would have struck a different balance.").

Therefore, the state court's decision was not contrary to or an unreasonable application of federal law.   Consequently, the claim for habeas relief on this basis is denied.

### 7.   Generational substance abuse and dependence

Whatley argues that he suffers with addiction and substance abuse, which can "can only be understood in the context of his family's history of chemical dependence and mental illness", yet trial counsel failed to "accurately represent the extent to which every member of Mr. Whatley's immediate family struggled with substance abuse and depression." (Doc. 9 at 64).   According to Whatley, his paternal grandfather was a "mean drunk, who regularly beat his wife and children. When he could not obtain alcohol, he was known to drink rubbing alcohol, cologne, or anything else that would get him drunk." (Doc. 9 at 64).   Whatley's paternal grandmother was also an alcoholic, who was known to be "violent when intoxicated." (*Id.*).   Whatley's father and mother were alcoholics, and his siblings have also suffered with substance abuse (with one brother developing an addiction to alcohol and drugs rendering him unable to hold a steady job and the other brother being addicted to heroin and dying of a drug overdose). (*Id.* at 64-65).   Lastly, "Whatley's sister, Deborah Fortner, spent years abusing alcohol, diet pills, and muscle relaxants."

(*Id*. at 65).  Whatley argues that "these details . . . were never presented to the judge or jury at trial, preventing them from hearing the critical context in which Mr. Whatley's addiction began and persisted."  (*Id*.).

The circuit court dismissed this claim as meritless and the Alabama Court of Criminal Appeals affirmed the denial, finding:

> Whatley's sister, Deborah Fortner, and Dr. William Morton, Jr., an expert in psychopharmacology retained by defense counsel, had testified at Whatley's trial and had identified numerous members of Whatley's family suffered from drug and alcohol addiction. . . .

(Doc. 2-59 at 27, Vol. 34, Tab 80 at 26).  Referring to the trial testimony, the Court concluded:

> During the penalty phase of Whatley's capital-murder trial, Whatley's sister, Deborah Fortner, testified that both their father and stepmother were alcoholics. She further testified that their grandparents were also alcoholics and that Whatley's older brothers died as a result of substance abuse.
>
> Dr. Morton, Jr., testified that the saw a genetic component in Whatley's addiction and noted that the records he reviewed indicated, among other things, that Whatley suffered from depression as a child and that he attempted suicide at the age of 12. He further testified:
>
>> Whatley has got a history of addiction as well as mental illness. Developmentally I think environment and divorce was a problem. Early exposure, eight years old is pretty early to be exposed to a substance . . . I saw with Donald . . . that genetically he's loaded, he uses early, he has documented physical and sexual abuse, divorce is an issue, he's lost just about everyone in his family. Environmentally he's homeless, jobless, he's got Hepatitis C along with the liver getting where it's not working very well.  He's got untreated mood symptoms.  And he runs across these drugs that work within seconds.

(*Id*. at 27) (internal record citations omitted).  The Court reasoned that purpose of Ms. Fortner's and Dr. Morton's testimony was "to show that substance abuse was a generational issue in Whatley's family and contributed to Whatley's own substance abuse.  Thus, based on the testimony discussed [], additional evidence on this point would have been cumulative."  (*Id*. at 28).

Review of the record reveals that, contrary to Whatley's claim, testimony was presented by all three defense witnesses regarding the notable generational alcoholism and substance abuse in Whatley's family. Mr. Lambert testified that Whatley's father "was always involved in alcohol," noting "sometimes there would be no food in the house but there was always alcohol." (Doc. 2-16 at 4-5). Ms. Fortner testified to that Whatley's grandfather "would drink anything in the medicine cabinet that had an alcohol content" and that both of their brothers had serious alcohol and drug problem, which led to their deaths. (Doc. 2-16 at 20-21). Furthermore, Dr. Moton testified that Whatley's addiction formed because he had a "genetic component" for it (*id*. at 84), stating:

> I saw [a genetic component] in his mother. I saw one in his brothers. I got a history of grandparents not being able to control how much alcohol they used and the consequences that this led to. Several of his brothers died from complications of substance abuse. So genetically he does have that play. . . .

(Doc. 2-16 at 66). Defense counsel again summarized the alcoholism hereditary to Whatley's family during closing arguments, commenting:

> His daddy is an alcoholic. His step mama is an alcoholic. The grandmother's an alcoholic. The grandfather is an alcoholic. The brothers are alcoholics. Donald's an alcoholic. Donald's one of the brothers. And how did they turn out? Three brothers, one OD'd and died on drugs. One blew his brains out because of his alcohol. Donald Whatley here has tried it several times and it never could be done. What does that tell you? Does that seem like any kind of halfway normal existence there was in that family? I submit not. As I told you in the beginning he never had a chance.

(Doc. 2-18 at 3-4).

Viewing the "totality of evidence," additional testimony would have been cumulative of other statements presented by defense counsel through the testimony of Ms. Fortner and Dr. Morton. Indeed, there was clear testimony during the penalty phase as to the family history of alcoholism and substance abuse prevalent in Whatley's history, as well as the significance genetics played in Whatley's addiction. *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069 ("When a defendant

challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Accordingly, the state court's decision was not contrary to or an unreasonable application of federal law. Consequently, the claim for habeas relief on this basis is denied.

8. <u>Generational domestic violence</u>

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence that violence was commonplace in his family and to "explain to the jury how the violence and abuse that Donald Whatley witnessed as a child predisposed him to violence and as an adult." (Doc. 9 at 65). Whatley asserts that his father was abusive to his wife (punching and kicking Whatley's mother when displeased with her and once attempting to cut her tongue out of her mouth with a knife for "sassing" him, necessitating stitches) and abusive to his children and that his paternal grandfather "regularly beat his wife and children." (*Id.*). Whatley further asserts his paternal grandmother was known to be violent when intoxicated and would freeze a cast iron skillet to defend herself against her husband, knocking him unconscious at least once. (*Id.* at 65-66).

The Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of Whatley's claim as meritless. (Doc. 2-59; Vol. 34, Tab 80 at 29). The state court determined:

> The testimony given by Franklin Lambert and Deborah Fortner all demonstrated the violent environment in which Whatley grew up. Although Whatley contends that this testimony fails to adequately show the impact that the violence he witnessed had on his life, additional testimony or evidence about the violence within Whatley's family would have been cumulative.
>
> Moreover, . . . Whatley failed to . . . specify what information would have been obtained had his trial counsel investigated these matters further and whether,

> assuming the evidence was admissible, its admission would have produced a different result. *See Van Pelt*, 202 So. 3d at 730. Finally, Whatley failed to allege any facts demonstrating how he was prejudiced by his counsels' failure to investigate this issue further and to present additional evidence on the matter. Therefore, summary dismissal of this claim was proper.

(Doc. 2-59; Vol. 34, Tab 80 at 29-30).

The record reflects that during the penalty phase, the jury heard testimony that Whatley grew up in an abusive family. Whatley's uncle, Mr. Lambert, testified that Whatley's mother would "pay the price physically" if she ever attempted to discipline Whatley or require him to do chores (Doc. 2-16 at 3, 6), and Ms. Fortner, Whatley's sister, testified that Whatley's father was physically abusive to their mother and mentally abusive to everyone in the family. (*Id*. at 12). The additional mitigating evidence pleaded in Whatley's petition was similar in kind to that presented at trial but more detailed. Thus, while additional mitigating evidence may have presented a grimmer view of Whatley's upbringing, it cannot be said that it would have altered the balance of aggravating and mitigating circumstances in this case. The Eleventh Circuit discussed in *Callahan v. Campbell*, "[w]hen a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal." 427 F.3d 897, 937 (11th Cir. 2005) (citing *Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir. 1990)) (according "little, if any, mitigating weight" to evidence of a deprived and abusive childhood where defendant was 31 years old when he committed the murder). In *Callahan*, the Court further discussed the "reducing value of abuse as mitigating evidence" where, like in Whatley's case, none of the defendant's siblings had committed violent crimes. *Id*. (citing *Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001)) ("The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation."). Here, the testimony presented revealed no evidence of criminal behavior on the part of any of Whatley's siblings, and moreover,

indicated that Whatley's only living sibling, Deborah Fortner, who grew up in the same home with Whatley, under the same abusive conditions, was able to be a "hard working," "productive member of society" her whole life.  (Doc. 2-16 at 33-34).  Furthermore, the testimony indicated that no physical abuse was used against Whatley as a child.  (*Id*. at 29-30).

Accordingly, it cannot be said that the state court's decision was contrary to or an unreasonable application of *Strickland*, and habeas relief is denied.

### 9.  Early introduction of drugs and alcohol

Whatley claims in his petition that trial counsel was ineffective for failing to investigate and present evidence that his parents and siblings introduced him to intoxicating substances at a very young age.  (Doc. 9 at 66).  Specifically, Whatley contends that trial counsel failed to investigate and present evidence that his brothers forced him to inhale marijuana beginning when he was eight years old and continued to provide Whatley with drugs throughout his teen years.  (*Id*. at 67).  Furthermore, Whatley's mother began buying him marijuana when he was thirteen. Whatley argues that had the jury heard such information, the jury would have understood Whatley's "lifelong addiction" and the evidence would have "countered the State's suggestion that Mr. Whatley chose to use drugs and alcohol at his leisure and that he was able to stop at any time." (*Id*.).

The Alabama Court of Criminal Appeals affirmed the circuit court's dismissal of Whatley's claim, finding:

> In summarily dismissing this claim, the circuit court stated:
>
>> . . . Dr. Morton testified that Whatley's substance abuse was due to a number of factors, including developmental, environmental, and genetic factors.  Trial counsel presented testimony that Whatley was not disciplined and began drinking at a very young age.  Whatley suffered from depression and had suicidal events when he was

young.  Whatley would self medicate with illegal drugs to alleviate symptoms associated with his disorders.

The testimony presented by trial counsel clearly illustrated that, due to actions or inaction by his family, Whatley began abusing alcohol and drugs at a young age and continued to do so into adulthood. This claim of ineffective assistance of counsel is without merit; therefore, it is denied.  Rule 32.7(d), Ala. R. Crim. P.

We agree with the circuit court's conclusions.

In addition to the testimony given by Dr. Morton, Whatley's maternal uncle Franklin Lambert testified during the penalty phase that he first witnessed Whatley drinking when Whatley was four years old.  Whatley's sister, Deborah Fortner, testified that Whatley's father gave him alcohol and that she once saw Whatley "sit and drink with his daddy."  She further stated that she witnessed Whatley drinking alcohol and that she also found marijuana in his possession when he was 13 years old.  Fortner then testified that, one time, she witnessed Whatley "huffing" gasoline from the tank of his motorcycle in order to "get high."  Finally, she stated that, in addition to drinking alcohol and smoking marijuana, Whatley told her he had done cocaine, acid, and ecstasy.

(Doc. 2-59, Vol. 34, Tab 80 at 35-36) (internal trial record citations omitted).  The state court then determined Whatley had failed to allege any facts demonstrating how he was prejudiced by his counsels' failure to investigate this issue further and to present additional evidence on the matter and concluded summary dismissal of the claim was proper.

Here, Whatley has failed to show there is a reasonable probability that the outcome of the proceeding would have been different had counsel investigated further Whatley's early drug and alcohol usage. *Strickland*, 466 U.S. at 698 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer – including the appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").  Indeed, the mitigation evidence offered clearly conveyed that Whatley was introduced to alcohol and drugs as a young child and further belies that more evidence

regarding Whatley's early substance usage would have changed a juror's decision, especially given Dr. Morton's testimony as to "the effects of drugs on the brain." (Doc. 2-16 at 46). The record reflects that Dr. Morton walked through Whatley's history of drug use, starting at age zero, in 1972 through age thirty-four when he was placed in jail. (Doc. 2-16 at 60-61). Dr. Morton pointed out that Whatley first started using alcohol around age five, first smoking marijuana at age ten, and becoming a regular user of both around age fourteen. (*Id*. at 61). Dr. Morton described Whatley's childhood experiences huffing or inhaling blackboard cleaner, gasoline, and freon that led to hospitalization, and Dr. Morton testified that Whatley began using cocaine at about fourteen years old. There can be no doubt that the jury heard sufficient evidence of Whatley's childhood drug usage. Furthermore, Dr. Morton opined that Whatley's early usage was one of the factors which triggered a "switch" to occur in Whatley, causing Whatley to become an addict, becoming ("biochemically") "someone that . . . cannot control their use [of drugs] and never will be [able to control their use of drugs]." (*Id*. at 65, 84, 99). Dr. Morton articulated that addicts are not using drugs out of "enjoy[ment], rather they have lost "the ability to control their use" – that is addicts, like Whatley, are "using [drugs] compulsively but they're not enjoying it." (Doc. 2-16 at 63). Dr. Morton further testified as to addiction being a lifelong brain disease and as to how withdrawal symptoms contribute to addicts' inability to stop using substances[37] (*Id*. at 63-64), specifically stating that while "everybody starts off by making a choice to use[,] I think later on it's seldom a voluntary choice. Their brain is saying you've got to use." (*Id*.at 72). Moreover, the jury was left with the following final opinion from the expert, Dr. Morton:

---

[37]   Dr. Morton testified that what distinguishes an addict from non-addict drug user, "is someone that has the disease of addiction cannot control their use and never will be." (Doc. 2-16 at 65). Dr. Morton further opined, "[a]nd I would say they don't have the biologic ability to stop; they can't stop." (*Id*.).

[State]:          If I get your report correct . . . The drugs made [Whatley commit the capital crime] ?

[Dr. Morton]:  The drugs made him do it?

[State]:          Correct.  It's because of the drugs.  Blame it on the drugs.

[Dr. Morton]:  Drugs were a complicating - - a big complicating factor.  I think his drive to get more drug help me understand why he would - - he needs to have money to get cocaine and that's get money at whatever costs.

[State]:          Nothing further, Judge.

(Doc. 2-16 at 98-99).  Contrary to Whatley's argument, the record reflects that the jury heard testimony confirming Whatley's lifelong addiction and the brain changes of addiction that affect an addict's ability to control or stop their usage.

Accordingly, Whatley has failed to establish he was prejudiced by counsel's decision to not further investigate or present evidence regarding Whatley's early usage of drugs and alcohol; thus, it cannot be said that the state court's decision was contrary to or an unreasonable application of *Strickland*, and habeas relief is denied.

### 10. Experiencing Cocaine Withdrawal

Whatley claims in his petition that counsel failed to investigate Whatley's prior use of cocaine, the effects of cocaine withdrawal, and present evidence to the jury as to how these factors impacted Whatley on the night of the capital offense, as well as how cocaine abuse effects the ability to retain memories of events.  (Doc. 9 at 67).

The circuit court dismissed Whatley's claim as meritless, and the Alabama Court of Criminal Appeals affirmed, finding:

Indeed, during the penalty phase of Whatley's capital-murder trial, Dr. Morton confirmed that Whatley had been struggling with cocaine use in the years leading up to the murder.  He also discussed that Whatley had been exhibiting withdrawal symptoms and that, even on the day of the murder, his main focus was on using

alcohol and cocaine.  Specifically, Dr. Morton testified that Whatley told him that, on the day of the murder,

> "his main focus was to get cocaine.  He talked about getting cocaine within an hour after he got the money, driving down the road smoking cocaine as he's driving, smoking it in a pipe.  You cannot get enough of this drug when you're physically dependent on it.  He basically used up about four hundred dollars worth of cocaine within a day."

> . . .

> Although Whatley contends that this trial counsel should have presented additional testimony from his expert indicating how a person's inability to retain memories of events is consistent with cocaine abuse, he fails to plead facts indicating how that testimony would have been relevant or if it would have been admissible.

(Doc. 2-59, Vol. 34, Tab 80 at 41) (internal trial record citations omitted).

As previously discussed, the jury repeatedly heard testimony that Whatley was addicted to cocaine, as well as how cocaine controls the addicted person.  (Doc. 2-16 at 73-75).  Dr. Morton expounded:

> [Addicts] don't learn.  They just continue on.

> They'll work for cocaine in preference to food even though they're starving.  . . . So it's something that that can really control people's lives regardless of who they are or how smart they are or how much money or where they live or anything.  It really knows no boundaries. . . .

(Doc. 2-16 at 74-75). The jury also heard substantial testimony regarding the effects of cocaine withdrawal on addicts and those experienced by Whatley in the days just prior to the committed crime – that is, "[h]e was very agitated, delusional and having hallucinations and agitated and having severe mood swings.  And five days later it was violent and homicidal." (*Id*.).  Dr. Morton explicitly described to the jury the withdrawal symptoms reflected in the medical records in December 2003 and those articulated to him by Whatley in the days around the incident:

> He was impulsive, irritable, aggressive, agitated, not thinking clearly, more anxious, distorted, thinking he saw things move, paranoid.  There were certain psychotic

> symptoms, seeing his dead father, talking to him. This was mainly again December 23rd, and having significant withdrawal symptoms. Withdrawal symptoms like this look, these are his words, antsy, agitated, mean, pissed off, when he quit using cocaine. He was also some of these, these are my words and not his words. Those were his words under irritability. He wasn't sleeping well. He was paranoid. People can stay paranoid for weeks, up to six weeks sometimes thinking that other people are out to get them, thinking that people are trying to make their life hard.

(*Id*.). Dr. Morton went so far as to opine that Whatley's cocaine addiction was "a big complicating factor" in why Whatley committed the capital offense, namely, Whatley needed "money to get cocaine" and he would do whatever it took to get the money - "that's get money at whatever costs." (*Id*. at 99).

Accordingly, the record reflects that counsel adequately conveyed to the jury Whatley's cocaine addiction and the effects of his withdrawal symptoms as they related to the capital offense in question. Thus, it cannot be said that the state court's decision was contrary to or an unreasonable application of *Strickland*, and habeas relief is denied.

Additionally, based on the trial evidence, counsel's decision not to investigate and present evidence that cocaine abuse effects the ability to retain memories of events was reasonable, given that the record reflects that Whatley was able retain and recall details from the incident in question.

> The jury heard testimony from Inmate Clifford Scott Cook, a former cellmate of Whatley's at Mobile Metro Jail, that Whatley told him about committing the capital offense, and Mr. Cook further recounted in detail Whatley's killing of the victim (*id*. at 67-70), including where, when, and how he committed the offense and specific details, like "thumping" down a cigarette, the sounds made by Mr. Patel, and throwing Mr. Patel's wallet out of the car window. (*Id*. at 68). Mr. Cook also recounted to the jury Whatley's thorough, descriptive narrative of killing Shelia Overstreet. (*Id*. at 70-71).

> The jury also heard Dr. Van Rosen, the state's forensic psychologist, testify that Whatley "seemed to have a relatively good memory of the [offense committed]" and "had a coherent account of his activities during the alleged crime." (Doc. 2-15 at 85-86).

> The jury further heard the testimony of Steve Thrower, the Texas investigator who took the confession statement of Whatley regarding Mr. Patel's murder, three years

after the offense was committed.  (Doc. 2-5 at 136).   The confession statement, which was also submitted into evidence for the jury's review, establishes that Whatley was able to retain memories, including the details of the conversation Whatley had with Mr. Patel before driving to the Africatown Cochran Bridge (the scene of the crime), the color of Mr. Patel's car, as well as the entire sequence of events surrounding the commission of the crime (before, during and after the murder).  (Doc. 2-5 at 151-152).

Accordingly, it cannot be said that investigation and presentation of evidence that cocaine abuse effects one's ability to retain memories would have swayed any juror to change their vote from death to life imprisonment without parole, given the extremely detailed accounts of the crime provided by Whatley on numerous occasions to various individuals.  Therefore, it cannot be said that the state court's decision was contrary to or an unreasonable application of *Strickland*, and habeas relief is denied.

> **ii.   Claim that Alabama Court of Criminal Appeals unreasonably concluded that trial counsel adequately presented the mitigation evidence they uncovered.**

Whatley claims in his petition that trial counsel provided ineffective assistance when counsel failed to adequately present the mitigation evidence counsel possessed.  (Doc. 9 at 69-76).

First, Whatley contends that counsel should have called Dr. John Goff to testify as an expert witness, "who would have diagnosed Mr. Whatley with bipolar disorder, a critical mitigating factor."  (*Id*. at 69).  The circuit court summarily dismissed this claim, stating:

> State witnesses testified during the penalty phase that Whatley had been diagnosed as having bipolar disorder and had a history of treatment for that disorder.   Additionally, trial counsel elicited extensive testimony from Dr. William Morton, Jr., a specialist in psychopharmacology, concerning Whatley's mental disorders and the mental health treatment that he had received.

(Doc. 2-59, Vol. 34, Tab 80 at 47).  The Alabama Court of Criminal Appeals affirmed the decision, maintaining that the decision to call a trial witness is a matter of trial strategy, which "courts are ill-suited to second-guess" (*id*.) (internal citations omitted), and concluding:

The record indicates that Whatley's defense counsel chose to call Dr. William Morton, Jr., to testify about Whatley's mental-health history. Dr. Morton specifically testified about Whatley's severe mood disorder which, he said, was initially diagnosed by various doctors as being severe depression but was later believed to be a form of bipolar disorder. He also testified about the various ways in which Whatley was treated for that disorder throughout his lifetime. Dr. Morton then addressed the ways in which Whatley's drug and alcohol abuse exacerbated those symptoms. Under these circumstances, trial counsels' decision not to call Dr. Goff but to instead rely on Dr. Morton's testimony was a matter of trial strategy. Whatley has not pleaded facts indicating that this strategy was unreasonable.

(*Id.*) (internal record citations omitted). The state court further concluded that the testimony of Dr. Goff would have been cumulative to the testimony already given by Dr. Morton, and thus denied relief. (*Id.* at 48). However, Whatley challenges that Dr. Morton's testimony was effective to establish that he suffered from bipolar disorder, for two reasons: (1) Dr. Morton admitted on cross-examination that he was not qualified to diagnosis Whatley's mental illness and (2) the trial court's sentencing order failed to mention bipolar disorder as a potential mitigating circumstance. To establish his claim, Whatley must show that but for his counsel's deficiency there is a reasonable probability he would have received a different sentence. In assessing that probability, courts consider "the totality of the available mitigation evidence--both that adduced at trial, and the evidence adduced in the habeas proceeding" --and "reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at 40-41, 130 S. Ct. at 453-54 (quoting *Williams*, 529 U.S. at 397-98, 120 S. Ct. 1495); *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

The record reflects that counsel presented mitigating evidence at the penalty phase establishing that Whatley suffered "from a serious severe complicated mental health problem",

based on review of approximately 1000 pages of medical and mental health records.  (Doc. 2-16 at 34, 46, 52, 85-92).  Although the State argued that Whatley had never been officially diagnosed with bipolar disorder, Dr. Morton testified extensively (pointing to specific medical records) that Whatley had been treated for a "mood disorder," of which bipolar disorder is "a subset."  (*Id.* at 90-91).  Dr. Morton further opined that Whatley's six recorded hospitalizations and six overdose attempts indicated a diagnosis of bipolar disorder, whether or not "those words" are written in the medical records.  (*Id.* at 86-87).  Mr. Patrick Buttell, a clinical social worker and State's witness, testified that he evaluated Whatley at Mobile Metro Jail in 2005, and further testified that Whatley's chart identified Whatley as suffering from bipolar disorder.  (Doc. 2-15 at 18-25).  Dr. Charles E. Smith, a psychiatrist and witness for the State, also testified that Whatley's chart reflected a "history of treatment for bipolar disorder."  (*Id.* at 29, 31).  Dr. Smith further testified that the first time he evaluated Whatley in 2005, Whatley had a "recent diagnosis of bipolar disorder" and Dr. Smith prescribed Whatley Lithium to treat his symptoms.  (*Id.* at 31, 38).  On cross examination, Dr. Smith explained that bipolar disorder is "a psychiatric condition in which a person is vulnerable to extreme mood swings, whether falling into deep depression or being way too fast and enthusiastic. . . [and] they can be quite psychotic."  (*Id.* at 35).  Dr. Smith expounded on the theory that bipolar disorder is sometimes viewed on a spectrum, encompassing "a whole raft of other psychiatric conditions" which involve "extreme mood swings in a patient", including personality disorders, extreme instability, and Dr. Smith maintained that those with bipolar disorder frequently suffer with "substance abuse of all kinds."  (*Id.* at 35-36).  And, while Dr. Smith was unable to locate a specific diagnosis of bipolar disorder in the record, he noted (on redirect) where Whatley had previously been prescribed Lithium and affirmed (three times) that Lithium is "only" used for the treatment of bipolar disorder.  (*Id.* at 51-52).

A comparison of the testimony presented to that which Whatley argues would have been presented by Dr. Goff, fails to reveal any unknown facts from those presented to the jury.  *See Walker v. State*, 194 So. 3d 253, 288 (Ala. Crim. App. 2015) ("[A] claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence will not be sustained where the jury was aware of most aspects of the mitigation evidence that the defendant argues should have been presented.") (quoting *Frances v. State*, 143 So. 3d 340, 356 (Fla. 2014)).  Instead, Dr. Goff's opinion that Whatley suffered from bipolar disorder merely confirms that presented at the penalty phase.  *But cf.*, *Williams v. Alabama*, 791 F.3d 1267 (11th Cir. 2015) ("[B]ecause the sentencing judge and jury never heard evidence that Mr. Williams was a victim of sexual abuse, such evidence is not 'cumulative'. . . [and] can be powerful mitigating evidence, and is precisely the type of evidence that is 'relevant to assessing a defendant's moral culpability.'") (internal citation omitted).

Additionally, review of the sentencing order in light of the total evidence presented reveals that Whatley has failed to establish prejudice due to the failure of counsel to present the testimony and opinion of Dr. Goff that Whatley suffers from bipolar disorder.  The sentencing order reflects three aggravating factors were found: (1) that defendant has previously been convicted of another capital offense or felony involving the use or threat of violence to the person (ALA. CODE § 13A-5-49(2)); (2) the capital offense was committed while the defendant was engaged in the commission of a robbery in the first degree (ALA. CODE § 13A-5-49(4)); and (3) that the capital offense was especially heinous, atrocious or cruel (ALA. CODE § 13A-5-49(8)).  The court then considered "all statutorily enumerated mitigating circumstances as well as any non-statutory mitigating circumstances which might reasonably appertain" and found no statutory mitigating circumstances to exist.  (Doc. 2-24 at 6).  It is not probable that Dr. Goff's bipolar diagnosis would

have swayed the weight of the aggravating factors in this case, given that the jury and judge heard testimony confirming that Whatley had been diagnosed with bipolar, experienced symptoms associated with bipolar disorder, and/or received treatment for bipolar disorder. *See Dallas v. Warden*, 964 F.3d 1285, 1310 (11th Cir. 2020) (Effects of "new evidence" of diagnosis of learning disorder and ADHD "were similar" to testimony of other witnesses and "would not have changed the characteristics and difficulties the jury heard and considered before it recommended that [the defendant] be sentenced to die."); *see also Earhart v. Johnson*, 132 F.3d 1062, 1067 (5th Cir. 1998) (concluding that even if counsel's failure to obtain expert testimony would have mandated reversal on direct appeal, the defendant still must show that the expert's testimony would have altered the outcome of the trial in order to succeed on an ineffective assistance claim for failure to call the expert).   Thus, the state court's dismissal of Whatley's claim was not contrary to *Strickland* or an unreasonable application of the facts in light of the evidence presented.

Second, Whatley claims that counsel did not adequately meet and prepare mitigation witnesses before their testimony; thus, failing to elicit testimony regarding Whatley's unstable childhood, continued substance abuse during the death of his father, and the depression and substance abuse suffered by his sister, Deborah Fortner, due to the dysfunctional family environment.   The circuit court dismissed this claim, finding:

> Whatley failed to state [in] his petition why this testimony would have been considered mitigating by jurors or the trial court.   This Court finds that testimony from Whatley's sister that she overcame substance abuse and depression could have, in fact, been harmful to Whatley. *See Sochor v. Florida*, 685 F.3d 1016, 1032-1033 (11th Cir. 2012) ("When 'additional mitigating evidence emphasizing physical abuse, neglect, and poverty' has the potential to highlight that a petitioner's sibling 'grew up in the same environment' and 'still emerged as a successfully employed, law-abiding citizen,' that evidence can pose as much harm as good.") (citation omitted).

(Doc. 2-55 at 11).  The Alabama Court of Criminal Appeals affirmed the circuit court's denial, concluding:

> These claims were dismissed by the circuit court as lacking merit and as being insufficiently pleaded.  As we have previously discussed, . . . similar claims were properly dismissed by the circuit court because Whatley's defense counsel adequately presented this information through the testimony of Deborah Fortner and Dr. William Morton.  Whatley has failed to plead sufficient facts demonstrating how the length of time counsel spent with various witnesses would have helped his case or how their failure to do so prejudiced him in any way.  Thus, this claim was properly dismissed by the circuit court.

(Doc. 2-59, Vol. 34, Tab 80 at 47).

"To assess whether counsel exercised objectively reasonable judgment under prevailing professional standards, [courts] first ask, whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Whatley's] background was itself reasonable (considering whether the scope of counsel's investigation into petitioner's background was reasonable)." *Andrus*, __ U.S. at __, 140 S. Ct. at 1882 (internal quotations and citations omitted).  Here, the record reveals that counsel investigated and presented ample evidence of Whatley's family environment of violence, alcoholism, substance abuse, and dysfunction.  The record further confirms that counsel presented evidence of the mental illness and alcohol and substance abuse suffered by Whatley's brothers, mother, father, and grandparents (as previously discussed).  Thus, counsel's investigation was reasonable.  Next, the decision not to introduce evidence of Whatley's sister's struggles with alcohol, pills, and suicidal tendencies must be assessed for reasonableness.  Here, such decision appears to "be justified as a tactical decision."  *Id*. at 1883 (quoting *Williams*, 529 U.S. at 396, 120 S. Ct. 1495).

No doubt, the State emphasized Ms. Fortner's experience growing up in the same environment as Whatley yet becoming "a productive citizen in society."  (Doc. 2-16 at 29, 34). However, Whatley has failed to show how evidence that Deborah Fortner struggled with alcohol,

diet pills, muscle relaxant abuse, along with antisocial and suicidal tendencies would have caused the jury and/or judge have weighed the aggravating and mitigating factors differently.  Notably, in identifying the non-statutory mitigating circumstances put forth by Whatley, the court stated in the sentencing order:

> The defense argued that the Defendant was dealt a bad hand in life as a child because he came from a dysfunctional family with violence and abuse, no discipline and excessive alcohol and drug abuse.  The defense argued the Defendant "did not have a chance from the get go."  However, the Court heard testimony from the Defendant's sister, Deborah Fortner, who testified during the penalty phase that she was also a product of the same environment and went on to lead a hard-working productive life as a citizen of our community.

(Doc. 2-24 at 9).  Based on the trial court's opinion, it is not unreasonable that the state court concluded specific testimony from Ms. Fortner regarding her struggles could serve to bolster the State's argument that Whatley's family environment was surmountable and not the cause of Whatley's crime.  (Doc. 2-55 at 11).  Thus, counsel's decision to focus on and present evidence pertaining to the family members unable to overcome the family dysfunction and environment could be viewed as a reasonable, strategic decision by counsel.  *See Kimmelman v. Morrison,* 477 U.S. 365, 106 S. Ct. 2574, 2588, 91 L. Ed. 2d 305 (1986) ("Counsel's competence … is presumed, and the [petitioner] must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.") (citations omitted).

As to Whatley's claim that counsel failed to investigate and present evidence that he used drugs while he was attending to his father who was in a hospital, habeas relief should also be denied.

The record confirms that the State elicited testimony from Deborah Fortner that Whatley was able to refrain from using drugs during the time that Whatley's father was hospitalized in 1999.

Whatley claims that the failure of counsel to investigate and present evidence that he did use drug during this time period "undermined Mr. Whatley's real struggle with addiction, and prejudiced him before the jury." (Doc. 9 at 73). This claim was presented to and dismissed by the state court, with the circuit court stating:

> Whatley's sister testified that he stayed "for seven days and nights, . . ., right by his daddy's side every minute." Whatley failed to proffer in [his petition] what drugs or alcohol he consumed during this time or that his sister, or anyone else, actually witnessed him consuming drugs or alcohol.
>
> This claim of ineffective assistance of counsel is deficiently pleaded; therefore, it is dismissed. Rule 32.6(b), Ala. R. Crim. P.

(Doc. 2-55 at 12).

Review of the record reflects that this evidence was considered in weighing the aggravating and mitigating circumstances, as the Sentencing Order states:

> The defense hired Dr. Alexander Morton who testified in the penalty phase of the trial that the Defendant had a long history of self-induced polysubstance abuse and depression. He testified that "his substance abuse and intense craving for cocaine were major factors in his behavior and thinking on the night of the murder." At the penalty phase of the trial, the State called C. Van Rosen, Ph.D., clinical and forensic psychologist, who testified that he evaluated the Defendant and "the Defendant presented a coherent account of his criminal behavior and his memories were relatively detailed" regarding the murder of the victim "Pete" Patel. It is worth noting, according to the Defendant's own testimony, that when his own father lay dying in a hospital, the Defendant stayed by his side 24 hours a day for almost two weeks without consuming any drugs or alcohol.

(Doc. 2-24 at 9-10). As indicated in the Sentencing Order, the record confirms that Whatley (in apologizing to the court, out of the presence of the jury, following an outburst triggered by the prosecutor discussing the hospitalization, death of Whatley's father) stayed with his father at the hospital nonstop, stating:

> Your Honor, I just apologize for my outburst. I've never been up under a strain like this. . . . [The DA] pushed the right button and that's what's she's paid for and I blew it and I'm sorry. I don't know what else to say. . . . Your Honor, I had to take my father off of life support. And that right there at that time was the

worsest[sic] ordeal I've ever had to go through in my life. . . . My sister's testimony
yesterday, I stayed at that hospital for seven days and seven nights and left one time.
No one even called me about my father.  I just had the strangest feeling about it and
went to the hospital and there was something wrong with him.  But that's in the
past and I just apologize.

(Doc. 2-17 at 23-24).  While Whatley's constant stay at the hospital does not necessarily negate

his usage of drugs during this time period, Whatley fails to elaborate in his petition to this court

(as well as to the state courts), what drugs he used during this time period; how he obtained drugs

during this time period; who knew about the drug use during this time period.  Moreover, Whatley

fails to demonstrate how counsel's allegedly deficient performance prejudiced his defense because

he does not establish, let alone argue, that "there is a reasonable probability that, absent the errors,

the sentencer . . . would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  Instead, Whatley makes only

a bare allegation that counsel's failure to present evidence that he did use drugs during the time

his father was hospitalized, "undermined" his struggle with addiction – such allegation is simply

insufficient to overcome the *Strickland* standard and habeas relief should be denied.

Last, Whatley claims counsel failed to present a "coherent mitigation theory" to the jury

connecting "Whatley's life-long struggles to the offense in this case."  (Doc. 9 at 69).  He claims

"if trial counsel had actually established [his] serious mental illness, they would have been able to

link it directly to the events leading up to the offense", making two statutory mitigating

circumstances applicable, ALA. CODE §§ 13A-5-51(2) ("The capital offense was committed while

the defendant was under the influence of extreme mental or emotional disturbance.") and (6) ("The

capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to

the requirements of law was substantially impaired.").[38]  This claim was dismissed by the state

---

[38]     The Alabama Court of Criminal Appeals determined the applicability of the statutory

courts, with the circuit court reasoning:

> Dr. Morton testified concerning the link between Whatley's development and drug addiction. Dr. Morton also informed the jury and trial court that, based on the alcohol and drug use of other family members, there appeared to be "a genetic component" with Whatley's substance addiction. Dr. Morton also reviewed Whatley's medical records from a number of institutions. Dr. Morton testified that Whatley had been treated for a number of mental disorders, including major depressive disorder and a severe mood disorder and had been prescribed medications that are used to treat individuals that are bipolar. Dr. Morton also explained why, in his opinion, Whatley's mood disorders had not been adequately treated.

(Doc. 2-55 at 13) (internal citations omitted). The Alabama Court of Criminal Appeals affirmed

the dismissal, stating:

> Whatley's allegations in his petition do not satisfy the pleading requirements in Rules 32.3 and 32.6(b), Ala. R. Crim. P. These paragraphs simply present a critique of trial counsel's mitigation strategy and do not allege sufficient facts to show that trial counsel's strategy was unreasonable. "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that [t]he counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000).

Review of the trial transcript shows that beyond the testimony of Dr. Morton connecting

Whatley's childhood and family history to his addiction (opining these were factors in causing a

"switch" from Whatley's drug usage to addiction), the jury was chronologically walked through

the psychological symptoms and issues experienced by Whatley in the month and days leading up

to the capital crime. Moreover, counsel's closing argument connected the testimony of the

witnesses, both defense and state, to form defense's mitigation theory:

> On the sentencing phase, we had his uncle. He testified about the background that Donald Whatley came out of, about the abusive father, the alcohol, given this kid, a small kid, alcohol. You know, you heard Dr. Morton talk about turning the switch. His switch might have been turned on at nine years old or so because of the way he was raised. During the formative years and I believe Dr. Morton said those first six

---

mitigating circumstances to be waived as it was not raised in Whatley's Rule 32 petition to the circuit court. (Doc. 2-59 at 50; Vol. 34, Tab. 80 at 50, n.23).

years are so important. . .

Deborah Fortner, his sister, who was originally testifying for the State, she testified
about this alcoholic childhood, alcoholic problems that were in the home place.  His
daddy is an alcoholic.  His step mama is a alcoholic.  The grandmother's a alcoholic.
The grandfather is an alcoholic.  The brothers are alcoholics.  Donald's an alcoholic.
The brothers are all drug addicts and alcoholics.  Donald's one of the brothers.  And
how did they turn out?  Three brothers, one OD'd and died on drugs.  One blew his
brains out because of his alcohol.  Donald Whatley here has tried it several times
and it never could be done.  What does that tell you?  Does that seem like any kind
of halfway normal existence there was in that family?  I submit not.  As I told you
in the beginning he never had a chance.  He never had a chance from when he was
a little kid. . . . The sister testified about how Donald's life started spiraling down
and it certainly did spiral down.  He went down and down and down to he winds
up living under a bridge.  Down, down, down, down, as he's in one hospital or
another hospital or Mobile Mental Health or a group home or somewhere people
are trying to treat a problem or problems.  He's got so many problems.

You've heard - - And we've talked about this bipolar business endlessly.  But it's
there in the records.  You'll have these records and I urge to look at these binders
here.  It's like a life story of Donald Whatley.  It's a sad pitiful story and he is a sad
pitiful man just by the hand that life has dealt him.  You know, it's one thing to say,
well, I would never do something like that.  But you don't know what you would
have done if you father's feeding you liquor as a little kid, you had mental problems
that never not properly treated, your father puts you in an apartment so you're wide
open with dope and beer and whatever else you want to do in there.  You don't
know what you would have done.  You would hope not but you don't know.

We had the man from the jail testifying about what supposedly Donald Whatley's
bipolar problem that it was in the records.  The doctor had diagnosed him.  They
were giving him medicine.  You heard Dr. Smith.  Now, these are State's witnesses;
not people I called up here.  The State - - Dr. Smith, the psychiatrist, he talks about
Donald's problem.  He talks about people with these psychological problems self
medicating.  It's a problem with people that have mental problems trying to ease
the turmoil and pain in their mind by taking whatever they can to get some relief.
You know, you have a headache and you take an aspirin trying to ease it.  And I
submit to you what's going on in Donald Whatley's head an aspirin would not touch.
And he did - - I'm not saying [it]'s a good thing, but he tried to ease that misery by
taking drugs and alcohol.

You heard Dr. Morton's presentation about the problems but not properly treating
these conditions.  You heard the problems about people trying to, as I said, self
medicate these situations, how it just goes down and out and worse.  That's what
happened to Donald Whatley.

The State called Dr. Rosen, a psychologist.  He said Donald suffers from organic

brain damage. That's damage to the brain itself. He has - - It affects his cognitive functions, that is his ability to make judgments and make decision. You're not dealing here with somebody, just regular people. You're dealing with someone that is a mental defective, that suffers from a mental illness, not to the point of being insane and we've never said that one time because it's not that. And we're not asking that he be excused. And we're not asking that everybody forget about this. We're simply asking that you don't put him to death. You don't kill people for being sick and being in a situation they can't help.

. . .

[The medical record] reference in there attempted suicide at twelve years old. Do you think that's a red flag about your life going down the drain? 5/2/2000 at Knollwood Hospital. He's found lying in a ditch from an overdose. 6/30/02 USA Medical Center. He's beating his head on the screen in the back of a police car to the point he has to have stitches. 3/8/03 USA Hospital, Knollwood. Admitted suicide attempt OD, overdose. 3/9/03 USA Knollwood. Still suicidal the note says. 3/17/03 Mobile Infirmary. Got psychological problems, suffering from auditory hallucinations. As we get closer to the offense. 11/19/03, found banging his head on a wall behind a convenient [sic] store. That's the one where he - - same time where he had been on a bridge but didn't but they find him behind the convenient [sic] store hammering his head on a brick wall. Getting closer to the offense. 11/24/03 Mobile Infirmary. Note, if discharged will pose a risk to his own safety and others. That's what the medical people and the hospital said. That's about a few days over a month from this incident here. 11/25/03, we're getting closer to the incident. He's exceptionally depressed. 11/25/03 talk about referring him going to jump off the bridge. 12/9/03. We're getting closer to the incident. Major depressive disorder. This is Mobile Mental Health records. Major depressive disorder. Alcohol dependence and then it goes on about what all kind of problems he's got along that line. 12/10/03 Mobile Mental Health. And they set out he's got severe mood problems. They're going to try Lithium. This is within days of this incident.

As I told you this man, he truly had no chance. And I'm not asking you to turn him loose to forget it. I'm just asking you not to kill him because he is not operating with the same kind of faculties that the rest of us do. . .

I'm asking you to please do not kill this mentally defective man. He's got a situation that he did not volunteer for. He has got a situation that is thrust upon him by life, by his family background, by his mental problems, by his damaged brain. He has all these problems that he comes here with. You know, you don't judge people in - - on the same level if they don't have the same attributes. . . . I ask you to look at the - - I ask you please look at these books. As I said, it's a nightmare tale. . .

(Doc. 2-18 at 3-12). Accordingly, counsel presented the sentencers with a full and clear picture of

the relevant mitigating evidence and further connected the mitigating factors to paint the jury a complete picture of who Whatley was and how he got there.

Thus, Whatley's argument is without merit and the state court's decision was not contrary to or an unreasonable application of *Strickland*, and habeas relief is denied.

### iii. Claim that Alabama Court of Criminal Appeals unreasonably concluded that counsel's performance cannot be deficient if they presented any mitigation evidence.

Whatley claims in his petition that the Alabama Court of Criminal Appeals, in violation of established Supreme Court precedent, determined that "only a complete failure to investigate would constitute deficient performance." (Doc. 9 at 78). This claim is without merit, as it misstates the state court's reasoning and decision with a quotation excerpt taken completely out of context.

Review of the Alabama Court of Criminal Appeal's memorandum opinion reveals that in a string of block quotations provided to lay out the foundational case law regarding counsel's failure to investigate, the court quoted:

> "The cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by <u>Strickland</u> will be hard to overcome."
>
> *Ray v. State*, 80 So. 3d 965, 984 (Ala. Crim. App. 2011) (quoting *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001).

(Doc. 2-59 at 16-17; Vol. 34, Tab 80 at 16-17). The state court then explained how courts are to evaluate "the reasonableness" of counsels' decisions not to investigate by examining, 'not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.' (*Id*. at 19) (internal citation omitted). The court

further discussed petitioner's burden to establish prejudice, before addressing Whatley's argument that counsel failed to adequately investigate mitigating circumstances.  (*Id*. at 17-23).

Here, Whatley's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence, and thus the question before the court is not whether or not counsel should have presented a mitigation case, but rather, whether the investigation supporting counsel's decision not to introduce mitigating evidence of Whatley's background was reasonable.  *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").  The state court correctly stated the law and correctly applied the legal standard.  As previously discussed, and determined by the state court, Whatley's counsel conducted a thorough investigation of Whatley's background and presented mitigation evidence to the sentencer.  The scope of counsel's investigation was reasonable in light of discovered information in Whatley's medical records, Pre-Sentence Investigation Report, family members' accounts, and state correctional records.  Indeed, as previously discussed, counsel repeatedly obtained funding from the trial court for additional evaluations of Whatley following opinions and leads presented in the reports of experts.  The additional evidence that Whatley argues should have been investigated and presented is cumulative to that which was presented to the jury and judge, and Whatley has failed to show that the scope of counsel's investigation was unreasonable in light of what counsel discovered. *But cf., Wiggins v. Smith*, 539 U.S. at 525) (Based on the information discoverable in the record, including that Wiggins' mother was an alcoholic, Wiggins was shuttled around the foster system, lengthy absences from school, emotional difficulties, and neglect, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an

informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background."). The record as a whole supports the conclusion that counsel conducted a reasonable investigation and presented discovered mitigation evidence to the sentencer during the penalty phase. Thus, the Alabama Court of Criminal Appeal's decision was not contrary to nor an unreasonable application of clearly established Supreme Court precedent or an unreasonable determination of the facts considering the evidence presented, and Whatley's claim should be denied.

### iv. Claim that Alabama Court of Criminal Appeals unreasonably concluded that counsel had no independent duty to identify mitigation witnesses.

Whatley claims that had counsel conducted more than cursory interviews with him regarding mitigation, "they could have learned about many of the records and witnesses that the petition alleged should have been investigated and presented." (Doc. 9 at 78-79). Whatley further claims that counsel had a duty to independently identify mitigation witnesses, and the Alabama Court of Criminal Appeals' holding that "a defense attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that this client does not mention to him", was in violation of clearly established Supreme Court precedent, citing to *Porter* and *Rompilla*. (*Id*. at 79). Such claim is without merit and clearly distinguishable from *Porter* and *Rompilla*,[39] and for the reasons discussed below, the state court holding was not contrary to or an

---

[39]    In *Porter*, the Supreme Court determined ineffective assistance where counsel "did not even take the first step of interviewing witnesses or requesting records." In particular, counsel ignored "[p]ertinent avenues for investigation" and petitioner was prejudiced, namely because the jury heard no evidence that would humanize petitioner and the aggravating factors were not substantial. 558 U.S. at 40-42, 130 S. Ct. at 453.
       In *Rompilla v. Beard*, 545 U.S. 374, 377, 125 S. Ct. 2456, 2460, 162 L. Ed. 2d 360 (2005), counsel was determined ineffective in capital sentencing for failing "to make reasonable efforts to obtain and review material that counsel [knew] the prosecution [would] probably rely on as evidence of aggravation at the sentencing phase of the trial." In particular, counsel failed to obtain the file of a prior conviction for rape and assault, even though counsel knew the prosecution

unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented.

This claim was presented to the state courts as counsel's failure to investigate or present evidence of abuse suffered by Whatley at the hands of his peers during his youth, specifically that counsel failed to contact his childhood friend, Amy Russell, who would have testified about the variety of ways Whatley was bullied as a child and how he was a kind person. (Doc. 2-59 at 32; Vol. 34, Tab 80 at 32). As previous discussed, the claim was denied.

In denying Whatley's claim, the Alabama Court of Criminal Appeals affirmed the trial court's determination that Whatley "failed to proffer in his petition why testimony that the was bullied as a child would have been considered mitigating to a brutal capital murder he committed when he was almost 32 years old." (*Id*. at 32). The Court of Criminal Appeals concluded that Whatley "fail[ed] to plead facts showing that that information would have been admissible and

---

intended to rely of the aggravating circumstance of a significate history of felony convictions indicating the use or threat of violence in sentencing. The court noted that in a capital sentencing, "defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Id*. at 380-81, 125 S. Ct. at 2462. Failure to obtain the prior conviction file, which was a public document, while knowing the State's intent to use it as evidence, was unreasonable, deficient, and flew in the face of common sense. The Court reasoned:

> [Counsel is not required to look] for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell the defense counsel something about what the prosecution can produce.

*Id*. at 389, 125 S. Ct. at 2467. The Court found the file also contained "red flags," information regarding mental health and intellectually disability issues that would have led to testing to establish mental disturbance, cognitive impairment, and other evidence that could have been introduced to "add[] up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury" and "might well have influenced the jury's appraisal of . . . culpability." *Id*.

ultimately would have changed the result of his trial." (*Id.*).  The court then noted:

> Additionally, Whatley does not indicate whether he told his defense counsel about Amy Russell and the information she could have provided.  Typically,
>
>> "[in evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant.' Newland v. Hall, 527 F.3d 1162, 1201 (11th Cir. 2008), cert. denied, 555 U.S. 1183, 129 S. Ct. 1336, 173 L. Ed. 2d 607 (2009).  Indeed, a defense attorney 'does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.' Id."
>
> DeYoung v. Schofield, 609 F.3d 1260, 1288 (11th Cir. 2010).  "The Constitution imposes no burden on counsel to scour a defendant's background for potential abuse given the defendant's contrary representations or failure to mention the abuse." Stewart v. Secretary, Dep't of Corr., 476 F.3d 1193, 1211 (11th Cir. 2007).  Under these circumstances, Whatley's claim was properly dismissed.

(*Id*. at 32-33).

Clearly, Whatley has, again, misstated the Court of Criminal Appeals' holding by relying on an (out of context) excerpt from the memorandum opinion.  Review of the memorandum opinion indicates that the court denied Whatley's claim because he failed to establish prejudice, a necessary element under *Strickland*.  Unlike *Porter*, *Rompilla*, and cases where ineffective assistance has been found, Whatley's counsel (as previously discussed) interviewed Whatley, Whatley's living relatives, and followed up on "red flags" and leads discovered in medical records, correctional institution records, and the evaluations of experts.  Notably, counsel was able to use the testimony of State's witnesses Dr. Smith, Mr. Buttell, and Dr. Rosen (as previously discussed) to boost the mitigation defense of showing Whatley suffered from organic brain damage and had received treatment for bipolar disorder.

"Simple mistakes or strategic errors are not enough, nor are serious errors absent those errors, there is no 'reasonable probability' that the outcome would have been different." *Franks v. GDCP Warden*, 975 F.3d 1165, 1175 (11th Cir. 2020) (quoting *Strickland*, 466 U.S. at 694).

Here, Whatley has failed to carry his burden of showing that he was prejudiced by any alleged failure of counsel to individually identify mitigation witnesses. Accordingly, the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented, and Whatley's claim is denied.

### v.   Claim that Alabama Court of Criminal Appeals unreasonably concluded that counsel's performance was the result of reasonable strategic decisions.

Whatley argues in his petition that the state court erred in holding that Whatley failed to show that trial counsel's strategy was unreasonable. (Doc. 9 at 81). Whatley reiterates a version of his previously pleaded claim, that "because Mr. Whatley's bipolar disorder was an important mitigating factor, trial counsel's failure to present expert testimony in support of it was unreasonable." (*Id.*). Essentially, Whatley contends that because counsel put forth argument and evidence that Whatley "might" have suffered from bipolar disorder, their failure to not present the testimony of Dr. Goff to prove he did suffer from bipolar disorder could not have been a reasonable strategic decision as concluded by the state court. (*Id.*).

> The Supreme Court has instructed that there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 104 S. Ct. at 2065. This presumption is like the "presumption of innocence" in a criminal trial, in which "the defendant is not required to come forward with proof of his innocence once evidence of guilt is introduced to avoid a directed verdict of guilty." *Black's Law Dictionary* 823 (6th ed. 1991). This presumption of competence must be disproved by a petitioner. Petitioner continually bears the burden of persuasion on the constitutional issue of competence and further, (adding the prejudice element) on the issue of ineffective assistance of counsel. *See Strickland,* 104 S. Ct. at 2064 (stating that "defendant must show that counsel's performance was deficient" and that defendant must also show prejudice). Never does the government acquire the burden to show competence, even when some evidence to the contrary might be offered by the petitioner.

*Chandler v. United States,* 218 F.3d 1305, 1314 n.15 (11th Cir. 2000), *cert. denied*, 531 U.S. 1204,

121 S. Ct. 1217, 149 L. Ed. 2d 129 (2001).

While Dr. Goff's testimony of a diagnosis of bipolar disorder may have strengthened the defense theory, "[c]ounsel's failure to call an expert witness is not *per se* ineffective assistance, even where doing so may have made the defendant's case stronger, because the State could always call its own witness to offer a contrasting opinion." *Marshall v. State*, 20 So. 3d 830, 841 (Ala. Crim. App. 2008) (quoting *People v. Hamilton*, 361 Ill. App. 3d 836, 847 (2005). It cannot be said under these circumstances that no reasonable attorney would have chosen not to call Dr. Goff to testify in this case. Furthermore, as previously discussed,[40] Whatley has failed to carry his burden of establishing the result of his sentence would have been different had Dr. Goff testified that Whatley suffered from bipolar disorder.[41] Where petitioner fails to establish the prejudice component, there is no reason to address the alleged deficiency. *Strickland*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

For these reasons, trial counsel's performance was not unconstitutionally deficient, and the Alabama Court of Criminal Appeals' decision was not contrary to or an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented. Accordingly, Whatley's claim is denied.

---

[40]    *Supra* section IV.2.b.ii.

[41]    Notably, the record does not indicate that Dr. John Goff ever diagnosed Whatley as suffering from bipolar disorder. Review of Dr. Goff's neuropsychological report indicates that Dr. Goff concluded that Whatley functioned within the average range of intelligence but found indications for "organic brain dysfunction" and diagnosed Whatley with "cognitive disorder," most likely associated with multiple head injuries. (Doc. 2-26 at 170).

**3.   The trial court's failure to find and consider mitigating circumstances violated clearly established United States Supreme Court precedent.**

Whatley identifies two mitigating factors for which he contends there was substantial and undisputed evidence presented but that the trial court did not consider: (1) Whatley's life-long struggle with mental illness and addiction and (2) his remorse and acceptance of responsibility. (Doc. 9 at 99-100).  The Court of Criminal Appeals reviewed Whatley's claim and found:

> The United States Supreme Court in *Lockett v. Ohio,* 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), held that a court must consider all evidence submitted by a capital-murder defendant in mitigation. " 'While *Lockett* and its progeny require consideration of all evidence as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' *Bankhead v. State,* 585 So. 2d 97, 108 (Ala. Cr. App. 1989)." *Ex parte Slaton,* 680 So. 2d 909, 924 (Ala.1996), cert. denied, *Slaton v. Alabama,* 519 U.S. 1079, 117 S. Ct. 742, 136 L. Ed. 2d 680 (1997). "*Lockett* does not require that all evidence offered as mitigating evidence be found to be mitigation." *Ex parte Ferguson,* 814 So. 2d 970, 976 (Ala.2001), cert. denied, *Ferguson v. Alabama,* 535 U.S. 907, 122 S. Ct. 1208, 152 L. Ed. 2d 145 (2002). *See also Snyder v. State,* 893 So. 2d 488 (Ala.Crim.App.2003), cert. denied, 893 So. 2d 563 (Ala.2004), cert. denied, *Snyder v. Alabama,* 544 U.S. 1062, 125 S. Ct. 2512, 161 L. Ed. 2d 1113 (2005). "The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance." *Calhoun v. State,* 932 So. 2d 923, 975 (Ala. Crim. App. 2005), cert. denied, *Calhoun v. Alabama,* 548 U.S. 926, 126 S. Ct. 2984, 165 L. Ed. 2d 990 (2006). Nor is the "the trial court ... required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating." *Williams v. State,* 710 So. 2d 1276, 1347 (Ala. Crim. App.1996), affirmed, 710 So.2d 1350 (Ala.1997), cert. denied, *Williams v. Alabama,* 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998).
>
> The circuit court's order specifically lists each statutory mitigating circumstance and found that none were present. The court then detailed the nonstatutory mitigating circumstances that had been presented by Whatley and stated:
>
> > "The murder of 'Pete' Patel committed by the Defendant occurred before he converted his life to Christianity and he has now turned his life over to Christ. If true, this is miraculous and commendable and may assure him everlasting life. However, the Court has its doubts as evidenced by the Defendant's conduct since he was returned to this county. The State produced records and testimony from employees of the Mobile County Metro Jail who have witnessed and documented the Defendant's violent outbursts while

incarcerated in this facility. Some of these outbursts occurred even after Defendant supposedly converted his life to Christianity".

"The murder of Sheila Diane Overstreet committed by the Defendant in the State of Texas occurred before he converted his life to Christianity. Defendant claims he has now turned his life over to Christ. However, the State produced records and testimony from the employees of the Mobile County Metro jail who have witnessed and documented the Defendant's violent outbursts while incarcerated and after the Defendant claims he turned his life over to Christ."

"The defense argued that the Defendant was dealt a bad hand in life as a child because he came from a dysfunctional family with violence and abuse, no discipline and excessive alcohol and drug abuse. The defense argued the Defendant 'did not have a chance from the get go.' However, the Court heard testimony from the Defendant's sister, Deborah Fortner, who testified during the penalty phase that she was also a product of the same environment and went on to lead a hard-working productive life as a citizen of our community.

"The defense hired Dr. [William] Alexander Morton who testified in the penalty phase of the trial that the Defendant had a long history of self-induced poly-substance abuse and depression. He testified that 'his substance abuse and intense craving for cocaine were major factors in his behavior and thinking on the night of the murder.' At the penalty phase of the trial, the State called C. Van Rosen, Ph.D., clinical and forensic psychologist, who testified that he evaluated the Defendant and 'the Defendant presented a coherent account of his criminal behavior and his memories were relatively detailed' regarding the murder of the victim 'Pete' Patel. It is worth noting, according to the Defendant's own testimony, that when his own father lay dying in a hospital, the Defendant stayed by his side 24 hours a day for almost two weeks without consuming any drugs or alcohol."

(C.R. 457–59.)

The circuit court's order shows that it complied with *Lockett* and considered the evidence that had been presented in mitigation. "Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact." *Harrell v. State,* 470 So.2d 1303, 1308 (Ala. Crim. App. 1984), affirmed, 470 So.2d 1309 (Ala. 1985), cert. denied, *Harrell v. Alabama,* 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985). The circuit court was within its discretion in failing to find the proffered evidence to be mitigating. Thus, we find no plain error.

*Whatley,* 146 So. 3d at 496-98.

It is well settled that due process requires sentencers to consider any relevant mitigating evidence that might lead the sentencer to decline to impose the death penalty.[42]  *See Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987) (holding that the sentencer may not refuse to consider any relevant mitigating evidence); *Woodson v. North Carolina.*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion) (invalidating mandatory death penalty statute for failing to consider defendants' characters and records and circumstances of particular offense); *Jones v. Polk*, 401 F.3d 257, 262-64 (4th Cir. 2005) (remorse relevant when considering mitigating factors); *Moore v. Johnson*, 225 F.3d 495, 506 (5th Cir. 2000) (character, record of defendant, and circumstances of crime relevant when considering mitigating factors); *Davis v. Coyle*, 475 F.3d 761, 774-75 (6th Cir. 2007) (evidence of defendant's good behavior in prison relevant when considering mitigating factors).  It is clear from the sentencing order in this case that the trial court properly considered all of the mitigating evidence offered by Whatley.  The record reflects that Whatley was allowed to present argument concerning the sentencing, was not limited in any way regarding the evidence he presented, and personally addressed the trial court. (Doc. 2-24 at 1).  The trial court considered all statutorily enumerated factors listed in § 13A-5-51 and made conclusions as to the existence of each.  (*See* Doc. 2-24 at 6-8).  Finding none, the trial court reviewed the non-statutory mitigating circumstances offered by Whatley, and specifically

---

[42]      "[T]he requirements of due process ban cruel and unusual punishment." *Furman v. Georgia.*, 408 U.S. 238, 241 (1972) (Douglas, J., concurring); *see also Robinson v. California*, 370 U.S. 660, 667 (1962) (States are subject to the Eighth Amendment's prohibition against cruel and unusual punishment through the Fourteenth Amendment.).  Consequently, defendants sentenced to death must be convicted of a crime for which the death penalty is a proportionate punishment. *See Gregg v. Georgia*, 428 U.S. 153, 187, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality opinion).

noted where State's evidence or testimony contradicted the alleged mitigating factor.  (Doc. 2-24 at 8-10).  Thus, the record belies that the trial court failed to comply with *Lockett* and its progeny and, instead reflects that the court considered all the mitigation evidence Whatley presented during the trial and sentencing.  *See* §2254(d)(1); *see also Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Although *Atkins* argues that the trial judge did not *consider* nonstatutory factors, it is more correct to say that the trial judge did not *accept*—that is, give much weight to—Atkins' nonstatutory factors.  Acceptance of nonstatutory mitigating factors is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors.").

Review of the sentencing order reveals that the trial court made the following findings regarding the statutory mitigating circumstances:

> 2.      The offense was not committed while the Defendant was under the influence of extreme mental or emotional disturbances.  Thus, the Court finds that the ALA. CODE § 13A-5-51 (1975) mitigating circumstance does not exist and is not considered.
> . . .
>
> 5.      The Court finds that the Defendant did not act under extreme duress or under the substantial domination of another person when he committed the capital offense.  Thus, the Court finds that the Ala. Code § 13A-5-51(5) (1975) mitigating circumstance does not exist and is not considered.

(Doc. 2-24 at 7).  The record confirms that in discussing mitigation factors, the trial court went beyond the statutory factors and recognized that Whatley "came from a dysfunctional family with violence and abuse, no discipline and excessive alcohol and drug abuse."  (Doc. 2-24 at 9).  The trial court further acknowledged Whatley's conversion to Christianity and responsibility for the crime and his actions.  (*See id*. at 9-10) (The trial court noted, "[t]he Defendant, in his own words at the last sentencing hearing while addressing the Court, stated that on the night of the murder he killed a man who was begging for his life.  The Defendant, in general, expressed sorrow for his crimes but did not ask the Court to spare his life or sentence him to life without parole.").  The

Court further noted in the sentencing order:

> The Court has considered all the evidence presented at trial, in the pre-sentence report and at the sentence hearing. (Doc. 2-24 at 1).

> The Court has weighed the aggravating and mitigating circumstances and . . . finds that the aggravating circumstances in this case outweigh the mitigating circumstances beyond a reasonable doubt and that the punishment should be DEATH. (Doc. 2-14 at 10-11).

Contrary to Whatley's contention, the record does not support that the trial court *failed to consider* the evidence presented by Whatley that he had a life-long struggle with mental illness and addiction and that he was remorseful and accepted responsibility for the committed crime. Instead, the record supports that the trial court merely found the presented evidence *unpersuasive*. The trial court findings are sufficiently supported by the record.

"By holding that the sentencer in capital cases must be permitted to consider any relevant mitigating factor, the rule in *Lockett* recognizes that a consistency produced by ignoring individual differences is a false consistency." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 875, 71 L. Ed. 2d 1 (1982). "The core substantive ingredient in the constitutional right to an 'individualized sentencing' is mitigation evidence relevant to the capital defendant as an individual or unique person (whether his background, character, mental health record, or circumstances of his crime), which a jury may consider to assess personal moral culpability and to determine an individualized sentence." *Puiatti v. McNeil*, 626 F.3d 1283, 1314 (11th Cir. 2010). "In ruling on a petition for a writ of habeas corpus, a federal court is not to overturn a factual conclusion of a state court, including a state appellate court, unless the conclusion is not 'fairly supported by the record.'" *Parker v. Dugger*, 498 U.S. 308, 320, 111 S. Ct. 731, 739, 112 L. Ed. 2d 812 (1991), *holding modified by Brown v. Sanders*, 546 U.S. 212, 126 S. Ct. 884, 163 L. Ed. 2d 723 (2006) (internal citation omitted). Furthermore, "[t]he sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give

it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114–15. Indeed, "state court must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Id*. at 117.

At trial, Whatley's written confession was introduced, and counsel repeatedly stressed that prior to Whatley's confession to the crime, it remained an unsolved murder for approximately three years.[43]  Testimony was also provided by Officer Steve Thrower, who interviewed Whatley and obtained his confession, that Whatley "seemed sincere" about his remorse and regret for the crime.[44]  Trial evidence also indicated that Whatley was under the influence of drugs and alcohol at the time of the capital offense.[45]

During the penalty phase, testimony was provided by Whatley's sister and uncle that evidenced the prominence of alcoholism, drug addiction, as well as violence and abuse in Whatley's family, and Whatley's early introduction to alcohol and subsequent substance abuse issues.[46]  Dr. Morton testified as to Whatley's struggles with mental illness (mood disorders and multiple suicide attempts) and unsuccessful attempts at treatment.[47]  Dr. Smith and Pat Buttell further testified that Whatley suffered from mental health issues, likely bipolar disorder.[48] Evidence was also introduced regarding the mental health treatment received in the days and month prior to the offense.[49]

The presentence investigation report confirmed regular alcohol and drug use, as well as

---

[43]     (Doc. 2-7 at 26-28, 112-116).
[44]     (Doc. 2-5 at 164).
[45]     (Doc. 2-5 at 164, 332).
[46]     (Doc. 2-16 at 3-5, 11-34).
[47]     (Doc. 2-16 at 34-99).
[48]     (Doc. 2-15 at 18-25, 25-65).
[49]     (Doc. 2-15 at 47-48; Doc. 2-16 at 56-60, 78-83).

mental health issues.[50]  The report further reflected a long criminal history (dating back to the 1980s), associated with drugs and alcohol use.[51]

Whatley argues in his petition that this evidence was "undisputed" (and thus must be considered by the sentencer as mitigating circumstances).  (Doc. 9 at 99-100).  However, the record belies such a claim, to the extent that evidence was presented which conflicted with the mitigation circumstances put forth and argued by Whatley in his petition.  Stated another way, the evidence relied upon by Whatley was directly challenged before the sentencer.  For instance, Dr. Smith testified that Whatley was "not crazy" and that he did not know what Whatley "was suffering from . . ., if anything, back in 2003."[52]  Evidence revealed that Whatley repeatedly refused to take the medications prescribed for mental illness, instead likely turning to drugs to "self-medicate",[53] and that Whatley had been able to abstain from drugs and alcohol for periods of time in his life, like when his father was sick in the hospital.[54] The medical records reflected that it was unclear whether Whatley suffered from "depression or bipolar or substance use." [55]   As to the remorsefulness of his actions, testimony provided by Inmate Cook revealed that when Whatley retold his crime, Whatley "got mad" because he missed money in Mr. Patel's wallet before

---

[50]     (Doc. 2-23 at 4, 6).
[51]     (*Id*. at 3, 6).
[52]     (Doc. 2-15 at 55, 61).  Whatley further confirmed in addressing the court, though he had had many times in his life where he would "blackout" and not remember for three, four, or five days what happened, the "night [of December 28, 2003] wasn't no black out."  (Doc. 2-22 at 10).
[53]     (Doc. 2-15 at 62; Doc. 2-16 at 56-58, 67).
[54]     (Doc. 2-16 at 28).  The cross-examination testimony of Dr. Morton revealed that Whatley had also been unsuccessful with addiction treatment as well.  (Doc. 2-16 at 93-94).
[55]     (Doc. 2-16 at 91-92). During closing arguments, the State argued that Whatley "chooses to ingest drugs and alcohol and the drugs and alcohol causes him problems. . . That is not a mental deficient.  And the records are in evidence [to support the same]."  (Doc. 2-17 at 14).  The prosecution then summarized the medical records indicating Whatley suffered from a "substance induced mood disorder", linked to alcohol dependence and drug use, coupled with Whatley's refusal to attend therapy meetings while in treatment.  (Doc. 2-17 at 14-18).

throwing it out the window.[56]   As to his traumatic upbringing, evidence was put forth that Whatley's sister was able to go "on to lead a hard-working productive life as a citizen of our community" and that Whatley "had a good relationship" with his parents, with lack of discipline (rather than abuse) being the issue at home.[57]

As to Whatley's claim that he was under the influence of an extreme or emotional disturbance and that his ability to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, the record or testimony confirms or suggests such, including Whatley's claim he had been drinking and taking drugs on the day of the offense. "Voluntary intoxication will not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating the criminality of his conduct." *Williams v. State,* 710 So.2d 1276, 1346 (Ala. Crim. App. 1996), *aff'd,* 710 So. 2d 1350 (Ala 1997), *cert. denied,* 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998).   As discussed *supra,* at section IV., 2., a., the evidence showed Whatley's attempts to cover up the crime, demonstrating he was not so intoxicated as to substantially impair his ability to appreciate the criminality of his conduct or to conform his conduct to the law.   As to Whatley's claim that the state court erred by not considering the nonstatutory mitigating evidence of his long history of alcohol and drug use, mental illness, and remorse and acceptance of responsibility for the offense, as discussed above, the record

---

[56]   (Doc. 2-15 at 69).   Inmate Cook further testified that when Whatley was discussing the murder of Ms. Overstreet, "he was laughing.   He never acted like it bothered him at all."   (*Id.* at 71).   Also, evidence was presented that Whatley threatened another inmate "that he done killed people [and the inmate] could be the third one."   (*Id.*).   A fact finder could easily conclude from this evidence that Whatley was not remorseful for murdering Mr. Patel.

[57]   (Doc. 2-16 at 12, 14-17, 30, 33-34).

contained evidence and testimony in opposite.  Notably, as the Eleventh Circuit discussed in *Atkins*, the verb "consider" is not synonymous with "accept," and "the Constitution only requires that the sentencer *consider* the factors." 965 F.2d at 962.

Here, it cannot be said that the findings of the state courts were unreasonable in light of the evidence.  Neither has Whatley offered clear and convincing evidence to overcome the presumption of correctness owed to the state court findings.  "[E]ven if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's ... determination".  *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010) (internal quotation and citation omitted).  Review of the record and of the sentencing order is convincing that the trial judge fully considered all the supposedly mitigating factors offered by Whatley, but in light of the other evidence presented by the State, refused to accept those mitigating factors[58] *Wesley v. State,* 575 So. 2d 108, 121 (Ala. Crim. App. 1989), *rev'd on other grounds*, 575 So. 2d 127 (Ala.1990) ("The factual determination of the existence or nonexistence of a mitigating circumstance is within the sound discretion of the trial judge where the evidence in that regard is in conflict."); *see also Harrell v. State,* 470 So. 2d 1303, 1308 (Ala. Crim. App.1984), *aff'd*, 470 So. 2d 1309 (Ala.), *cert. denied*, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985) ("Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact."); *Blystone v. Pennsylvania,* 494 U.S. 299, 308, 110 S. Ct. 1078, 108 L. Ed. 2d 255 (1990) (Consideration of

---

[58]    The trial court weighed the mitigation evidence against the following aggravating factors: (1) Whatley was previously convicted of two felony charges involving the use or threat of violence (assault with a deadly weapon and first-degree robbery), ALA. CODE § 13A-5-49; (2) the capital offense was committed while Whatley was engaged in the commission of a robbery in the first-degree, ALA. CODE § 13A-5-49(4);(3) the capital offense was especially heinous, atrocious or cruel, ALA. CODE § 13A-5-49(8).

mitigating factors, as expressed by the trial court and upheld by the Court of Criminal Appeals, is "sufficient to satisfy the dictates of the Eighth Amendment."). The trial court specifically stated in its sentencing order that it "weighed the aggravating and mitigating circumstances" and determined "that the aggravating circumstances in this case outweigh the mitigating circumstances," (Doc. 2-14 at 10-11), evidencing the trial court considered all mitigation evidence put on by Whatley, both statutory and nonstatutory. *Cf., Ford v. Strickland*, 696 F.2d 804, 813 (11th Cir. 1983) (The concluding phrase of the trial court, "[t]here are no mitigating circumstances existing-either statutory or otherwise-which outweigh any aggravating circumstances" was held indicative of the sentencing judge's consideration of nonstatutory mitigating evidence.); *Baldwin v. Johnson*, 152 F.3d 1304, 1324 (11th Cir. 1998) ("Although the court did not discuss any nonstatutory mitigating evidence . . ., the court preceded [its] findings through stating that it had 'considered the evidence presented at trial and at said sentence hearing.' ") (emphasis omitted); *Card v. Dugger*, 911 F.2d 1494, 1523 (11th Cir. 1990) (comments by the trial judge, as well as his jury charge, reflected that he knew non-statutory mitigating circumstances could be considered, and even though his order did not specifically address non-statutory mitigating circumstances, it did state that he had considered and weighed all evidence in the case); *see also Dobbert v. Strickland*, 718 F.2d 1518, 1524 (11th Cir. 1983) ("What one person may view as mitigating, another may not.").

Accordingly, Whatley's claim lacks merit and is denied habeas relief.

**4. The trial court's reliance on future dangerousness as a non-statutory aggravating circumstance in sentencing Whatley to death violated clearly established United States Supreme Court precedent.**

Whatley argues that the trial court's consideration of his future dangerousness constitutes a novel and unprecedented construction of Alabama law, where prior to Mr. Whatley's trial,

Alabama law clearly prohibited such use of non-statutory aggravator evidence.[59]  (Doc. 9 at 106).

The Alabama Court of Criminal Appeals rejected Whatley's claim, finding:

> The record indicates that, before the penalty phase, the prosecutor requested that he be allowed to present evidence of Whatley's future dangerousness. The State asserted that this evidence was admissible pursuant to § 13A–5–45(d), Ala. Code 1975, which provides:
>
>> "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
>
> Whatley objected and argued that admitting the evidence would "create a new aggravator." The circuit court allowed the evidence to be admitted at the penalty phase. [Doc. 2-13 at 4].
>
> The State presented evidence concerning Whatley's behavior while he was incarcerated at the Mobile County jail. Testimony was presented that Whatley had disciplinary infractions while there and that he threatened another inmate. Whatley asserts that this evidence was not admissible at the penalty phase because it tended

---

[59]    The sentencing order, in the section addressing "The Aggravating Circumstances," discusses the evidence of future dangerousness put forth by the State:

> The Court was also presented evidence and considered that evidence which was submitted to the jury in the sentencing phase of the trial regarding future dangerousness of the Defendant. . . .
>
> Pat Buttell, license clinical social worker and employee of Mobile Metro Jail, testified in the penalty phase that he visited the Defendant on or around July 11, 2005.  Mr. Buttell testified that during this visit, the Defendant was having continuing thought of killing other inmates and because of this, the Defendant was transferred to an isolation area.
>
> Dr. Charles Smith, a psychiatrist, testified that he saw the Defendant on a number of occasions while the Defendant was in Mobile Metro Jail.  Dr. Smith testified that on June 15, 2005, the Defendant complained that he was "irritated" by the other inmates and that he (the Defendant) would like to "wring their necks."

(Doc. 2-24 at 6).

to establish a nonstatutory aggravating circumstance concerning his future dangerousness.

The United States Supreme Court has stated the following concerning evidence of a defendant's future dangerousness:

> "This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system."

*Simmons v. South Carolina,* 512 U.S. 154, 162, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994).

Section 13A–5–45, Ala. Code 1975, states, in pertinent part:

> "(c) At the sentencing hearing evidence may be presented as to *any matter that the court deems relevant to sentence* and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A–5–49, 13A–5–51, and 13A–5–52....

> "(d) *Any evidence which has probative value and is relevant to sentence* shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."
> (Emphasis added.)

In Alabama, in order to sentence a defendant to death, the aggravating circumstances must outweigh the mitigating circumstances. *See* § 13A–5–47(e), Ala. Code 1975. There is no aggravating circumstance that relates to a defendant's future dangerousness. *See* § 13A–5–49, Ala. Code 1975. However, the appellate courts of Alabama have never restricted the admission of evidence at the penalty phase in a capital-murder case to evidence related solely to the aggravating circumstances and the mitigating circumstances. *See Lee v. State,* 44 So. 3d 1145, 1174 (Ala. Crim. App. 2009) ( "[V]ictim impact evidence is admissible at the penalty phase of a capital trial."); *McGriff v. State,* 908 So. 2d 961, 1013 (Ala. Crim. App. 2000), *rev'd on other grounds*, 908 So. 2d 1024 (Ala.2004) (upholding admission of evidence at penalty phase that defendant said he had " 'done killed one m___ f___ and would kill again' ").

In *Doster v. State,* 72 So. 3d 50, 120–21 (Ala. Crim. App. 2010), we held that "evidence indicating future dangerousness was relevant and admissible in Alabama pursuant to § 13A–5–45(d), Ala. Code 1975." The evidence in this case was relevant and admissible at the penalty phase of Whatley's trial. The circuit court properly instructed the jury on the applicable aggravating circumstances and that,

before a death sentence could be imposed, the aggravating circumstances must outweigh the mitigating circumstances.

Moreover, Whatley argued at the penalty phase that he had confessed to the murder/robbery, thereby helping the police; that he had had a "religious conversion" after killing Patel; and that he was remorseful for his actions. Whatley's conduct in jail and the statements he made concerning harming other inmates were relevant to rebut evidence that Whatley presented in mitigation.

> "Evidence of Clark's prison disciplinary problems was clearly offered to rebut the evidence he had offered in mitigation that he was a 'model inmate.' (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g., *Jackson v. State,* 791 So.2d 979 (Ala. Crim. App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S. Ct. 1387, 149 L. Ed. 2d 311 (2001)(evidence of the defendant's prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant's mitigation evidence); and *Hallford v. State,* 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S. Ct. 354, 107 L. Ed. 2d 342 (1989)(evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant's mitigation evidence regarding his good character)."

*Clark v. State,* 896 So.2d 584, 597 (Ala.Crim.App.2000), cert. denied, *Clark v. Alabama,* 545 U.S. 1130, 125 S. Ct. 2930, 162 L. Ed. 2d 870 (2005). For these reasons, we find no error in the admission of this evidence at the penalty phase.

*Whatley*, 146 So. 3d at 481-82.

Review of the state court's decision shows that it was not contrary to, or an unreasonable application of clearly established law, neither was the decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. § 2254(d).

As pointed out by the state court, "consideration of future dangerousness during the penalty phase of a capital trial" is appropriate because it "bears on all sentencing recommendations." 512 U.S. at 162. Pursuant to the Supreme Court's holding in *Simmons*, however, when future dangerousness is at issue in the penalty phase of a capital trial and the defendant is ineligible for parole under state law, "due process requires that the sentencing jury be informed that the

defendant is parole ineligible," *id*. at 156, as was the jury here, when advised that Whatley would never be released into the public, no matter the determined verdict.  In charging the jury, the trial judge advised:

> Now death means that the Defendant will be put to death by lethal injection.  That's the law in this state.  Life imprisonment means - - without parole, means exactly what it says.  Life imprisonment without parole.  It doesn't mean good time.  You hear life sentences all the time but they're not life without parole.  This means life without parole.  So if he got that he would never be released.  Those are your only two choices.

(Doc. 2-19 at 5).  Defense counsel further emphasized at the sentencing hearing that no matter what sentence was imposed, Whatley would "be shut off from society" and would "not pose a threat to society".  (Doc. 2-22 at 9).  The State then urged the trial judge to remember the volumes of records that depict Whatley's behavior, arguing:

> That was a big part of the State's case in the penalty phase, not only the murder in Texas but his attitude while being incarcerated.  It doesn't - - And contrary to what he says today those records don't show a changed man who is living the life of God and exemplifying a model prisoner.

(Doc. 2-22 at 15). Accordingly, the record indicates that future dangerousness was presented for determining "what weight should be afforded the aggravating circumstances that the State had proven." *Floyd v. State*, 289 So. 3d 337, 431 (Ala. Crim. App. 2017) (finding remarks of future dangerousness "were proper arguments about Floyd's criminal history and future dangerousness and what weight should be afforded the aggravating circumstances that the State had proven.").

Under Alabama law, the imposition of a death sentence requires a finding of at least one aggravating circumstance under ALA. CODE § 13A-5-49, which weighs heavier than the mitigating circumstance(s).  Here, the State argued in its closing that it had proven three statutory aggravating factors: (1) the murder occurred during the course of a robbery (jury determined during the guilt phase), §13A-5-49(1); (2) Defendant was previously convicted of a felony involving the use or threat of violence to a person (judicial records from North Carolina were entered into evidence),

§13A-5-49(2); and (3) the offense was heinous, atrocious, and cruel (pointing to Dr. Enstice's testimony regarding 19 pages of injuries inflicted upon the victim), §13A-5-49(8).  (Doc. 2-17 at 3-9).  The State further argued that in weighing potential aggravating factors against presented mitigating circumstances, as required pursuant to §13A-5-48, the jury should consider evidence of Whatley's behavior while imprisoned, stating:

> I submit to you, ladies and gentlemen, we've also submitted to you that you can take into consideration this Defendant's future dangerousness.  What has the testimony been?  Pat Buttell told you that man said he wants to kill other inmates in the jail.  What did Scott Cook come in here and tell you, an inmate in the jail?  That this Defendant after killing, brutally killing Pete Patel, killing Sheila Overstreet, he tells someone in the jail, I've already killed two people, you can be my third.  That's what he said.  I've already killed two, you can be my third.  And then what did Dr. Smith tell you?  He said the Defendant said regarding other inmates in the jail with him, he would like to wring their necks, wring their necks.

(Doc. 2-17 at 10).  The Defense then urged the jury that Whatley's religious conversion and confession should be considered a mitigating circumstance in his sentencing.  Rebutting, the State pointed to jail records as proof of Whatley's character both before and after his alleged conversion, stating:

>  And they bring in religion and they bring in this religious conversion and that the only reason he confessed was because he had a religious conversion.  But I want you to look at the Defendant's conduct as evidence in the records that you will have before you of what his conduct was even before and especially after that religious conversion.  And I will show you from the jail records the first - - some of the injuries in the jail records [prior to his conversion]. . . . he had an exhibited abusive language to the staff . . . denies assaulting intentions even though he says, he would like to wring their necks.  He reports, I'm having thoughts of killing fellow inmates.  I have had it with everyone and I can't control my anger any longer . . . [And] after he's found religion. . . he gets cited for disciplinary problems for disobeying staff members.  He picks a fight with another inmate where he's picked up and slammed on his left shoulder on the concrete floor fighter with another inmate.  On December 8, 2007 he's disrespecting staff.  He told staff members that he would shove a razor up his behind. . . . on January 1, 2008 he's fighting in the day room and he took Moon Pies from another inmate.  January 5th he's irate and screaming at other inmates.  He threatened to harm other inmates and hitting heads on the bars.  February 18th, he refuses to take his medications again.  May 7th, he refuses to obey orders given by staff members.  June 11th, I just went off.  He destroyed and altered

and damaged jail property.  He refused to obey the orders of the staff at the jail. His conduct was disrupting and interfering with the security and orderly running of the jail.  Then on July 31, 2008, he assaulted a staff member.  He hit a corrections officer who directed him to go to his jail cell.  The corrections officer was transported to Springhill Memorial and he was cited for failure to obey orders and fighting.  And then September 15, 2008, less than two months, he refused to obey orders given to staff.  He was insolence[sic] toward the staff and disrespectful.  He was not fully clothed when he was out of his cell and he was using abusive or obscene language.

Patterns of aggressive behavior even after behind bars, even after no drugs and alcohol, even after medications.

(Doc. 2-17 at 29-32).

When the State's evidence and argument is viewed in its entirety and in the context of the entire trial, the prosecutor's complained-of remarks and submitted evidence did not urge the jury or the trial court to impermissibly consider a nonstatutory aggravating circumstance to support a death sentence. Rather, the remarks were proper argument about Whatley's criminal history, behavior, and future dangerousness and what weight should be afforded the aggravating circumstances that the State had proven, when stacked against the mitigating factors put forth by the Defense.  Such evidence falls well within the purview of §13A–5–45, as evidence relevant to the aggravating and mitigating circumstances presented.   Furthermore, the jury was properly charged by the court as to the statutory aggravating circumstances to be deliberated; notably, void from the charge is any mention of future dangerousness being a consideration. (Doc. 2-19 at 6-17). Thus, the state court's decision was not contrary to, or an unreasonable application of clearly established law, neither was the decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, § 2254(d), and Whatley is not entitled to habeas relief on this claim.

**5. The prosecution's improper assertion that the victim's family wanted Whatley to be sentenced to death violated clearly established United States Supreme Court precedent.**

At the sentencing hearing, on December 11, 2008, in the presence of the trial judge, the State requested that the court stand behind the jury's verdict and sentence Whatley to death, asserting:

> Your Honor, I can say on behalf of the family that they are in favor of the penalty. You did not hear that when they took the stand because, of course, that would be in violation of the laws of the State of Alabama. But the family is in support of the jury's recommendation that Donald Whatley be put to death, each and every member of this family is in support of that.

(Doc. 2-22 at 4). Identifying *Booth v. Maryland* and *Payne v. Tennessee* as the appropriate legal standards, the Alabama Court of Appeals determined that Whatley was not entitled to post-conviction relief because the State's comment was "presented only to the trial court" and "was not introduced during the sentencing hearing before the jury." *Whatley*, 146 So. 3d at 496. The Court of Criminal Appeals further determined that there was no indication in the record or the sentencing order that the statement was considered by the circuit court when fixing Whatley's sentence at death. *Id*. Consequently, the Court of Criminal Appeals found the trial court did not "improperly considered this evidence" and took "into account only the proper determining factors" when sentencing Whatley. *Id.*

In *Booth v. Maryland*, evidence that members of the victim's family believed the crime was vicious and that the defendant could not be rehabilitated was presented to the jury. 482 U.S. 496, 508, 107 S. Ct. 2529, 2535-36, 96 L. Ed. 2d 440 (1987). The Court held that "this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner," in violation of the Eighth and Fourteenth Amendments. *Id*. at 502-03, 107 S. Ct. at 2533. The

United States Supreme Court held that "admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Id*. at 508-09, 107 S. Ct. at 2536.

In *Payne v. Tennessee*, the Supreme Court reconsidered its holding in *Booth*, that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial. 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). The Court held that "[t]he Eighth Amendment erects no *per se* bar prohibiting a capital sentencing jury from considering 'victim impact' evidence relating to the victim's personal characteristics and the emotional impact of the murder of the victim's family, or precluding a prosecutor from arguing such evidence at a capital sentencing hearing." *Id*. at 808, 111 S. Ct. at 2599-60. This holding, however, does not allow testimony to the jury regarding opinions of the defendant, the crime, or the appropriate punishment.

Here, as reasoned by the state court, the record reflects that the victim's family members' opinions regarding the appropriate punishment were not presented to the jury in the penalty phase (*see* Doc. 2-17), where the jury voted 10-2 to impose a sentence of death. (Doc. 2-21). Thus, *Booth* nor *Payne* are implicated. Additionally, as determined by the state court, there is no suggestion in the Sentencing Order that the trial judge considered the opinion(s) of the victim's family member(s) in imposing a sentence of death. (*See* Doc. 2-24). Consequently, Whatley has failed to show that the decision of the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of clearly established law, neither was the decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Thus, Whatley is not entitled to habeas relief on this claim.

**6.   Informing jurors that others would review the case impermissibly lessened their sense of responsibility and violated clearly established United States Supreme Court precedent.**

Whatley contends that the trial court made remarks to the jury during *voir dire* which suggested the responsibility for its verdict rested elsewhere, contrary to *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).   According to Whatley, the trial court's statements violated his rights to due process, an impartial jury, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments.   (Doc. 9 at 109-11).   This Court of Criminal Appeals previously reviewed this claim and found:

> The circuit court gave the following instruction to the venire at the end of the first day of the proceedings:

>> "So don't go do any independent investigation on your own, don't look up anything on the computer. Just come down here like you are today ready to be involved in the case. Don't be nervous about it. Every case is important. We're just a little more—doing things little bit more by the book when it's a capital case as opposed to a normal case because we know that, depending on how it turns out, that a lot of extra people look at the case. These questionnaires that you're getting ready to get, I don't think they particularly ask you any questions that you would consider intrusive but maybe some of you do and I can understand that.... But these questions, the attorneys on both sides look at the questions and then after the case is over they're sealed. They're under a court order and put in an envelope and they're sealed and never looked at again unless there's some reason that the case is appealed or is retried, they need to be looked at."

*Whatley*, 146 So. 3d at 461; *see also* Doc. 2-2 at 8-9.   The Court of Criminal Appeals concluded that the trial court's comments did not lessen the jurors' responsibility for determining the appropriateness of the defendant's death sentence, stating:

> The circuit court's comments in no way diminished the jury's role in fixing Whatley's sentence, rather the court merely stated what every juror knew—that if Whatley was convicted his case would be reviewed by a higher court. Moreover, the circuit court instructed the jury not to let anything it had said or done influence the jury's verdict. (R. 1370–71.) Accordingly, we find no error in the above comments made by the circuit court during voir dire

*Whatley*, 146 So. 3d at 437.

In *Caldwell v. Mississippi*, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29, 105 S. Ct. at 2639. In *Caldwell,* the prosecution argued to the jury that its decision to render a death sentence was "not the final decision.... Your job is reviewable.... [T]he decision you render is automatically reviewable by the Supreme Court." *Id.* at 325-26, 105 S. Ct. at 2637-38. On objection, the trial court endorsed the prosecution's argument, telling the jury, "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands." *Id.* at 325, 105 S. Ct. at 2638. The Supreme Court concluded that "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death," and vacated the sentence. *Id.* at 341, 105 S. Ct. at 2646.

The Supreme Court has explained that in order "to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994) (citation omitted); *see also Carr v. Schofield,* 364 F.3d 1246, 1258 (11th Cir. 2004) ("a *Caldwell* violation is not established where the jury was not affirmatively misled regarding its role in the sentencing process") (citation and internal quotation marks omitted); *Davis v. Singletary,* 119 F.3d 1471, 1482 (11th Cir. 1997) (prosecutor's "references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell* . . . because they accurately characterize the jury's and judge's sentencing roles under Florida law"). Whatley does not allege, and cannot show, that the objected-to statements by the trial judge were affirmatively misleading

or otherwise inaccurate. [60]   Furthermore, any possible confusion this brief and isolated communication may have engendered was alleviated by the repeated emphasis of the entire proceeding that the jury, and not the prosecutor, judge, or appellate court, was vested with the decision as to whether Whatley should live or die.[61]

As such, it is clear that the Alabama Court of Criminal Appeals correctly understood and applied *Caldwell* to the circumstances of this case. This is not a close question, and it cannot reasonably be asserted that the state court's determination of Whatley's *Caldwell* claim is either contrary to or an unreasonable application of clearly established federal law. Accordingly, habeas relief is unwarranted and unavailable.

---

[60]    Defense counsel objected to the trial judge's remarks, arguing that "the Court's statement to the jurors that depending on how this turns out that there may be other people looking at this or that the juror questionnaires would not be disseminated except - - . . . in case of an appeal or something. (Doc. 2-2 at 12). In overruling the objection, the court stated, "what I said . . . is they wouldn't be made public. . . .  But I want to make sure they understand it's not going to be in the newspaper." (*Id*. at 13).

[61]    In the State's opening statement, the prosecutor reminded the jury that at the close of the trial, "the State is asking you to find [Whatley] had no regard for human life and killed a man during the course of a robbery and is guilty of capital murder." (Doc. 2-3 at 25). Defense counsel reiterated to the jury in opening statements that, "Number one, . . . y'all are judges of the facts." (Doc. 2-4 at 2). The judge instructed the jury prior to closing arguments, "You y'all are the judges of the evidence." (Doc. 2-6 at 5). In charging the jury during the guilt phase, the court repeatedly instructed the jury that they had the responsibility to determine whether the State had met its burden of proof, that they were "the sole judges" of the evidence. (*See* Doc. 2-10).  During the opening statements of the penalty phase, Defense counsel instructed the jury, "You have as grave an awesome responsibility as any human being can have over the life of another. . . You're going to [be] asked to pick between the two most severe punishments that the law allows. . . . I you conclude and he gets the death penalty then that's what will happen. Likewise, if you conclude that life without parole is appropriate then that's what will happen. . . . The person that assigns the weight to [the aggravating and mitigating] factors is each one of you. . . . Each one of you has to make that call just as each one of you has to make the call about life without parole or death." (Doc. 2-14 at 1-2, 6).

**7.  Whatley was prevented from adequately presenting the mitigating effect of addiction in violation of clearly established United States Supreme Court precedent.**

Whatley contends that the trial court's refusal to permit Dr. Morton's "testimony at the penalty phase about changes in brain chemistry that drive an addict to compulsively seek more drugs" was contrary to *Lockett v. Ohio* and violated his rights to due process, an impartial jury, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. 20 at 23; 9 at 111-13).  According to Whatley, the trial court sustained a State objection to Dr. Morton's testimony about how drug use becomes involuntary due to addiction, thereby "improperly prevent[ing] Mr. Whatley's expert from offering testimony about the nature of his addiction and prevent[ing] the jury from adequately considering Mr. Whatley's mitigation case." (Doc. 9 at 111-12).  This claim was reviewed and rejected by the Alabama Court of Criminal Appeals, reasoning:

At the penalty phase, Dr. Morton, a psychopharmacologist, testified to the following:

"[Defense counsel]: Now, this next sets out voluntary intoxication?

"[Dr. Morton]: Yes and how it starts—You know, everybody starts off by making a choice to use. I think later on it's seldom a voluntary choice. Their brain is saying you've got to use.

"[Defense counsel]: And that's to deal with the effects of the withdrawal?

"[Dr. Morton]: And because it's just tricking the brain. It's saying you got to use. You don't have to but it's tricking the brain.

"[Prosecutor]: And, Judge, I'm going to object to the latter part. There's been no testimony whatsoever regarding anything being involuntary in this case.

"The Court: Yeah, I'll sustain that objection. Disregard anything about involuntary. Involuntary is normally defined as somebody spiking your drink or somebody slipping some substance in without

your awareness. I think the Doctor is using it as a different term but we're not going to get into involuntary in this case."

(R. 1583–84.) Whatley did not object to the court's ruling; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R. App. P.

Dr. Morton had earlier testified that Whatley was an addict and he stated:

> "Addiction is a disease, truly a brain disease that you have for your life. You relapse, you compulsively use, you seek it and you frequently have withdrawal and you use it despite horrible things going on in your life.
>
> "[Defense counsel]: Did you see this in the records with Mr. Whatley?
>
> "[Dr. Morton]: I did. I saw him basically lose everything in his life. I saw him lose his self esteem. I saw him lose his mental health. I saw him lose his physical health. I saw him lose access to his son. I saw him lose work. I saw him not have a place to live, all pretty much related to substance use in an attempt to treat a mood disorder.
>
> "[Defense counsel]: Self medicate?
>
> "[Dr. Morton]: Self medicate?
>
> "[Defense counsel]: Now, what you're setting out here is the switch from when people stop choosing to use and just use because they have to?
>
> "[Dr. Morton]: It's essentially a switch. Something occurs in the brain where people get on a path on an access road. They never get off that access road once that switch occurs. And we're trying to find the biochemical reason of how people get over there so they have lost that inability to control their use. That's the essential difference between an addict and non-addict is someone that has the disease of addiction cannot control their use and never will be. And I would say they don't have the biologic ability to stop; they can't stop."

(R. 1575–76.)

Thus the record of the penalty phase shows that Whatley was allowed to present testimony concerning the effect of an addiction; therefore, this claim is not supported by the record.

*Whatley*, 146 So. 3d at 487.

As previously discussed, the Supreme Court made clear in *Lockett v. Ohio*, "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-65, 57 L. Ed. 2d 973 (1973) (emphasis omitted). "In *Eddings [v. Oklahoma*, 455 U.S. 104 (1982)], the view adopted by the *Lockett* plurality ripened into a holding of the Court." *Saffle v. Parks*, 494 U.S. 484, 489, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990). The "precise holding" of *Lockett* and *Eddings* is "that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial." *Id.* at 490, 110 S. Ct. at 1261.

Review of the record reveals that prior to the State's objection, Dr. Morton described that drugs addiction "tricks the brain into thinking you've got to have it. . .  [T]he brain is saying, I have got to have it.  And that is how people can do some of the things they do. . . . [H]ow they can do the most irresponsible things.  It helps me understand how powerful these drugs are. . . . It's just amazing how powerful the substance is."  (Doc. 2-16 at 71-72).  Following the State's objection to Dr. Morton's description of "involuntary" drug usage, Dr. Morton went on to explain research showing just how much control cocaine addiction has over its user, affirming that (based on studies with mice) those with cocaine addictions will self-administer the drug until they overdose and kill themselves, choose it instead of food or sex, and will seek the drug despite electric shocks.  (Doc. 2-16 at 75).  Taking Dr. Morton's testimony in total, the record reveals that the jury heard evidence of the changes in brain chemistry that drive an addict to compulsively seek more drugs.  Thus, contrary to his claim, Whatley was not prevented from offering testimony about the nature of his addiction nor was the jury prevented from adequately considering Whatley's

mitigation case.

Accordingly, Whatley is not entitled to relief on this ground.

**8.    The refusal to give appropriate lesser included offense instructions violated clearly established United States Supreme Court precedent.**

Whatley argues that the trial court erred by failing to charge the jury on the lesser included offenses of felony murder, robbery as an afterthought, or the possibility of a conviction for separate offenses of murder and robbery, violating his rights to a fair trial and Fourteenth Amendment due process under the U.S. Constitution and in violation of *Beck v. Alabama*, 447 U.S. 625 (1980). (Doc. 9 at 114).  He maintains that because evidence was introduced at trial that Whatley was intoxicated at the time of the offense and only intended to rob the victim, not kill him, *Beck* mandates that the trial court instruct the jury on the lesser-included offense of felony murder.

Pursuant to *Beck* and its progeny, "a capital defendant is entitled to a lesser included offense instruction if there is evidence in the record to support such an instruction." *Gilmore v. Taylor*, 508 U.S. 333, 361, 113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993).  This is tempered, however, with the Supreme Court's instruction that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  *Hopper v. Evans*, 456 U.S. 605, 611, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982).

In reviewing Whatley's claim, the Alabama Court of Criminal Appeals found "there was absolutely no evidence presented that would bring the murder into the definition of felony murder." 146 So. 3d at 471.  Having reviewed the record, the court agrees with the Alabama Court of Criminal Appeals, for the reasons stated in its memorandum opinion, that the trial court did not err in refusing to charge the jury regarding the lesser included offense of felony murder.

Under Alabama law, a person is guilty of felony murder when:

(3) He or she commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree, any other felony clearly dangerous to human life and, in the course of an in furtherance of the crime that he or she is committing or attempting to commit, or in immediate flight therefrom, he or she, or another participant if there by any, causes the death of any person.

ALA. CODE (1975) § 13A-6-2(a)(3).  Thus, as reasoned by the trial court, felony murder involves "an unplanned kind of accidental killing during the course of a felony as opposed to somebody actually doing an overt act."  (Doc. 2-5 at 376).  The question is then, did the evidence produced at trial support an "accidental killing" or an intentional act?  Notably, Whatley avowed in his confession that he only intended to rob the victim, not kill him, demonstrating a lack of intent necessary for capital murder.  On the other hand, the State introduced 19-pages of injuries Whatley inflicted on the victim.  Indeed, Dr. Enstice testified that the autopsy findings included evidence of multiple strikes to the face, fractured nose, deep skull contusions, brain hemorrhages, multiple fractured vertebrae, fractured shoulder, eight fractured ribs, lung tears, and heart bruising (Doc. 2-5 at 233-78).  Evidence showed that the victim was strangled by a pair of pants tied around his neck, as well as possible manual strangulation with hands.  (Doc. 2-5 at 245-247).  Evidence showed that the victim's chest was run over by a motor vehicle.  (*Id*. at 265-66).  Evidence further supported that the victim was alive at the time he was both stuck in the face and run over by the car.  (*Id*. at 243, 266, 278).  The State's evidence corroborated Whatley's confession that he hit the victim with his fist (knocking him down) and then got on top of the victim, continuing to hit the victim and choke the victim.  (Doc. 2-7 at 116).  Whatley confessed that when he thought the victim was dead, he took the victim's pants off him, but then the victim "started moaning," so Whatley "jumped in his car and ran over his head a couple of times," before taking off in the victim's car.  (*Id*.).   Such actions and injuries demonstrate malicious and purposeful action by

Whatley, rather than violence merely incidental to another crime. Thus, Whatley has failed to show that "there was no reasonable basis" for the state court's decision, *Harrington*, 562 U.S. 86, 98, and the state court's decision reasonably applied the standard set out in *Beck* and reasonably applied the facts based on the evidence presented at trial.

Additionally, as determined by the Alabama Court of Criminal Appeals, the trial court was not required to use the words "mere afterthought" in its capital murder-robbery instructions, as long as the court's instruction adequately communicates the law by instructing the jury that the robbery had to occur "during" the course of the murder and that the intent to murder and the intent to rob had to coexist. *See Ex parte Brown*, 74 So. 3d 1039, 1054 (Ala. 2011); *see also Woods v. State,* 789 So. 2d 896, 932-33 (Ala. Crim. App. 1999) (recognizing that although the taking of property as a mere afterthought will not support a capital-murder conviction based on an underlying robbery, the trial court does not have to use the term "mere afterthought" in its jury instructions on the robbery element of the capital murder). Here, the trial court charged the jury:

> Now, the Defendant is charged with capital murder. The law states that an intentional murder committed during robbery in the first degree is capital murder. A person commits an intentional murder if he causes the death of another person and in performing the act or acts which caused the death of that person he intends - - he intended to kill that person. A person commits the crime of robbery in the first degree, if, in the course of committing a theft, he uses or threatens the imminent use of force against the person present with intent to overcome that person's physical resistance or physical power of resistance or threatens the imminent use of force against the owner or any other person present with intent to compel the acquiescence to the taking of or escaping with the property and in doing so he causes serious physical injury to another. . . .
>
> To convict, the State of Alabama must prove beyond a reasonable doubt each of the following elements of intentional murder during - - committed during robbery in the first degree: That Pete Patel is dead. That the Defendant Donald Dwayne Whatley caused the death of Pete Patel by strangling him and/or running over him with an automobile. That in committing the act or acts which caused the death of Pete Patel the Defendant intended to kill Mr. Patel or another person. Now a person acts intentionally when it is his purpose to cause the death of that person. The intent to kill must be real and specific. That the Defendant committed or attempted to

commit a theft of a 1992 Honda Accord four door sedan.  That in the course of committing or attempting to commit the theft or in the immediate flight after attempting to commit - - attempting or the commission of the theft, the Defendant either used force or threatened the imminent use of force against Pete Patel with intent to overcome his physical resistance or physical power to resist or to compel acquiescence to the taking of or escaping with that property.  That the murder took place during the course of a robbery. . . .

**During means in the course of the commission of or in connection with the immediate flight from the commission of, in this case, the robbery**.  If you find from the evidence that the State of Alabama has proved beyond a reasonable doubt each of the above elements of the offense of intentional murder committed during the course of robbery in the first degree as charges, then you shall find the Defendant guilty of capital murder.  **If you find that the State of Alabama has failed to prove beyond a reasonable doubt any one or more elements of the offense of intentional murder committed during robbery in the first degree, then you cannot find the Defendant guilty of capital murder. . . . Then you would move to what we call the lesser included offenses**. . .Then you would consider evidence as to the lesser included offenses. . . .

(Doc. 2-10 at 8-12) (emphasis added). The Court is not swayed by Whatley's argument that the "Court of Criminal Appeals improperly assumed that jurors could easily extrapolate that robbery as an afterthought cannot sustain a capital murder conviction from the standard definition of 'during.'" (Doc. 9 at 116).  For such argument, Whatley relies of *Perkins v. State*, 814 So. 2d 1177, 1179 (Fla. App. 2002), which is easily distinguishable from the facts of this case.  In *Perkins*, the force or violence used by the defendant was motivated for a reason other than to rob the victim.  Here, Whatley used force (strangulation and/or running over the victim with a car) to rob the victim of his vehicle (and wallet).  The instructions provided to the jury clearly demonstrate that to convict of capital murder, the jury must find Whatley intended to rob the victim (stealing his car) and intended to kill him during the course of the robbery.  The jury charge further instructs that without the simultaneous existence of intent to rob and kill, the jury could not convict Whatley of capital murder and would have to consider lesser-included offenses. Based on a review of the trial court's instructions, it cannot be said that there was no reasonable basis to support the state court's decision.

The Alabama Court of Criminal Appeals further concluded that no error occurred in the trial court's failure to charge the jury on murder and robbery as separate and distinct crimes, as "there was no evidence indicating that the murder and the robbery were 'separate and distinct crimes.'"  146 So. 3d at 472.  Again, a jury charge of a lesser included offense is only required where there is a reasonable theory from the evidence to support the lesser offense.  Here, Whatley has failed to furnish, such and the record fails to support such theory.  Whatley was charged with capital murder (*see* Doc. 2-25), which "requires the existence, at the legally relevant time, of two intents: the intent to kill and the intent to rob. Without an intent to kill, the crime is felony murder. Without an intent to rob, the crime is murder. Without either, the most serious crime is manslaughter." *Clark v. Dunn*, Civ. Act. No. 16-0454-WS-C, 2018 WL 264393, at *12, 2018 U.S. Dist. LEXIS 54, at *36 (S.D. Ala. Jan. 2, 2018), *on reconsideration in part,* 2019 WL 1119354, 2019 U.S. Dist. LEXIS 38442 (S.D. Ala. Mar. 11, 2019), and *aff'd sub nom. Clark v. Comm'r, Ala. Dep't of Corr.*, 988 F.3d 1326 (11th Cir. 2021).  As previously discussed, the evidence presented did not support a lack of intent to kill sufficient for a charge of felony murder and, thus, the jury was not charged on felony murder.  The trial court, however, did instruct the jury that if it did not conclude that the State proved beyond a reasonable doubt that the killing occurred "during the course" of an intentional robbery as charged in the indictment, the jury must consider the lesser included offenses of murder, reckless manslaughter, and heat of passion manslaughter.  (Doc. 2-10 at 8-15).  Consequently, it cannot be concluded that the state court's decision was an objectively unreasonable determination of the facts in light of the evidence presented nor that the state court unreasonably applied the standard set out in *Beck*.

Furthermore, even if the failure to provide such instructions could be viewed as error, Whatley's attempt to parlay that error into a constitutional deprivation is misguided. In *Beck v.*

*Alabama,* 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), the Supreme Court declared that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id.* at 637.  In arguing a violation of *Beck,* however, Whatley ignores both Supreme Court and Eleventh Circuit precedent making clear that *Beck* does not apply where, as here, a capital defendant does receive charges on certain lesser included offenses, just not on every single lesser included offense that the evidence might support, or that the defendant might desire. *See, e.g., Schad v. Arizona,* 501 U.S. 624, 646–47, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) ("Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. . . . This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.").  Review of the record reveals that the trial court instructed the jury not only as to capital murder, but also "noncapital" murder, reckless manslaughter, and heat of passion manslaughter.  (Doc. 2-10 at 8-15).  Thus, *Beck* is not implicated.  *Powell v. Allen,* 602 F.3d 1263, 1271 (11th Cir.2010) (determining that *Beck* did not entitle capital defendant to jury instruction on felony murder, where charge included capital murder, intentional murder and manslaughter, such that "the jury was not faced with the 'all-or-nothing choice' *Beck* is concerned with").

In light of these principles, this court cannot find that the Alabama Court of Criminal Appeals' conclusion was contrary to or an unreasonable application of *Beck,* under § 2254(d)(1),

nor was it an objectively unreasonable determination of the facts under § 2254(d)(2).

**9.   Whatley's death sentence is in conflict with *Ring v. Arizona.***

Whatley claims that his death sentence is contrary to *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), because the jury never unanimously found, beyond a reasonable doubt, the existence of a statutory aggravating factor or that aggravating circumstances outweighed the mitigating circumstances to impose the death penalty.   (Doc. 9 at 117-18).   He specifically argues that the jury's 10 to 2 verdict supports that the jury did not agree that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. (*Id.* at 118).   Whatley further maintains that Alabama's capital sentencing scheme, set out in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), arbitrarily renders defendants convicted of some capital offenses automatically subject to the death penalty at the end of the penalty phase without further jury fact-finding.   (Doc. 9 at 118).   The Alabama Court of Criminal Appeals denied Whatley's claim, finding his death sentence did not violate *Ring v. Arizona*, based on *Waldrop* and further noted, "[t]he Court has no authority to overrule Alabama Supreme Court precedent." *Whatley*, 146 So. 3d 437, 489.   The undersigned finds that the Alabama courts did not err in denying habeas relief as Whatley has identified no clearly established law that is on point, and this claim is foreclosed by binding precedent.

In *Ring v. Arizona*, 536 U.S. 584, 589, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) the United States Supreme Court held the aggravating factor necessary for sentencing must be established by jury.[62]   The specific legal effect of *Ring* was to overrule prior Supreme Court jurisprudence that

---

[62]      Whatley also cites to *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016) in arguing that his death sentence is invalid.   (Doc. 9 at 119).   However, *Hurst* does not apply retroactively on collateral review.   *See McKinney v. Arizona*, 589 U.S. __, 140 S. Ct. 702, 708, 206 L.Ed.2d 69 (2020) ("*Ring* and *Hurst* do not apply retroactively on collateral review.").   Whatley's conviction and sentence were final approximately two years before *Hurst* was decided;

"allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. at 609.  "The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury."  *Lee v. Commissioner, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir 2013).  Indeed, the *Ring* Court made clear that it was not deciding whether the Sixth Amendment (1) required a jury to make findings as to mitigating circumstances, (2) required the jury to make the ultimate determination as to whether to impose a death sentence, or (3) forbade the state court from reweighing aggravating and mitigating circumstances. *Ring*, 536 U.S. at 597 n.4, 122 S. Ct. at 2437 n.4.

Under Alabama law, the guilt and penalty phases of a capital defendant's trial is bifurcated, and a defendant convicted of a capital offense cannot be sentenced to death unless at least one statutory aggravating circumstance exists.  *See* ALA. CODE §§ 13A-5-45, 49.  Certain capital cases, like a murder committed during a robbery, have a "built-in aggravating circumstance" that corresponds to an aggravating circumstances listed in § 13A-5-49; thus, "when a defendant is found guilty of such a capital offense, 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.'" *Waldrop v. Comm'r, Ala. Dep't of Corr.,* 711 F. App'x 900, 922 (11th Cir. 2017), *cert. denied*, __U.S. __, 139 S. Ct. 118, 202 L. Ed. 2d 74 (2018) (citing § 13A-5-45(e), which states, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at

---

therefore, *Hurst* does not apply to him.  *Glock v. Singletary*, 65 F.3d 878, 838 (11th Cir. 1995) (For purposes of determining retroactivity, "[a] state conviction and sentence become final . . . when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.") (citation omitted).

trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."). "Nothing in *Ring*—or any other Supreme Court decision—forbids the use of an aggravating circumstance implicit in a jury's verdict." *Lee*, 726 F.3d at 1198.

Here, the record reflects Whatley was charged with murder in commission of a robbery in the first degree, in violation of ALA. CODE § 13A-5-40(a)(2), (Doc. 2-25; 2-10 at 9-10), which pairs with the statutory aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of . . . robbery" identified in ALA. CODE § 13A-5-49(4). By the terms of the Alabama statute, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." § 13A-5-45(f). What this means is that when Whatley's jury unanimously found beyond a reasonable doubt that he was guilty of robbery-murder under § 13A-5-40(a)(2), they also unanimously found beyond a reasonable doubt the aggravating circumstance set forth at § 13A-5-49(4). Those jury findings as to the existence of aggravating circumstances are what made Whatley death-eligible in the Alabama capital sentencing scheme.[63] Thus, there is no *Ring* problem here because Whatley's jury found the aggravating circumstance of robbery (which rendered him eligible for the death penalty) beyond a reasonable doubt. *See Evans v. Sec'y, Fla. Dep't of Corr.*,

---

[63]     The jury was specifically instructed by the trial court during the guilt phase:

> If you find that the State of Alabama has failed to prove beyond a reasonable doubt any one or more elements of the offense of intentional murder committed during robbery in the first degree, then you cannot find the Defendant guilty of capital murder.
> . . .
> Now, your verdict must be unanimous.

(Doc. 2-10 at 12, 33).

699 F.3d 1249, 1260 (11th Cir. 2012) ("The jury's verdict necessarily contained [findings that an aggravating circumstance existed] because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed ...."); *United States v. Townsend*, 630 F.3d 1003, 1013-14 (11th Cir. 2011) (finding that because the court instructed the jury that it must make a prerequisite finding as to the existence of an element before convicting the defendant, the jury's guilty verdict necessarily meant the jurors found the element); *McNabb v. Thomas*, Civ. Act. No. 208-CV-683-MEF, 2012 WL 1032540, at *20, 2012 U.S. Dist. LEXIS 41327, at *60 (M.D. Ala. Mar. 27, 2012), *aff'd sub nom. McNabb v. Comm'r Ala. Dep't of Corr.,* 727 F.3d 1334 (11th Cir. 2013) (discussing the jury's unanimous finding beyond a reasonable doubt of at least one statutory aggravating circumstance shifted the maximum penalty upwards from life without parole to death, and any other statutory aggravating circumstances are not "necessary for the imposition of the death penalty.") (quoting *Ring*, 536 U.S. at 609).

Whatley further contends Alabama's sentencing process, as defined by *Waldrop*, and relied on by the Alabama Court of Criminal in affirming his death sentence, "arbitrarily renders defendants convicted of some capital offenses automatically subject to the death penalty at the end of the first phase and unfairly skews sentencing toward imposition of the death penalty in cases like Mr. Whatley's." (Doc. 20 at 26). Whatley argues this violates the requirements of due process and is contrary to *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994) and *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521. 65 L. Ed. 2d 581 (1980). The Court is unpersuaded.

Whatley claims that under *Simmons*, due process entitled him to inform the jury at the guilt phase about the nature and consequences of finding him guilty of murder during a robbery – that

is, that it exposed him to the death penalty under Alabama law. (Doc. 9 at 118-119). *Simmons*, however, does not stand for this. *Simmons* held, where the State raises the issue of the defendant's future dangerousness at the penalty phase of a capital trial, and the defendant is ineligible for parole under state law, "due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Barber v. Dunn*, 2019 WL 1098486, at \*36, 2019 U.S. Dist. LEXIS 37546, at \*115 (N.D. Ala. Mar. 8, 2019) (quoting *Simmons*, 512 U.S. at 156). The plurality decision was a narrow exception (focused the concealment of critical information – that the defendant never had a chance of leaving prison- in arguing that the death penalty is the only appropriate sentence) to the Court's "broad proposition that [it] generally will defer to a State's determination as to what a jury should and should not be told about sentencing." 512 U.S. at 168, 114 S. Ct. at 2196. Whatley has presented no facts justifying a departure from this general rule. There is nothing in the record to suggest the State concealed critical facts about the effect of the jury's guilt-phase verdict. Whatley has failed to identify clearly established law holding that a defendant has a constitutional right to inform a guilt-phase jury that a conviction for a particular offense will result in being eligible for the death penalty. *See Barber*, 2019 WL 1098486 at \*36, 2019 U.S. Dist. LEXIS 37546 at \*117. Neither has Whatley shown how the state court decision was contrary to or an unreasonable application of *Adams v. Texas*. The U.S. Supreme Court held that Texas violated the Constitution "when it excluded members of the venire from jury service because they were unable to take an oath that the mandatory penalty of death or imprisonment for life would not affect [their] deliberations on any issue of fact." *Adams*, 488 U.S. at 40, 100 S. Ct at 2524. However, no such jury oath issue exists in this case. Accordingly, the Alabama court's decision was neither contrary to nor an unreasonable application of *Simmons* nor *Adams*.

Whatley has failed to establish that the Alabama Court of Criminal Appeals' decision was

contrary to nor an unreasonable application of clearly established Supreme Court precedent; thus, Whatley is not entitled to habeas relief.

**10. The failure to instruct the jury that it must unanimously find each aggravating circumstance violated clearly established United states Supreme Court precedent.**

Whatley claims the trial court erred when it failed to instruct the jury that they must unanimously find each aggravating circumstance in recommending a sentence of death (Doc. 9 at 119-21), arguing the United States Supreme Court has made clear that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000); *see also Ring*, 536 U.S. at 609, 122 S. Ct. at 2443 (extending *Apprendi* to capital cases); *Hurst v. Florida*, 577 U.S. 92, 102, 136 S. Ct. 616, 626, 193 L. Ed. 2d 504 (2016) (reaffirming *Ring* and *Apprendi* in holding a jury, not judge, is required in capital cases to "find the existence of an aggravating circumstance.").[64]  Whatley contends that as a result of the trial court's constitutionally deficient instruction, the jurors may have considered two aggravating circumstances that were never found unanimously by the jury or perhaps never even voted on at all, and these additional aggravators could have influenced jurors to vote for death and improperly increased his sentenced based on facts not found unanimously by a jury beyond a reasonable doubt. (Doc. 9 at 120).

The Alabama Court of Criminal Appeals reviewed Whatley's claim for plain error and found:

> The court specifically instructed the jury that, in order to find the existence of any mitigating circumstance, the jury did not have to unanimously agree, but that the aggravating circumstances had to be proven beyond a reasonable doubt to the jury.

---

[64]     As noted, *supra*, at n.62, *Hurst* is inapplicable to Whatley.  However, for purposes of understanding the established law on this issue, this opinion will reference *Hurst* in the discussion of Whatley's claim.

The court further instructed that one aggravating circumstance, that the murder was committed during the course of a robbery, had been proven by the jury's verdict in the guilt phase and that it was to consider the other two aggravating circumstances the State alleged were present in the case.

> "[T]he charge clearly put the jury on notice that unanimity was not required for a finding that mitigating circumstances existed, but was required for a finding that aggravating circumstances existed. In other words, the jury was informed that it must—as a unit—unanimously find the existence of any aggravating circumstance it considered in arriving at a recommended sentence."

*Ex parte McNabb,* 887 So. 2d 998, 1006 (Ala.), *cert. denied, McNabb v. Alabama,* 543 U.S. 1005, 125 S. Ct. 606, 160 L. Ed. 2d 466 (2004).

> "[W]e find that any possible error that may have occurred from the trial court's failure to use the word 'unanimous' did not amount to plain error. The court's use of the terms 'the jury' and 'each of you' implies that any findings of aggravating circumstances had to be unanimous. 'We must evaluate instructions like a reasonable juror may have interpreted them.' *Stewart v. State,* 601 So. 2d 491, 507 (Ala. Cr. App.), *opinion after remand,* 659 So. 2d 120 (Ala. Cr. App. 1992), *aff'd in part, rev'd in part on other grounds*, 659 So.2d 122 (Ala.1993)."

*Taylor v. State,* 808 So. 2d 1148, 1211 (Ala. Crim. App. 2000), *affirmed*, 808 So. 2d 1215 (Ala. 2001), *cert. denied, Taylor v. Alabama,* 534 U.S. 1086, 122 S. Ct. 824, 151 L. Ed. 2d 705 (2002). The circuit court's instructions on aggravating circumstances did not constitute plain error.

*Whatley*, 146 So. 3d at 494.

Giving deference to the state court's decision, the undersigned concludes that Whatley's attempt to expand the holdings of *Apprendi*, *Ring*, and *Hurst* fails, and he is not entitled to habeas relief pursuant to § 2254.

*Apprendi* holds that any fact which increases a defendant's sentence above the range established by a jury's verdict must be determined by the jury. 530 U.S. 466 (2000). *Ring* holds that, in a capital case, the Sixth Amendment right to a jury trial requires that the jury unanimously, beyond a reasonable doubt, "find an aggravating circumstance necessary for imposition of the

death penalty." 539 U.S. at 585. *Hurst* applies *Ring*, requiring that a jury, not a judge, find the existence of the aggravating factor that makes a defendant eligible for the death penalty." 577 U.S. 102-03, 136 S. Ct. at 624. Thus, "[u]nder *Apprendi*, *Ring*, and *Hurst*, the crucial question is—does the required finding that an aggravating circumstance exists expose the defendant to a greater punishment than that authorized by the jury's guilty verdict alone?" *Ex parte State*, 223 So. 3d 954, 966 (Ala. Crim. App. 2016). Here, it does not.

The record confirms that Whatley became death eligible based on the jury's verdict during the guilt phase, with their finding that an aggravating circumstance existed. *See id.* ("The Alabama legislature has chosen in some cases to have the jury make the finding that an aggravating circumstance exists during the guilt phase of the trial and has chosen in some cases to have the jury make that finding during the penalty phase of the trial."). Indeed, the trial court instructed the jury during the penalty phase:

> By your verdict of guilt - - by your verdict in the guilt phase, the State has proven the existence of one aggravating circumstance beyond a reasonable doubt. This aggravating circumstance which you shall consider is already proven beyond a reasonable doubt are, intentional murder committed during the course of a robbery in the first degree. You may not consider any other aggravating circumstances as proven from the evidence presented in the guilt phase. That had to be considered proven otherwise you could not have come back with a verdict of guilty of capital murder.

(Doc. 2-19 at 7). The jury was then asked to consider two additional aggravating circumstances: (1) three prior felony convictions involving the use or threat of use of violence and (2) that the charged capital offense was especially heinous, atrocious or cruel. (*Id.* at 8). Accordingly, no other aggravating circumstances found by the jury or sentencing judge in recommending or imposing a sentence of death can be said to have increased or exposed Whatley to a greater sentence than the jury's guilty verdict.

> When one statutory aggravating circumstance is found by a jury beyond a reasonable doubt, the maximum penalty is shifted upwards from life without parole to death, and any other statutory aggravating circumstances may be found by the sentencing judge without increasing the statutory maximum penalty. Thus, any *additional* statutory aggravating circumstances found by the trial judge are not "necessary for the imposition of the death penalty."

*McNabb*, Civ. Act. No. 208-CV-683-MEF, 2012 WL 1032540, at *20, 2012 U.S. Dist. LEXIS 41327, at *60-61 (quoting *Ring*, 536 U.S. at 609); *see also Marshall v. Dunn*, 497 F. Supp. 3d 1124, 1187-88 (N.D. Ala. 2020) (finding a jury's unanimous guilty verdict of a capital offense, which contained an aggravating circumstance as defined by § 13A-5-49, complied with *Apprendi* and *Ring*, making Marshall death eligible beyond a reasonable doubt).  Accordingly, *Apprendi*, *Ring*, and *Hurst* are satisfied.  Notably, these cases do not extend to the jury's weighing of aggravating circumstances and mitigating circumstances, which is considered "a moral or legal judgment" rather than a "factual determination".  *Ex parte Waldrop*, 859 So. 2d at 1189-90. Furthermore, the Eleventh Circuit has explicitly determined that a trial court need not instruct a "jury that it must find all aggravating circumstances unanimously." *Mills v. Comm'r, Ala. Dep't of Corr*., Civ. Act. No. 21-11534, 2021 WL 5107477, *10, 2021 U.S. App. LEXIS 24108 (11th Cir. Aug. 12, 2021) ("Mills's assertion that the trial court should have instructed the jury that it must find all aggravating circumstances unanimously misreads *Ex parte McNabb*, 887 So. 2d 998 (Ala. 2004), which requires no such thing, *see id.* at 1004-06. So counsel had no basis to object to these aspects of the jury charge."); *Moody v. Thomas*, 89 F. Supp. 3d 1167, 1238 (N.D. Ala. 2015), *aff'd sub nom. Moody v. Comm'r, Alabama Dep't of Corr.*, 682 F. App'x 802 (11th Cir. 2017) ("Because the jury necessarily found beyond a reasonable doubt and by a unanimous verdict the existence of at least one aggravating circumstance, the requirements of *Ring* were satisfied in Moody's case.").

Consequently, the state court's decision cannot be viewed as contrary to or an unreasonable

application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented.  Thus, Whatley is not entitled to habeas relief.

**11. The trial court erroneously instructed the jury on flight without sufficient evidence and used flight as a sentencing factor in violation of clearly established United States Supreme Court precedent.**

Whatley contends the trial evidence was insufficient to show that he fled to Texas to avoid arrest and prosecution in Alabama for the murder of Mr. Patel; thus, the trial court erred in instructing the jury on flight.  (Doc. 9 at 121-24).  The Alabama Court of Criminal Appeals previously reviewed and denied this claim, stating the following facts were shown and sufficient to support the jury instruction:

> The record shows that Patel died in December 2003. On June 6, 2005, police officers interviewed Whatley and informed him that his DNA was discovered on a cigarette butt found near the victim's body. At that time Whatley denied any involvement in the offense. On June 17, 2005, police collected a DNA sample from Whatley to confirm the match. When the match was verified, police issued a "be-on-the-lookout" for Whatley.  Police did not locate Whatley until Texas law-enforcement officials informed them of his location in August 2006.

146 So. 3d at 474.  Review of the record reveals that the trial court gave the following instructions on flight:

> Now with reference to evidence that was presented in this case bearing on the alleged flight by the defendant from the scene of the alleged crime, you, the jury, [are] instructed that evidence may be offered by—hold on. Let me back up. With reference to evidence that was presented in the case bearing on the alleged flight by the defendant from the scene of the alleged crime the jury is instructed that evidence—that this evidence may be offered by the State, it may be considered by you the jury in connection with all of the other evidence in the case of the circumstances tending to prove guilt. And in connection with such evidence consideration should be given to any evidence of the motive which may have prompted such flight, that is, whether a consciousness of guilt or impending or likely apprehension of being brought to justice caused the flight or whether it was caused by some other more—some other more harmless motive. In the first place where evidence is offered tending to show the defendant's offense, it would be for you the jury to say whether it is flight as a matter of fact. The jury would have to determine from the evidence the question about whether there was flight or not and then you further would—then you would further consider such evidence in light of all the other evidence in the case including any evidence to negate or explain any

> such evidence of flight and whether such evidence was a reasonable explanation or
> not, all of which you would consider in connection with all of the other evidence in
> the case giving each part of the evidence such weight as you the jury feel—you the
> jury justly feel it is entitled to receive in this particular case.

*Whatley*, 146 So. 3d at 473–74; *see also* Doc. 2-10 at 26-27.  Finding the facts presented at trial

showed that "Whatley knew that he was a suspect when he left the State" and that the jury

instruction "gave the jury the option of determining whether there was evidence of flight," the

Court of Criminal Appeals concluded the trial court did not err in charging the jury on flight to

avoid prosecution.  *Whatley*, 146 So. 3d at 474.

"A flight instruction is proper where a 'reasonable jury could conclude, based on the

evidence presented, that the defendant fled from the police to avoid the charged crime.'"  *United*

*States v. Albury*, 782 F.3d 1285, 1295-96 (11th Cir. 2015) (quoting *United States v. Williams,* 541

F.3d 1087, 1089 (11th Cir. 2008)) (per curiam) (giving the flight instruction is not an abuse of

discretion where the evidence could lead a reasonable jury to conclude that the defendant fled to

avoid apprehension for the charged crime).

> We have approved the flight instruction even where the evidence could support
> more than one motive for flight, indicating that "it is for the jury to infer" the source
> of the defendant's guilt. *Wright,* 392 F.3d at 1279. . . .
>
> District courts have broad discretion in crafting jury instructions, provided the
> charge as a whole accurately reflects the law and the facts.  *United States v.*
> *Kennard,* 472 F.3d 851, 854 (11th Cir. 2006). We examine whether the charge
> sufficiently instructed the jurors so that they understood the issues and were not
> misled.  *United States v. Fulford,* 267 F.3d 1241, 1245 (11th Cir. 2001).
>
> We have indicated that a flight instruction is not an abuse of discretion if it informs
> jurors that it is up to them to determine whether the evidence proved flight. *See*
> *Borders,* 693 F.2d at 1328.

*United States v. Haugabrook*, 576 F. App'x 918, 920 (11th Cir. 2014); *but cf.*, *Hickory v. United*

*States*, 160 U.S. 408, 421-22, 16 S. Ct. 327, 332, 40 L. Ed. 474 (1896) (Jury charge which

"practically instructed that the facts were . . . conclusive of guilt" was found erroneous.).

The record supports the state court's finding that the jury heard evidence (in the form of witness testimony, videotaped recordings, and copies of statement transcripts) from which they could conclude that Whatley fled the state to avoid prosecution. For instance, Sergeant Morgan testified as to his questioning of Whatley on June 6, 2005 (Doc. 2-5 at 315-31), where Whatley was asked about the murder of Mr. Patel and informed that Whatley had "been identified by several different people as being with Pete Patel." (Doc. 2-7 at 90). The questioning further reveals that Whatley understood, at that time, that he was implicated as a suspect in the murder of Mr. Patel:

> MORGAN:    Well here is the situation that we have. You've been identified by now ok as being with him and we also have a cigarette butt under [t]he bridge next to Mr. Patel's body with your DNA on it.
>
> WHATLEY:   I need a lawyer.

(Doc. 2-7 at 90; Doc. 2-5 at 319-20 (jury watches video of questioning and video and transcript of questioning is entered into evidence)). Evidence was also presented at trial that when a blood sample was taken of Whatley on June 17, 2005, Whatley was told:

> You are not charged at this time, but you are a suspect absolutely. Like I said we, the case led us to you. . . . [W]hen we went and found his body and we started our investigation, your name came up in it pretty early and then when we found the cigarette butt with the DNA, obviously that means we need to talk to you. . . .

(Doc. 2-7 at 162). Finally, the facts of the case evidenced that sometime thereafter, Whatley left the state of Alabama for Texas. (Doc. 2-5 at 331, 333).

The record reflects sufficient facts that a reasonable juror could conclude demonstrated flight, and the trial court's instructions clearly indicated that it was the jury's decision to determine whether the evidence proved flight. *See Haugabrook*, 576 F. App'x at 920. Accordingly, the state court's decision was not contrary to, or involved an unreasonable application of, clearly established constitutional law as determined by the United States nor did the decision rested upon an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)-(2); *see also Loggins v. Thomas*, 654

F.3d 1204, 1220 (11th Cir. 2011) ("[I]f some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied . . . [T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear.").  Therefore, Whatley is denied habeas relief on this claim.

### 12. The trial court's instructions on intent and intoxication lessened the state's burden of proving intent to kill beyond a reasonable doubt, in violation of clearly established United States Supreme Court precedent.

Whatley contends that the trial court's jury charge unconstitutionally shifted the burden of persuasion on the essential element of intent from the prosecution to the defense.  (Doc. 9 at 126-130).  Specifically, Whatley asserts the trial court erred in instructing that "intent can be formed in an instant" and created "an insurmountable burden that intoxication must amount to insanity in order to negate intent,"[65] in violation of Supreme Court precedent.  (Doc. 9 at 126-27).  This claim was presented to and denied by the Court of Criminal Appeals, which concluded it has previously upheld the instruction "that intent may be formed in the spur of the moment." *Whatley*, 146 So. 2d at 475 (internal quotation and citation omitted).

> The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S., at 364, 90 S. Ct. at 1073. This "bedrock, 'axiomatic and elementary' [constitutional] principle," *id.,* at 363, 90 S. Ct., at 1072, prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Sandstrom v. Montana, supra,* at 520-524, 99 S. Ct., at 2457-2459; *Patterson v. New York,* 432 U.S. 197, 210, 215, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *Mullaney v. Wilbur,* 421 U.S. 684, 698-701, 95 S. Ct. 1881, 1889-1890, 44 L. Ed. 2d 508 (1975); *see also Morissette v. United States,* 342 U.S. 246, 274-275, 72 S. Ct. 240, 255, 96 L. Ed 288 (1952).

---

[65]    Whatley challenges that when state law allows intoxication to negate intent, "a court's instruction cannot erect a burden that is so high to overcome and relieve the State of its constitutional obligation to prove intent beyond a reasonable doubt." (Doc. 20 at 32).

*Francis v. Franklin*, 471 U.S. 307, 313, 105 S. Ct. 1965, 1970, 85 L. Ed. 2d 344 (1985), *holding modified by Boyde v. California*, 494 U.S. 370, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

No doubt, Whatley's defense of lack of intent due to intoxication put the issue of intent squarely before the jury. *Cf.*, *Dick v. Kemp*, 833 F.2d 1448, 1451 (11th Cir. 1987) (defense of lack of intent due to involuntary intoxication put the issue of intent squarely before the jury). Where intent is an element of the case, the court's instruction is unconstitutional where it has "the effect of relieving the State of the burden of proof . . . on the critical question of [the defendant's] state of mind." *Sandstrom v. Montana*, 442 U.S. 510, 512, 521-24, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). Stated another way, where a reasonable juror would understand an instruction as creating a mandatory presumption, even if rebuttable, the instruction will likely be deemed constitutionally infirm, as it shifts the burden of proof on that issue to the defense. *Francis v. Franklin*, 471 U.S. at 325, 105 S. Ct. at 1977. "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Id.* at 314, 105 S. Ct. at 1971. The Supreme Court has provided guidance to the courts in how to evaluate such claims:

> Analysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption.

*Id.* at 315, 105 S. Ct. at 1971. Accordingly, we turn to the record, which reflects the trial court provided the following instructions regarding intent:

A person commits an intentional murder if he causes the death of another person
and in performing the act or acts which caused the death of that person he intends
- - he intended to kill that person. . . .

To convict, the State of Alabama must prove beyond a reasonable doubt each of
the following elements of intentional murder during - - committed during robbery
in the first degree: That Pete Patel is dead.  That the Defendant Donald Dwayne
Whatley caused the death of Pete Patel by strangling him and/or running over him
with an automobile.  That in committing the act or acts which caused the death of
Pete Patel the Defendant intended to kill Mr. Patel or another person.  Now a person
acts intentionally when it is his purpose to cause the death of that person.  The intent
to kill must be real and specific. . . .

A person acts knowingly with respect to conduct or to circumstances when he is
aware that his conduct is of such nature or that that circumstance exists.

A person acts intentionally with respect to a result or to conduct when it is his
purpose to cause that result or to engage in that conduct.

Intent can be formed in an instant.  It need not be preplanned or premeditated.
There's no requirement that the intent to kill be formed well in advance of
committing the crime.  The requisite intent may be performed immediately before
a crime is committed.

(Doc. 2-10 at 8, 9, 11).  As to intoxication, the trial court instructed:

Now, the Defendant has introduced evidence regarding voluntary intoxication.
Intoxication in and of itself does not constitute a mental disease or defect under the
law of Alabama.  Intoxication, whether voluntary or involuntary, is admissible in
evidence whenever it is relevant to negate an element of the offense charged.  But
intoxication is not a defense to a criminal charge.  It only goes towards the issue of
intent.  Because capital murder requires that the Defendant must have acted with
intent evidence that the Defendant may have been intoxicated - - evidence that the
Defendant may have been intoxicated may be considered by you not as a complete
or total defense to the charge, if, as a result of the intoxication the Defendant lacked
capacity either to appreciate the criminality of his conduct or to conform his
conduct to the requirements of the law.  The intoxication must be of such character
and extent as to render the Defendant incapable of consciousness that he is
committing a crime.  Intoxication must be of so excessive as to paralyze the mental
[faculties] . . . and to render the Defendant incapable of forming or entertaining the
design to take a life.  The degree of intoxication necessary to negate specific intent
and thus reduce the charge, must amount to insanity.

(Doc. 2-10 at 15-16).

Unlike the cases cited by Whatley, it cannot be said, here, that the trial court's instructions

in any way shifted the burden of proof from the prosecution to the defense nor did it create a presumption to be inferred by the jury based on the State's ability to prove certain predicate facts. Review of the trial court's instructions demonstrate that it thoroughly explained that the prosecution, at all times, had the burden of proving the necessary elements of the charged crime, including the specific intent to kill. The instruction that intent could "be formed in an instant" did not lessen that burden. Instead, the instruction quantified it, by clarifying that intent was not related to advanced planning or scheming. The jury was instructed that the State was required to present sufficient facts to prove that Whatley acted purposefully to cause the death of Mr. Patel or "to engage in the conduct" that caused the death of Mr. Patel and that the facts to prove this could have occurred immediately before the act(s) was committed. Similarly, the court's instruction regarding intoxication did not lessen the State's burden nor shift the burden to the defense. Rather, it expounded on the degree or extent of intoxication necessary to negate specific intent – that is, intoxication to the level of rendering one incapable of consciousness that he is committing a crime or incapable of forming the idea or plan to take a life – a degree which amounts to insanity. The trial court's instruction on intoxication is amply supported by Alabama law[66] and in no way relieves the State of its constitutional obligation to prove intent beyond a reasonable doubt. (Doc. 20 at 32). Indeed, the instruction emphasized that Whatley's "intoxication must have been so

---

[66]     *See Jackson v. State*, 305 So. 3d 440, 487-88 (Ala. Crim. App. 2019) (Intoxication instruction upheld where jury was instructed that for intoxication to be a defense, the defendant had to be incapable of forming a specific intent and specified the degree of intoxication necessary to negate intent "must be so great as to amount to insanity."); *Woods v. State*, 789 So. 2d 896, 934 (Ala. Crim. App. 1999), *aff'd*, 789 So. 2d 941 (Ala. 2001) ("It is the law in Alabama that before intoxication can negate intent as an element of murder it must amount to insanity."); *Wesson v. State*, 644 So. 2d 1302 (Ala. Crim. App. 1994) (Instruction on intoxication upheld where the trial court instructed the jury that the degree of intoxication must amount to insanity but the court did not define the terms "mental defect," "diminished capacity," or "insanity.")

excessive and extreme" that he was "unable to form the requisite intent." *Wesson v. State*, 644 So. 2d 1302, 1313 (Ala. Crim. App. 1994).

Reviewed as a whole, the trial court's jury instructions accurately reflect the law and do not shift the burden of proof from the prosecution to the defense. *Franklin*, 471 U.S. at 325 (emphasizing jury instructions are to be "read as a whole"); *Cupp v. Naughten*, 414 U.S. 141, 146-147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973) ("[A] single instruction to a jury may not be judge in artificial isolation, but must be viewed in the context of the overall charge."). The trial court's instructions on intent and intoxication did not have "the effect of relieving the State of the burden of proof . . . on the critical question of [the defendant's] state of mind." *Sandstrom*, 442 U.S. at 512, 521-24, 99 S. Ct. at 2453, 2458-59. According, Whatley is not entitled to habeas relief, as the state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law, nor did the decision rest upon an unreasonable factual determination. 28 U.S.C. § 2254(d)(1)-(2).

**13. The trial court improperly became an advocate by questioning witnesses and commenting on evidence in violation of clearly established United States Supreme Court precedent.**

Whatley asserts that the trial court's repeated questioning of witnesses and comments on evidence amounted to plain error and deprived him of his rights to present a defense, to due process, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. (Doc. 9 at 130). The Alabama Court of Criminal Appeals reviewed this claim for plain error and denied relief, determining, "[t]he court may interrogate witnesses, whether they were called by the court or by a party," so long as it is done in a bipartisan manner, as to not appear that the court believes the accused is guilty. *Whatley*, 146 So. 2d at 483-84. After reviewing "the record and the instructions given by the court," the Court of Criminal Appeals found "no evidence

that Whatley suffered any prejudice as a result of the circuit court's questioning of Dr. Smith and Dr. Morton" and the state court found "no plain error in the circuit court's actions." *Whatley*, 146 So. 3d at 486.

A defendant is entitled to an impartial judge, however, a trial judge is not "relegated to complete silence and inaction during the course of [a] criminal jury trial." *United States v. Wright,* 392 F.3d 1269, 1274 (11th Cir. 2004). Indeed, a "court may comment on the evidence, question witnesses, and elicit facts not yet adduced or clarify those previously presented." *United States v. Hill,* 643 F.3d 807, 845 (11th Cir. 2011). The Eleventh Circuit Court of Appeals has addressed the issue of trial courts commenting on witness testimony and questioning witnesses many times over and consistently found that a court "abuses its role only when it 'strays from neutrality,' and its remarks demonstrate 'pervasive bias and unfairness that actually prejudice a party.'" *United States v. Metz,* 572 F. App'x 709, 712 (11th Cir. 2014) (quoting *Hill,* 643 F.3d at 845-46 (11th Cir. 2011) ("The court may examine a witness regardless of who calls the witness.")); *United States v. Harris,* 720 F.2d 1259, 1260-61 (11th Cir. 1983) ("A trial judge is . . . more than a mere moderator and is under a duty to question witnesses and comment on evidence when it appears necessary."); *Manchack v. S/S Overseas Progress,* 524 F.2d 918, 919 (5th Cir. 1975) (the trial court may interrogate a witness to clarify his testimony or to insure that a case is fairly tried).[67] The Eleventh Circuit has also held that while the cumulative effect of numerous intrusions by the trial court might inhibit a defendant's right to a fair trial, prejudice could be cured by instructing the jury not to infer the court's opinion from comments or rulings. *United States v. Blackburn,* 165 F. App'x 721, 724 (11th Cir. 2006).

---

[67]     This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

During the penalty phase of the trial, the State's witness Dr. Charles Smith, a psychiatrist for the Mobile Metro Jail (who evaluated Whatley in June 2005, after an unrelated arrest) opined "that Whatley suffered from polysubstance abuse, a mood disorder, and that he had a history of bipolar disorder." *Whatley*, 146 So. 3d at 148. Whatley argues that through its questions and comments during Dr. Smith's testimony, the trial judge attempted to downplay the severity of Mr. Whatley's mental health diagnosis by comparing him to a neighbor whose disorder led to late-night gardening in dress clothes and to bipolar suffers who go on spending sprees. (Doc. 9 at 131). The undersigned disagrees.

Review of the testimony supports that the trial judge's comments to and questioning of Dr. Smith expounded on the general features of bipolar disorder, namely the manic phase, (Doc. 2-15 at 48-55), following defense counsel's cross-examination of Dr. Smith, where counsel began asking questions about the manic phase.[68] While the court was waiting on the prosecutor for redirect examination, the following exchange occurred:

> The Court:    Doctor, ... you were talking I believe in general about crimes associated with bipolar disorder I believe.
>
> [Dr. Smith]:   Yes.

---

[68]    [Defense]:    . . . I'm just asking as a general principal. If somebody is suffering from the bipolar and they're in this, say the manic phase or whatever, phase, you say they get out of touch with reality because they're psychotic. When they're in that phase are they liable to act out in some fashion and might be a crime?

[Dr. Smith]:    Yes.

[Defense]:    And people that are bipolar and have these kind of problems - - Let me back up. I'm sorry. I'm jumping ahead of myself.
Are you familiar with the term self medication?

[Dr. Smith]:    Yes.

(Doc. 2-15 at 36-37).

The Court:      I think you said incidents of crimes.

Isn't it a fact that most of those crimes are associated with the manic state and they're crimes such as writing bad checks?

[Dr. Smith]:   Yes, sir.

The Court:      Could you explain a little bit of how, in general not this case, but what maybe I'm referring to about in the manic state the crimes that people that are generally committed?

[Dr. Smith]:   Well, you think of mania or a manic stage is a stage in terms of speed or pace. A person is too fast. He has more energy than usual, needs less sleep, is very expansive in his thinking and quick to turn thought into actions and just shows very poor judgment and to avoid restraints if he possibly can and to carry out whatever strikes him as a good idea at the time. I think an interesting example of what I'm talking about is it's a good feeling with a person when he's manic. He's too fast, he can conquer the world. So you virtually never see a patient who is manic seek treatment. You don't hear from them. They don't have a problem. They don't have any insight. They feel good. Rather you hear from the family or the police or the national guard or something of that sort. They do make trouble for themselves because of that poor judgment and lack of restraint and feeling that they can conquer anything or achieve anything.

The Court:      For instance, going on a spending spree when they have no money is a typical type?

[Dr. Smith]:   Yes, sir, good example, yes.

The Court:      I actually have a neighbor—actually two neighbors in the same family and it's kind of amazing. I mean this neighbor was out, pretty sad, weeding her garden in the dark with her nice clothes on just a mile a minute."

(R. 1479–80.) Shortly thereafter, the following occurred:

[Prosecutor]: Dr. Smith, let's concentrate on what we have here today; okay. And what we have here today is we're talking about Donald Whatley; okay?

[Dr. Smith]:   Yes.

[Prosecutor]:  And you're not telling the ladies and gentlemen of this jury that Donald Whatley is crazy, are you?

[Dr. Smith]:   No.

[Prosecutor]:   And you're not telling the ladies and gentlemen of this jury that Donald Whatley suffers from a mental disease or defect that would have rendered him not guilty by reason of mental disease or defect, are you?

[Dr. Smith]:   No, I don't have any opinion on that.

[Prosecutor]:   In fact, you're not even a forensic psychologist, are you?

[Dr. Smith]:   No, and I'm not a forensic psychiatrist.

[Prosecutor]:   And so you have no idea what he suffered from in 2003 at the time that he committed this murder, do you?

> "[Defense counsel]: Your Honor, if it pleases the court leading. Telling him you don't do this or you do that.

> "The Court: Overrule. I'm going to add if anything. You don't have any idea what Mr. Whatley was suffering from the state of mental disorder, if anything, back in 2003; is that right or wrong?

[Dr. Smith]:   That's correct." (R. 1486.)

146 So. 3d at 484-85; *see also* Doc. 2-15 at 48-49, 54-55.

The trial court's posed questions and comments cannot be said to have lessened or downplayed the severity of Whatley's mental health (as argued by Whatley).  Dr. Smith's answers referred generally to symptoms of the manic phase, revealing a person "has more energy than usual, needs less sleep, is very expansive in his thinking and quick to turn thought into actions and just shows very poor judgment and to avoid restraints if he possibly can and to carry out whatever strikes him as a good idea at the time. . . . They don't have any insight. . . . They do make trouble for themselves because of that poor judgment and lack of restraint and feeling that they can conquer anything or achieve anything."  (Doc. 2-15 at 48-49). The court's questions and comments cannot be viewed as biased.  Furthermore, the testimony elicited from Dr. Smith allowed the jury to connect Whatley's behavior to the characteristics of bipolar disorder described by Dr. Smith and

conclude that Whatley suffered from bipolar disorder.  (*See* Doc. 2-15 at 50-57).  In total, the questioning of Dr. Smith by the trial court was neutral and did not advocate against Whatley.

Likewise, the trial judge's questioning of Dr. Morton did not lessen the defense's attempt to present mitigating evidence that Whatley suffered from bipolar disorder.  The record reflects that Dr. Moton was questioned by the defense as to Whatley's drug use and its origin, where the following exchange occurred:

> [Defense]:      And then, now this is where Donald's behavior and how that led to the drug use?
>
> [Dr. Morton]:  I think from a psychopharmacology point of view I have to look at these and I have to look at them and say he just never got his disorder treated or treated adequately.  He was treated with medicines that didn't work and made his disorder worse.
>
> [Defense]:      So when you say it wasn't treated adequately, it was he was continuously treated for antidepression when he was actually bipolar?
>
> [Dr. Morton]:  Yes.  They were treating his one pole, the depressive pole, but they weren't treating the other pole of agitation and irritability which is hard to do sometimes.
>
> [Defense]:      I think you set out earlier, that actually makes things worse.  He would have been better off not being treated at all?
>
> [Dr. Morton]:  Yes.
>
> The Court:      Doctor, quick question.  Wasn't it widely believed in the psychiatric community, especially back before nineties, that children and let's define that as maybe less than eighteen, could not get or suffer from bipolar disease?
>
> [Dr. Morton]:  I think it was thought that but - -
>
> The Court:      I understand that's not the thinking now but - -
>
> [Dr. Morton]:  I've seen bipolar kids at age five and I saw them back in the seventies.  So it's a matter of realizing that it's more likely that it's a disorder of young adulthood.  But you can get it as a teenager.  Sometimes it's thought that attention deficit disorder may really be bipolar symptoms.
>
> The Court:      It wasn't generally in the medical community though?

[Dr. Morton]: It was.  It was.  Early it wasn't thought that you could get bipolar until you were much older.

The Court:      So the decision back the[n] to treat him for, let's say, depression wasn't that out of the ordinary perhaps?

[Dr. Morton]: Probably - - It depends. If you don't have a chance to look at someone's whole history and someone comes in that is severely depressed, yeah, you're going to treat them for depression almost always.  He was at a[n] age then, I think he would have probably been at a time he could have been eligible for having bipolar disorder.

The Court:      I'm sorry, Lee.  Go ahead.

[Defense]:      Go ahead, Doctor.

[Dr. Morton]: Well, just self medication.  It's not unusual for people with psychiatric disorders to find substances that make them feel better quicker.  But it's hard for them to say, gosh, this does put me into the hospital more frequently.  I've got to quit using marijuana.  Or cocaine makes me more paranoid and psychotic. I'm just going to never use it again.

(Doc. 2-16 at 80-82).  There is no basis for Whatley's assertion that the trial court's questioning of Dr. Morton suggested that "Whatley could have been healed by anti-depressants." (Doc. 9 at 131).  Indeed, Dr. Morton testified that it was the use of antidepressants as the sole treatment which made things worse for Whatley.  Furthermore, the responses from the trial judge's questioning, again, lean in Whatley's favor, demonstrating why Whatley turned to drugs and how he became addicted to drugs, which was foundational to defense's trial strategy.

As to the trial judge's questioning of Dr. Enstice, the State's medical examiner, regarding Mr. Patel's injuries, Whatley has failed to show that it was unconstitutional and aided the prosecution and elicited information that was relied on by the State to argue that the committed murder was especially heinous, atrocious, and cruel.  (Doc. 9 at 131).  The record reflects that at the close of direct examination (and after defense passed the witness with no cross-examination), the Court asked the following questions to Dr. Enstice:

- Whether the strangulation of Mr. Patel caused his death? (2-5 at 273-74)
- Whether the strangulation of Mr. Patel rendered him unconscious? (*Id*. at 274)
- Whether there were drugs or alcohol in Mr. Patel's system at the time of his death? (*Id*.at 274).
- Whether the drugs or alcohol would have altered Mr. Patel's senses as to make him unaware of what was happening to him, in particular that he was being strangled? (*Id*. at 274).

The prosecution interjected in response to Dr. Enstice's opinion that the strangulation would have rendered Mr. Patel unconscious, with the following exchange occurred:

[State]:        The Defendant has made a statement that the victim, after that woke up or moaned. Is that possible, Dr. Enstice, as with the strangulation?

[Dr. Enstice]: Yes, one can regain consciousness in a number of seconds and studies were actually done where - - in the 40s where men volunteered believe it or not, to have all of their airway and blood flow cut off for periods of time. Average rate of unconscious was six to ten seconds, they were unconscious for twenty to forty seconds and then regained consciousness. I don't think we'd [do] that in this day in age but in 1943 this was a very big study.

The Court:            Were those - - part of that conscientious objective group in the war? You know they did a starvation experiment on the conscientious - - people - -

[Dr. Enstice]: That I'm sorry I don't know.

The Court:      I bet i[t] was. We're on the same line. What makes a person become unconscious when they're being strangled?

[Dr. Enstice]: The lack of blood flow up to the brain. . . .

The Court:            Do you have an opinion about whether the blood flow to Mr. Patel's brain was restored after the strangulation?

[Dr. Enstice]: Mr. Patel, in my opinion yes, I show signs that - - he was certainly alive. Blood was still flowing. Did he regain consciousness? That - - I cannot say he did not. He may well have.

The Court:            Can't say one way or another?

[Dr. Enstice]: You're correct.

The Court:            You have to have other evidence of that?

[Dr. Enstice]:  Yes.

The Court:          Anything else for the Doctor?

(*Id*. at 276-78).  These questions can only be seen as clarifying questions, within the trial court's discretion, totally lacking bias or advocacy.  Furthermore, the record belies Whatley's claim that these questions posed by the trial judge "elicited" information relied on by the prosecution to argue the aggravating circumstances that the murder was heinous, atrocious, and cruel.  Indeed, the jury had already heard testimony from Dr. Enstice during direct examination that a pair of pants had been tied around the victim's neck and used to strangle him (*id*. at 231-32); that the victim suffered blunt trauma to the face (*id*. at 239), skull contusions (*id*. at 241-42), two brain hemorrhages (*id*. at 242), brain swelling, indicating he was alive when struck in the head (*id*. at 243), scratch marks and bruising on his neck, as well as fracturing of the victim's hyoid bone, indicating both manual strangulation and strangulation by an object (*id*. at 243-46), broken cervical and thoracic vertebra (*id*. at 251, 263) a sternal fracture (*id*. at 263), right shoulder fracture (*id*. at 263), the fracturing of four right ribs and eight left ribs (*id*. at 264), lacerated lungs and pulmonary contusions of the lungs and heart (*id*.).  The jury also heard Dr. Enstice opine during the State's direct examination that the scratch marks around Mr. Patel's neck were caused from Mr. Patel "trying to remove the ligature [(pants)] from around his neck." (*Id*. at 247-48).  They had further viewed photographs of the victim's face, with bruising and swelling present and the ligature (pants leg) around his neck, as well as scratch marks on his neck and face.  (*Id*. at 253-55; *see also id*. at 237-38).  Additionally, the jury heard Dr. Enstice's testimony that she believed that the victim was alive at the time the blunt force trauma occurred and when he was run over by the car.  (*Id*. at 266-267).

Review of the record reflects that the trial court's interjections served to clarify issues or concepts previously presented to the jury and remained neutral.  *Cf*., *United States v. Harriston*,

329 F.3d 779, 790 (11th Cir. 2003) (finding defendant is "denied constitutionally fair trial" when "judge's conduct strays from neutrality").  The questions propounded by the court were not accusatory or cross-examination type questions nor did were they made in a manner which indicated the judge's bias or opinion.  Instead, the remarks were straightforward and clarifying questions as to mental illness and forensic evidence – areas beyond a layperson's common knowledge.  Moreover, as prescribed in *Blackburn*, the trial court orally charged the jury not to consider anything the court said as an opinion on the evidence, stating:

> I have no opinion regarding the facts of the case. It would be improper for me to have an opinion regarding the facts of the case. Do not let any ruling I have made nor anything I may have said give you an impression that I think one way or another regarding the facts of the case. Your duty is to determine the facts, take the testimony of the witnesses together with all the proper and reasonable inferences therefrom, apply your common sense, and in an impartial and honest way determine what you believe the truth to be.

(Doc. 2-10 at 31-32).  The court further instructed the jury that they were the sole fact-finders in this case.  Thus, the undersigned agrees with the Alabama Court of Criminal Appeals that there is "no evidence that Whatley suffered any prejudice as a result of the circuit court's questioning", *Whatley*, 146 So. 3d at 186; *see also United States v. Hesser*, 800 F.3d 1310, 1330 (11th Cir. 2015) (reasoning that "the few errors we have identified did not impact the jury's verdicts").

Furthermore, Whatley has not shown that the trial judge's comment during the penalty phase jury instructions "improperly signaled to the jury that, in fact, the mitigating circumstances are unlikely to outweigh several aggravating circumstances, undermining the case for life without parole."  (Doc. 9 at 132).  Review of the record demonstrates that the trial judge repeatedly reminded to the jury that the responsibility to weigh the presented aggravating and mitigating circumstances and determine a recommended sentence lied with them, instructing:

> Now the process of weighing aggravating and mitigating circumstances is not mechanical or a mathematical one.  If it was, we would just get a computer to do

this.  We got you all.  Your weighing of the circumstances against one another should not consist merely of adding up the number of aggravating circumstances and comparing that number to the total number of mitigating circumstances. . . .  Once again, it's not a process of adding them up.  I will say that again.  The law of our State recognizes that it is possible, at least in some situations, that one or a few number of aggravating circumstances might outweigh a large number of mitigating circumstances.  The law also recognizes that it is possible, at least in some situations, that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances.  I'll go through that one again too.  The law recognizes that it is possible, at least in some situations, that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances.  See that doesn't seem logical but it is the law.  In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in this case.  And you, the jury, are to decide what weight or value to be given to the particular circumstance in determining the sentence in light of all the circumstances in the case.

(Doc. 2-19 at 15-17).  When viewed in context, it is clear that the trial judge's comment, "that doesn't seem logical," served to emphasize and explain the obligation of the jury to independently decide the weight or value to be given to a particular circumstance or fact in determining the sentence in light of the totality of the case.  It cannot be said that a reasonable juror would have understood the trial judge's comment to imply that "the mitigating circumstances are unlikely to outweigh several aggravating circumstances," and Whatley has failed to show that the trial court's comments demonstrated bias, much less bias to the degree to impact the jury's verdict. *United States v. Truss*, 723 F. App'x 660, 663-64 (11th Cir. 2018) ("The interjections cited by Truss did not demonstrate bias, much less bias so egregious that it impacted the verdict. The court's questions and statements were therefore not error warranting reversal.").

Accordingly, Whatley has failed to show that the state courts resolved this claim in a manner contrary to, or involving an unreasonable application of, federal law as established by United States Supreme Court precedent. Whatley has offered no factually similar United States Supreme law to support his claim and neither has Whatley shown that the state court's decision

rested upon an unreasonable determination of the facts presented.  Thus, Whatley is not entitled to habeas relief on the basis of this claim.

14. **The introduction of testimony that Whatley's DNA was in a database containing convicted offenders and suspects violated clearly established United States Supreme Court precedent.**

During the guilt phase of Whatley's capital trial, the State admitted into evidence a cigarette butt that was found at the scene near Mr. Patel's foot.  (Vol. 9 at R. 1011-12; Vol. 10 at 1206, 1214).  The cigarette was submitted to the Alabama Department of Forensic Sciences (ADFS) and the DNA profile obtained was placed in the CODIS database. (Vol. 10 at 1205-06, 1213-14). (Doc. 2-5 at 306-09).  The analyst, Mr. Faron Brewer, that conducted the testing at ADFS explained the workings of the CODIS database to the jury, stating:

> The DNA data base is called the CODIS.  That stands for combined DNA index system.  It's a data base that's run by the FBI and it contains DNA profiles from forensic unknowns which are DNA profiles from crime scenes or associated with crimes that are unsolved.  It contains DNA profiles from victims and suspects in crimes and also missing persons, relatives of missing persons and convicted offenders.
> . . .
>
> [A]t regular periodic intervals searches are performed with computers to compare all of the different profiles in there with each other.  So it's possible to link samples from suspect crimes with convicted offenders, suspects, that sort of thing and generate investigative leads.

(Doc. 2-5 at 307-08).  A CODIS search ultimately revealed that the DNA profile from the cigarette matched Whatley's DNA profile in the database.  (Doc. 2-5 at 306-09; Vol. 10 at 1213-16).

Whatley claims that this testimony, indicating his DNA was contained a database for "convicted offenders," violated his rights to be presumed innocent, to due process, a fair trial, and a reliable sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution, as it would have left the jury "with the firm impression that Mr. Whatley was a convicted offender

or suspect." (Doc. 9 at 132-33). The Alabama Court of Criminal Appeals previously reviewed

and denied Whatley's claim, reasoning:

> Alabama has not had occasion specifically to consider whether the mere testimony that a defendant's DNA was matched to evidence using CODIS implies that the defendant has a prior conviction and is therefore inadmissible. However, we have held: "The mere existence of recorded fingerprints does not *per se* imply the existence of a criminal record." *Brown v. State,* 369 So. 2d 881, 884 (Ala.Crim.App.1979).

>> The Missouri Court of Appeals, in affirming a ruling on the admission of evidence that the defendant's DNA was matched using a statewide database, stated:
>> . In cases where a 'hit' or match is made, the State needs to be able to explain how a particular individual became a suspect, especially where, as here, a considerable period of time has passed since the offense. In both cases, a possibility exists that the public may assume that this identifying information is collected primarily or exclusively from persons arrested for, and/or convicted of, crimes.

>> "... [T]he mere fact that McMilian's DNA profile was present in a statewide database did not constitute an improper reference to other, uncharged crimes."

> *Missouri v. McMilian,* 295 S.W.3d 537, 540 (Mo. Ct. App. 2009). *See also People v. Harland,* 251 P.3d 515, 518 (Colo. Ct. App. 2010) ("We therefore reject defendant's assertion that [police officer's] testimony mentioning the DNA databases necessarily led the jury to speculate that defendant had prior criminal convictions. Under the circumstances here, any inference of such prejudice is itself speculative."); *People v. Jackson,* 232 Ill.2d 246, 272, 903 N.E.2d 388, 402, 328 Ill.Dec. 1, 15 (2009) ("[W]e are unwilling to assume, as defendant does, that the jury had any preconceived notions of the types of persons from whom DNA had been collected and stored for [law enforcement] to reference through the 'codus [sic] ... [or] data base administrator' in Springfield."); *Atteberry v. State,* 911 N.E.2d 601, 609 (Ind.Ct.App.2009) ("Atteberry argues ... the jury could have inferred that, because Atteberry's DNA profile was in the database, he had been convicted in the past. This is nothing more than speculation. Moreover, evidence which creates a mere inference of prior bad conduct does not fall within the purview of Evidence Rule 404(b)."); *Deals v. Berghuis,* (No. 1:08–cv–1000, June 16, 2011) (W.D.Mich.2011) (unpublished order) ("The only unfairly prejudicial effect of the DNA evidence asserted by petitioner is that these witnesses mentioned that the DNA found at the scene was matched with petitioner's using the CODIS database. Petitioner asserts that this 'as good as tells the jury that [petitioner] has a prior record....' The Court of Appeals correctly noted that this argument is based on

speculation and assumption concerning inferences that the jury might have made."); *People v. Meekins,* 34 A.D.3d 843, 828 N.Y.S.2d 83 (2006) (affirming admission of evidence concerning match on DNA database).

We agree with the states that have considered this issue, and we hold that testimony of the mere existence of a defendant's DNA profile in the CODIS database does not "per se" imply the existence of a criminal history. Here, Brewer indicated that there were several reasons why a person's DNA would be in CODIS. Accordingly, we find no plain error in the admittance of Brewer's testimony.

*Whatley*, 146 So. 3d at 464–66.

Whatley appears to argue that the Court of Criminal Appeals' holding was contrary to or an unreasonable application of *Spencer v. Texas*, 385 U.S. 554, 564, 87 S. Ct. 648, 653, 17 L. Ed. 2d 606 (1967) and *Old Chief v. United States*, 519 U.S. 172, 180-81, 117 S. Ct. 644, 650, 136 L. Ed. 2d 574 (1997), because the trial court admitted testimony that his "DNA was contained in a database with 'convicted offenders.'" (Doc. 9 at 133). While these decisions generally recognize the potential risk of prejudice that could result when a defendant's prior conviction is presented to the jury, *Old Chief*, 519 U.S. at 185, 117 S. Ct. at 652; *Spencer*, 385 U.S. at 560, 87 S. Ct. at 651-52, they are factually distinct and do not support his conclusion that his jury verdict was tainted by an improper consideration of a past conviction as to render his trial fundamentally unfair. In *Old Chief*, the Supreme held that "when the purpose of the evidence is solely to prove the element of prior conviction", the prosecutor cannot, when the defendant is willing to stipulate to such prior conviction, present evidence to the jury regarding the name or nature of a prior conviction because such evidence "raises the risk of a verdict tainted by improper considerations[.]" 519 U.S. at 174, 117 S. Ct. at 647. In upholding Texas' recidivist procedure, in *Spencer v. State of Texas,* which permitted the prosecutor to introduce evidence of the defendant's prior convictions before determination of guilt, the Supreme Court found no due process violation, determining the state's purpose in introducing the prior conviction evidence outweighed the prejudice to the defendant.

385 U.S. at 564 87 S. Ct. at 654.  As it pertains to this case, precedent thus has made clear that due process is concerned with "unfair prejudice" that prior offenses may interject in a jury's verdict. *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 218-19, 93 L. Ed. 168 (1948) ("The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.").

Here, the State made no mention of how Whatley's DNA became catalogued in the CODIS database.  Specifically, there was no evidence to the jury regarding the name or nature of a prior committed crime, arrest, or conviction.  *See Scales v. State*, 310 Ga. App. 48, 51-53, 712 S.E.2d 555, 561–62 (2011) (holding "that evidence of a matching DNA profile in a government database does not, in and of itself, constitute impermissible character evidence when no reference is made as to why the matching sample was collected or stored and when no reference is made linking the defendant's DNA profile to other criminal activity. Other states have reached similar conclusions."); *Church v. Denney*, Civ. Act. No. 4:12-CV-1374 CEJ, 2014 WL 1910282, at *6, 2014 U.S. Dist. LEXIS 65476, at *16 (E.D. Mo. May 13, 2014) (finding the average layperson is unfamiliar with CODIS and would not independently draw the conclusion that a CODIS hit was indicative of prior crimes and further finding the limited testimony regarding CODIS did not compromise the fairness of petitioner's trial and did not rise to the level of a due process violation). Furthermore, the testimony regarding the CODIS database was necessary to explain to the jury the gaps in time between the dates of the murder, when Whatley was questioned by investigators, and when Whatley was arrested.  Without such testimony, the jury would have no understanding of how Whatley became a named suspect/person of interest in the murder for which he was on trial. *See Scales,* 712 S.E.2d at 561-62 (Evidence of Scales' matching DNA profile was introduced for

the limited, relevant purpose of explaining "why this fourteen year old case is now being prosecuted and how the investigation came to focus on the Defendant."). Accordingly, the record supports that the evidence was not introduced for the purpose of proving a prior conviction, and there is no evidence that the testimony tainted the verdict in Whatley's case. *See United States v. Williams*, Civ. Act. No. 3:13-CR-00764-WHO-1, 2017 WL 4310712, at *15, 2017 U.S. Dist. LEXIS 160102, at *42-43 (N.D. Cal. Sept. 28, 2017) (The cross-reference with the CODIS database was a critical step in the analysis of the case and removing it may leave a gap in the jury's understanding. While noting the defendant's presence in the database may be prejudicial, it was not unfairly so.); *Falgout v. Vannoy*, Civ. Act. No. 20-07, 2021 WL 6498839, at *17, 2021 U.S. Dist. LEXIS 250573 (E.D. La. Sept. 30, 2021), *report and recommendation adopted,* No. CV 20-07, 2022 WL 137053, 2022 U.S. Dist. LEXIS 7413 (E.D. La. Jan. 14, 2022) (Habeas relief denied where nothing, apart from Falgout's unsupported allegations, suggested that even if wrongfully admitted, contrary to the state courts' explicit findings otherwise, the statements made by the victim in the 1988 rape case played a critical or highly significant role in the jury's guilty verdict and rendered his trial fundamentally unfair.).

Federal habeas relief based on an evidentiary ruling will only be granted if the ruling affects the fundamental fairness of the trial, *see Baxter v. Thomas,* 45 F.3d 1501, 1509 (11th Cir. 1995), for instance, if the evidence was a "crucial, critical, highly significant factor" in obtaining the conviction. *Williams v. Kemp,* 846 F.2d 1276, 1281 (11th Cir. 1988) (quotation omitted). On collateral review, a federal constitutional error is harmless unless there is "actual prejudice," meaning that the error had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946). The State

merely offered the testimony of Mr. Brewer to explain how Whatley became a suspect approximately two years after the murder.  There is nothing to suggest that the State relied in any way on a prior arrest or conviction in any questioning or in its closing arguments to the jury. Moreover, the State's evidence of guilt was overwhelming, including a confession from Whatley. In light of all the evidence presented at trial as a whole and accepting as correct the unrebutted factual findings of the Alabama Court of Criminal Appeals, this Court concludes any erroneous admission at trial that Whatley's DNA was contained in a database with "convicted offenders" did not substantially influence the jury's verdict—that is, it was harmless error under *Brecht*—and, therefore, Petitioner is not entitled to federal habeas corpus relief. *See Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998) (declining to review state court's denial of a mistrial based on a witness's reference to the petitioner's "mug shots" because the admission did not render the trial fundamentally unfair); *Tejada v. Dugger*, 941 F.2d 1551, 1561 (11th Cir. 1991) (refusing to review admission of evidence of the defendant's prior bad acts because, in light of substantial evidence of his guilt, the evidence was not material to conviction and thus did not deprive him of a fundamentally fair trial). For federal habeas relief, an evidentiary ruling must have affected the fundamental fairness of a trial. *Sims,* 155 F.3d at 1312.

For these reasons, the Court is unpersuaded by Whatley's argument that the state court's determination was contrary to, or involved an unreasonable application of, clearly established federal law.

## V.    REQUEST FOR EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing.  *See* Doc. 1 at 129 ¶ 277(c).  To the extent Petitioner's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of his direct appeal or Rule 32 proceeding, Whatley is not entitled to a federal

evidentiary hearing to develop new evidence attaching the state appellate or state habeas court's resolution of those claims.  Under the AEDPA, the state court is the proper place for development of the facts.

> AEDPA also restricts the ability of a federal habeas court to develop and consider new evidence. Review of factual determinations under §2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." And in *Cullen v. Pinholster*, 563 U. S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), we explained that review of legal claims under §2254(d)(1) is also "limited to the record that was before the state court." *Id.*, at 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557. This ensures that the "state trial on the merits" is the "main event, so to speak, rather than a tryout on the road for what will later be the determinative federal habeas hearing." *Wainwright v. Sykes*, 433 U. S. 72, 90, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (internal quotation marks omitted).

*Shoop v. Twyford*, ___ U.S. ___,142 S. Ct. 2037, 2043-44, 213 L. Ed. 2d 318 (2022).  There are only two exceptions to the general rule: "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by this Court, or it must rely on 'a factual predicate that could not have been previously discovered through the exercise of due diligence."  *Id.* at 2044 (quoting §2254(e)(2)(A)).  "And even if a prisoner can satisfy one of those two exceptions, he must also show that the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." *Id.* (quoting 28 U.S.C § 2254(e)(2)(B)).

Thus, petitioner is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's Rule 32 proceeding.  Nor does Whatley establish one of the two exceptions.  "Moreover, a petitioner seeking an evidentiary hearing must make a 'proffer to the district court of any evidence that he would seek to introduce at a hearing.'" *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1319 (11th Cir. 2016).  "A §2254 petitioner is not entitled to an evidentiary hearing if he fails to 'proffer evidence that, if true, would entitle him to relief.'" *Hamilton v. Sec'y, Fla. Dep't of Corr.*, 793

F.3d 1261, 1266 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1661 (2016).  Because Petitioner failed to make a valid proffer of new evidence in support of his claims, he is not entitled to an evidentiary hearing to develop that evidence in this court.

## VI.    CERTIFICATE OF APPEALABILITY

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under 28 U.S.C. § 2254, the petitioner must obtain a Certificate of Appealability ("COA").[69] *Miller-El v. Johnson*, 537 U. S. 322, 335-36 (2003); 28 U.S.C. §2253(c)(2).  A COA is granted or denied on an issue-by-issue basis.  *Jones v. Sec'y, Fla. Dep't of Corr.*, 607 F.3d 1346, 1354 (11th Cir. 2010) (no court may issue a COA unless the applicant has made a substantial showing of the denial of a constitutional right and the COA itself "shall indicate which specific issue or issues satisfy" that standard), *cert. denied*, 562 U. S. 1012 (2010); 28 U.S.C. §2253(c)(3).

A COA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.  *Tennard v. Dretke*, 542 U. S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U. S. at 336; *Slack v. McDaniel*, 529 U. S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U. S. 880, 893 (1983).  To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further.  *Tennard v. Dretke*, 542 U. S. at 282; *Miller-El v. Johnson*, 537 U. S. at 336.

The showing necessary to obtain a COA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.  "[W]here a district court has rejected the

---

[69] This court is required to issue or deny a COA when it enters a final Order that is adverse to a federal habeas petitioner.  *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U. S. at 338 (quoting *Slack v. McDaniel*, 529 U. S. at 484). In a case in which the petitioner wishes to challenge on appeal this court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, untimely filing, or lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U. S. at 484 (when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a COA may issue only when the petitioner shows that reasonable jurists would find it debatable whether the claim is a valid assertion of the denial of a constitutional right and whether the district court's procedural ruling was correct).

In the present action, the Court concludes that reasonable minds could not disagree with this court's conclusions that (1) during the course of Whatley's Rule 32 proceeding, the state courts reasonably rejected on the merits all of the ineffective assistance complaints about the performance of his trial counsel and state appellate counsel; (2) during the course of his direct appeal and Rule 32 proceeding, the state courts reasonably rejected on the merits Whatley's complaints about alleged *Batson* violations, the allegedly erroneous trial court evidentiary rulings, the trial court's failure to instruct on lesser-included offenses, the constitutionality of the Alabama capital sentencing scheme, alleged errors in the trial court's punishment phase jury instructions, the trial court's allegedly erroneous weighing of aggravating and mitigating circumstances, and (3) Whatley is not entitled to an evidentiary hearing in this court. For these reasons, Whatley is not entitled to a COA on any of his claims for federal habeas corpus relief.

## VII.   CONCLUSION

Based on the foregoing, the Court concludes that Whatley's petition for habeas corpus relief is **DENIED** as is a certificate of appealability.  Final judgment will issue separately pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this the 31st day of August, 2022.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE